IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

UNITED STATES OF AMERICA     : CRIMINAL NO. 09-733-ALL
                             :
                             :
                             :
                             :
                             :
                             :
            v                :
                             :
                             :
                             :
                             :
                             :
                             :
                             :
JONATHAN COBB, DAVID COBB,   :
and DARREN MACKLIN,          : Philadelphia, Pennsylvania
                             : June 8, 2010
            Defendants       : 2:13 p.m.

- - -

TRANSCRIPT OF SUPPRESSION HEARING
BEFORE THE HONORABLE EDUARDO C. ROBRENO
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Government:     NEUMAN LEVERETT, III, ESQUIRE
                        KAREN S. MARSTON, ESQUIRE
                        Assistant United States Attorneys
                        United States Attorney's Office
                        615 Chestnut Street
                        Suite 1250
                        Philadelphia, PA  19106


For Defendant          WILLIAM R. CANNON, ESQUIRE
Jonathan Cobb:         William T. Cannon, P.C.
                       100 South Broad Street
                       Suite 1910
                       Philadelphia, PA  19110


*Transcribers Limited*
17 Rickland Drive
Sewell, NJ 08080
856-589-6100 · 856-589-9005

2

APPEARANCES:              (Continued)

For Defendant            ROLAND B. JARVIS, ESQUIRE
David Cobb:              RONALD BLAIR JARVIS PC
                         230 South Broad Street
                         Suite 700
                         Philadelphia, PA   19102


For Defendant            MARGARET M. GRASSO, ESQUIRE
Darren Macklin:          Law Office of
                         Margaret M. Grasso
                         230 South Broad Street
                         Suite 503
                         Philadelphia, PA   19102

                              - - -

Audio Operator:          Joseph Matkowski

Transcribed By:          Donna M. Anders

                              - - -

        Proceedings recorded by electronic sound
recording, transcript produced by computer-aided
transcription service.

                              - - -

3

1          (The following was heard in open court at

2    2:13 p.m.)

3          THE COURT:  Good afternoon.

4          ALL:  Good afternoon, Your Honor.

5          THE COURT:  Please be seated.  Okay.  We are

6    ready to proceed on a number of pretrial motions.  We

7    are going to start with the motion to suppress, but let

8    me just ask the status of some of the others so that we

9    know what may still be on the agenda for today.

10          First we have the motion to suppress the

11   physical evidence, Mr. Cobbs' motion, right?

12          MR. JARVIS:  Yes, David Cobb, Your Honor,

13   that's correct.

14          THE COURT:  Okay.  I think next is the motion

15   to admit the tape recordings.  Does anyone have any

16   objections to the government's motion?

17          MR. CANNON:  Well, Your Honor, on behalf of

18   Jonathan Cobb, outstanding still is my motion to bar

19   the introduction of the wiretap evidence, so that kind

20   of goes hand in hand with --

21          THE COURT:  Okay.  Very well.  Subject to

22   that --

23          MR. CANNON:  Yes.

24          THE COURT:  -- but in terms of Starks issues,

25   you don't have any issues?

4

1        MR. CANNON:  I do not.

2        THE COURT:  Okay.  You object to the entire

3   matter on other grounds.

4        MR. CANNON:  That's exactly correct, Your

5   Honor.

6        THE COURT:  Very well.  Thank you.  Yes, we

7   have your motion to bar introduction of the wiretap.

8   Would that be evidentiary or is that a matter of legal

9   argument?

10        MR. CANNON:  It's a matter of legal argument.

11   I cited in my memorandum to the Court the fact that the

12   Third Circuit has not favored evidentiary hearings on

13   this.

14        It's kind of like the Court reviewing the

15   search warrants, four corners of the affidavit to see

16   if, indeed, the affidavit makes out probable cause.

17        THE COURT:  Right.

18        MR. CANNON:  And in this case, this Court

19   would be reviewing the decision of Judge Sanchez to

20   approve the wiretap and deciding if the government had,

21   in fact, in its affidavit established the necessity

22   requirement that the statute requires --

23        THE COURT:  Right.

24        MR. CANNON:  -- in order for the Court to

25   approve a wiretap.

5

1          THE COURT:  Yes.

2          MR. CANNON:  So, all of those arguments have

3    been briefed for the Court.

4          THE COURT:  Very good.  Then the government's

5    pretrial motions.  Those have largely not been

6    answered, so I don't know if there is any opposition.

7    A number of them have to do with cross-examination of

8    the defendant if the defendant takes the stand, so they

9    may not actually be right at this point.

10          So, why don't we lay those aside for now and

11    let's go on.  Did you want to say anything here, Mr.

12    Jarvis?

13          MR. JARVIS:  Your Honor, I just wanted to be

14    clear because I think some of those government motions

15    were asking permission to use that evidence

16    affirmatively in their case in chief.  I didn't get a

17    chance to file a reply to those motions.

18          THE COURT:  Are you planning to use them in

19    the case in chief or cross-examination?

20          MS. MARSTON:  The 404(b) motion, Your Honor,

21    would be obviously for us to use in our case in chief,

22    and the motion to admit the proffer statement, that you

23    are right, would be for cross-examination purposes, but

24    it also goes to the questioning that the defense

25    attorneys can do to certain witnesses as well based on

6

the proffer statements already made by the defendants.

THE COURT:  Okay.  That would be oral arguments on those, right?

MS. MARSTON:  Correct, Your Honor.

MR. JARVIS:  Very well, Your Honor.

THE COURT:  So, why don't we proceed then with the motion to suppress.  Ms. Marston, please.

MS. MARSTON:  Your Honor, at this time we would call Agent Luke Church.

LUKE CHURCH, Government's Witness, Sworn.

COURTROOM DEPUTY:  Please state your full name.

THE WITNESS:  Luke Church, C-H-U-R-C-H.

DIRECT EXAMINATION

BY MS. MARSTON:

Q    Sir, what do you for a living?

A    I'm an FBI agent.

Q    And how long have you been an FBI agent?

A    Nineteen years.

Q    And can you tell us what some of your duties and responsibilities are?

A    I'm assigned to investigations involving narcotics trafficking.

Q    I want to specifically address your attention to an investigation involving a Jonathan Cobb, a David Cobb,

Agent Church - Direct                    7

1   and a Darren Macklin.  Were you involved in the

2   investigation of those three individuals?

3   A   Yes, I was.

4   Q   And do you see those three individuals in the

5   courtroom today?

6   A   Yes, I do.

7   Q   Can you please tell us where each individual is

8   sitting and what they are wearing, or where they are

9   sitting as next to a defense attorney, I suppose?

10  A   Jonathan Cobb is sitting next to Mr. Cannon; Darren

11  Macklin is sitting next to Ms. Grasso; and David Cobb

12  is sitting next to Mr. Jarvis.

13          MS. MARSTON:  Your Honor, may the record

14  reflect that Agent Church has identified the three

15  defendants.

16          THE COURT:  Okay.  So noted.

17  BY MS. MARSTON:

18  Q   Now, sir, when did that investigation begin?

19  A   December 2008.

20  Q   And between December 2008 and the summer of 2009,

21  hat investigative techniques did you use?

22  A   We used physical surveillance, we used informant

23  information, we used Pen Registers, track and trace.

24  That was primarily it.

25  Q   Now, the Pen Register information, was that on more

Agent Church - Direct                    8

1   than one telephone?

2   A    Yes, it was.

3   Q    And how did you go about getting the telephone

4   numbers, and why was there more than one telephone?

5   A    How did we go about getting the telephone numbers?

6   The telephone numbers were given to us by various

7   informants.  We went about getting the subscriber

8   information by subpoenaing the subscriber from the

9   telephone company.

10  Q    And did that subscriber information come back to

11  anybody in particular?

12  A    They came back to various names.  As most as I

13  could determine, they were false names.

14  Q    And based on that information on the Pen register,

15  were you also using individuals to make controlled

16  purchases using those telephone numbers?

17  A    Yes.

18  Q    And were you able to hear the voice that your

19  cooperator was using to make those controlled

20  purchases?

21  A    Yes, I was.

22  Q    And were you able to identify who that voice was?

23  A    Yes.

24  Q    And who was that?

25        MR. JARVIS:  Objection, Your Honor.

Agent Church - Direct                    9

1          THE COURT:  Basis?

2          MR. JARVIS:  I have no problem with the

3    approach, but if we're talking about controlled

4    purchases or transactions, were talking individuals,

5    informants, et cetera, the record is not going to be

6    clear.

7          I'm not going to be clear when I try to

8    cross-examine if there is a transaction that informed a

9    different informant on a different date, that would be

10   helpful.  I'm not sure how many transactions --

11         THE COURT:  Well, foundation, is what you are

12   talking about, to be able to identify --

13         MR. JARVIS:  Well, it's kind of foundational,

14   yes, Your Honor.

15         THE COURT:  -- on or about what date, the

16   circumstances.

17         MS. MARSTON:  Well, let me go back, Your

18   Honor.

19   BY MS. MARSTON:

20   Q   The telephone numbers, how many different telephone

21   numbers did you obtain during the course of this

22   investigation for defendant, Jonathan Cobb?

23   A   Four.

24   Q   And were you able to listen to Jonathan Cobb's

25   voice one each of those four different numbers?

Agent Church - Direct                    10

1   A    I believe on each of the four.

2   Q    And how did you go -- were the four numbers at the

3   same time?

4   A    No, the four numbers were each at different times.

5   Q    And how did you learn about the different numbers

6   each time?

7   A    Through an informant.

8   Q    And based on your training and experience being an

9   FBI agent working drug investigations for eighteen

10  years, what did you determine was the reason why you

11  had four different numbers during that period of time?

12  A    Mr. Cobb --

13           MR. CANNON:  Objection, it calls for

14  speculation.

15           THE COURT:  Overruled.

16           THE WITNESS:  Mr. Cobb would continually drop

17  his telephone, meaning he would discontinue use of it,

18  he would cut it off.  He would stop and that phone

19  would no longer be in use.

20           My training and experience is that drug

21  dealers commonly do this, they commonly change phones

22  every couple months, sometimes more often.

23  BY MS. MARSTON:

24  Q    Now, in this particular case you eventually in the

25  summer of 2009 sought authorization for something than

Agent Church - Direct                          11

1    a Pen register, is that correct?

2    A    Yes.

3    Q    What did you seek authorization for?

4            MR. JARVIS:  Your Honor, I'm going to object,

5    Your Honor.  I asked that you grant the request for

6    more of a foundation.

7            This agent has not identified one telephone

8    number at all, yet he's saying that Mr. Cobb, Jonathan

9    Cobb, dropped telephones at any given time when he

10   decided that it was necessary.

11           No foundation has been laid for this, Your

12   Honor.  Just give us some phone numbers at least so we

13   have something to go on.

14           THE COURT:  Overruled.

15   BY MS. MARSTON:

16   Q    In the summer of 2009, what did you seek

17   authorization for?

18   A    A Title 3.

19   Q    And are you the affiant on that Title 3

20   investigation?

21   A    Yes.

22   Q    And did you prepare in support of seeking that

23   Title 3 an affidavit?

24   A    Yes.

25           MS. MARSTON:  Your Honor, if I may approach?

Agent Church - Direct                    12

1   Your Honor, may I approach?

2              THE COURT:  Yes, you may.

3              MR. JARVIS:  Can I see the document, first,

4   Your Honor?

5              MS. MARSTON:  I have already turned over

6   copies to you.

7              MR. JARVIS:  I have a redacted version.  Are

8   you going to give me the redacted version?

9              MS. MARSTON:  That is what I'm showing him.

10             MR. JARVIS:  If that is what he is given,

11  that's fine, I do have that.

12             THE COURT:  Fine.

13             (Pause in proceedings.)

14  BY MS. MARSTON:

15  Q   I'm showing you what has been marked as Government

16  Exhibit 1.  Do you recognize Government Exhibit 1?

17  A   Yes.

18  Q   And just for Counsels' clarification, this is a

19  redacted version of this affidavit, is that correct?

20  A   Yes, it is.

21  Q   Now, this is approximately fifty-eight pages long,

22  is that correct?

23  A   Yes.

24  Q   And can you tell us very briefly in summary what

25  the basis for this affidavit was?

Agent Church - Direct                    13

A    The basis was controlled purchases made through the

use -- controlled purchases of narcotics, cocaine, made

from Jonathan Cobb using the different telephones that

Jonathan Cobb was utilizing during those periods of

time.

Q    And what are you seeking authorization, for which

specific telephone number?

A    Telephone 484-751-2537.

        MS. MARSTON:  Your Honor, at this time, the

government would move into evidence Government Exhibit

1 for purposes of this hearing.

        THE COURT:  Okay.  It's admitted.

        (Government Exhibit 1, affidavit, is admitted

into evidence.)

BY MS. MARSTON:

Q    Now, what is the standard in terms for obtaining a

Title 3 investigation?

        MR. JARVIS:  Objection, Your Honor, it calls

for a legal conclusion.

        THE COURT:  Overruled.  It's not a matter

that he is going to determine whether it met.  He is

simply going to set forth what is the generally

accepted standard for that.

        MR. JARVIS:  Very well, Your Honor.

        THE WITNESS:  We have to show that there is

Agent Church - Direct                    14

1    probable cause to believe that that telephone is being

2    used to facilitate crimes.

3    BY MS. MARSTON:

4    Q   And this fifty-eight page affidavit which you were

5    the affiant on, contains all of the information that

6    you had as September 20 -- all of the information that

7    you submitted in support of this affidavit as of

8    September 29th, 2009, is that correct?

9    A   Yes.

10   Q   And that included all of the investigative

11   techniques that you were using to that date, is that

12   right?

13   A   Correct.

14   Q   Now, did you obtain that authorization?

15   A   Yes, we did.

16   Q   And once you obtained that authorization, what

17   happened?

18   A   We began to intercept telephone calls over that --

19   over that telephone line.

20           THE COURT:  Now, to obtain authorization, you

21   mean you had a judge who approved the Title 3?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  Okay.

24   BY MS. MARSTON:

25   Q   And once the judge approved that Title 3, you

Agent Church - Direct                    15

1   specifically went up on what we refer to wire, is that

2   right?

3   A    Correct.

4   Q    And that was for telephone number 484-751-2537?

5   A    Correct.

6   Q    Now, once the wire went up, did you listen to the

7   telephone calls that were being intercepted?

8   A    Yes, I did.

9   Q    Did you do that also with some co-case agents?

10  A    Yes, I did.

11  Q    The voice that you heard on those calls using that

12  telephone number, were you able to determine who that

13  was?

14  A    Yes, we were.

15  Q    And who was that?

16  A    Jonathan Cobb.

17  Q    Now, during the course of your investigation, what

18  did you determine was happening on those calls that you

19  were intercepting?

20  A    He was using that telephone, he was talking with

21  drug customers, he was talking to drug suppliers, he

22  was using that telephone to talk about drug trafficking

23  with his network of people.

24  Q    Were you able to identify some of the people that

25  he was talking to on that phone?

Agent Church - Direct                    16

1    A    Yes.

2    Q    How were you able to do that?

3    A    We were able to do that through -- some through

4    subscriber information, others through identification

5    by other law enforcement officers who had talked with

6    those people, who had heard the voices.

7    Q    And subsequently have you talked to some of the

8    people that you were able to identify on that wire

9    having conversations with defendant, Jonathan Cobb?

10   A    Yes.

11   Q    And have you confirmed that those are, in fact, the

12   identifications of who those were intercepted?

13   A    Yes.

14   Q    Now, specifically you mentioned that there

15   obviously were calls intercepted with drug customers,

16   as well as people he was working with.

17        Who did you determine defendant, Jonathan

18   Cobb, to be working with once the wire went up on

19   September 29th, 2009?

20   A    David Cobb and Darren Macklin.

21   Q    And what is David Cobb's relationship to Jonathan

22   Cobb?

23   A    It's his brother, one of his brothers.

24   Q    Now, you mentioned that you also determined that he

25   was talking with suppliers.  How did you determine

Agent Church - Direct                    17

1   that?

2   A    Through the nature of the conversations he would

3   have with them, they would discuss prices, quality and

4   coming to get it, coming to pick up.

5   Q    And were those conversations different than the

6   conversations that he would have with his drug

7   customers?

8   A    Yes.

9   Q    And how were they different?

10  A    He would be discussing more price and quality.  He

11  would be discussing previous -- previous times he dealt

12  with them.

13  Q    And when you say "them," who are you referring to?

14  A    The suppliers.

15  Q    And when you say "he" who are you referring to?

16  A    Jonathan Cobb.

17  Q    And when Jonathan Cobb talked to customers, how

18  were those conversations?

19  A    They would be -- they would be in code generally,

20  and it would be real short conversations, something

21  along the lines of I want to see you, I want to come

22  hang out with you.  They would agree to meet and then

23  they sometimes would have a conversation following it

24  for whatever reason.

25  Q    Now, during the course of the time that you were

1  intercepting these calls, you were using other

2  investigative techniques as well?

3  A    Correct.

4  Q    Can you tell us some of the other investigative

5  techniques you were using hand in hand with the

6  interception of these calls?

7  A    Physical surveillance and we had a pole camera

8  active.

9  Q    Where was that pole cam active?

10 A    It was active on the 300 block of Norris Street in

11 Chester.

12 Q    And why was the 300 block of Norris Street chosen

13 as the location for that pole camera?

14 A    That's one of the locations that Jonathan Cobb used

15 to make a lot of drug sales.  It's also the location

16 where his brother David lived, and David was also

17 making a lot of drug sales.

18 Q    And you also mentioned physical surveillance, is

19 that correct?

20 A    Yes.

21 Q    And during the course of this, were there times

22 where traffic stops were conducted?

23 A    Yes.

24 Q    And what was the purpose of those traffic stops?

25 A    The purpose of those traffic stops was we would

Agent Church - Direct                    19

1   hear telephone conversations with a person we believed

2   to be a supplier -- excuse me -- a customer, and so

3   after they would have -- after that customer and

4   Jonathan Cobb would have a series of phone calls where

5   they would be speaking in language that we believed was

6   indicative, they would be conducting a drug deal, we

7   stopped the cars to try to confirm that a drug deal

8   had, in fact, taken place.

9   Q    And were you actually trying to stop and arrest

10  those individuals at that time?

11  A    No.

12  Q    On one occasion, what happened on October 16th,

13  2009 regarding a traffic stop of a drug customer?

14          MR. CANNON:  I'm sorry, what date is that?

15          MS. MARSTON:  October 16th, 2009.

16          THE WITNESS:  On October 16th, 2009, my

17  recollection is that we had a -- there was a series of

18  conversations with a drug customer, her identify -- she

19  has been identified as Angela Strand.  Her and --

20  Q    I'm sorry.  I'm directing your attention to a

21  traffic stop that occurred on October 16th, 2009.

22  A    I'm sorry, I'm confused.

23  Q    All right.  How many traffic stops are you aware

24  that were conducted in this case to identify drug

25  customers?

Agent Church - Direct                    20

1  A    Yes.

2  Q    And do you recall the two individuals?

3  A    Yes.

4  Q    Their names?

5  A    Yes.

6  Q    Okay.  On one of those occasions, was one

7  individual actually found in possession of cocaine?

8  A    Yes.

9  Q    Okay.  And who was that individual?

10 A    That was Angela Strand.

11          MR. JARVIS:  No objection, Your Honor, she

12 can impeach him.

13          THE COURT:  Well, are you surprised?

14          MS. MARSTON:  I think the agent is confused,

15 Your Honor.

16          THE COURT:  Well, that means that you are

17 surprised.  So, if you have some method of refreshing

18 his recollection.

19          MS. MARSTON:  Yes.

20 BY MS. MARSTON:

21 Q    Are you aware that there is a person who was

22 actually wanted by --

23          MR. JARVIS:  Without leading, Your Honor.

24          THE WITNESS:  I'm sorry, Your Honor.

25 BY MS. MARSTON:

Agent Church - Direct                    21

1   Q    Is it -- have you --

2            MR. JARVIS:  Objection, Your Honor.

3            MS. MARSTON:  I haven't asked a question.

4            THE COURT:  Do you have any documents that

5   would refresh his memory?

6            MS. MARSTON:  Yes, Your Honor.

7            THE COURT:  Okay.

8            (Pause in proceedings.)

9   BY MS. MARSTON:

10  Q    If I show you a photograph of an individual, do you

11  think that would help refresh your memory as to who I

12  am referring to on October 16th, 2009?

13  A    Yes.

14           MR. JARVIS:  As long as he doesn't turn it

15  over, Your Honor, there is a name on the back of it.

16           THE COURT:  Okay.

17           MS. MARSTON:  I will not turn it over, Your

18  Honor.

19           MR. JARVIS:  No, I don't want him to turn it

20  over, Counsel.  I respect what you --

21           MS. MARSTON:  I am not going to hand it to

22  him.

23           MR. JARVIS:  Oh, very well.  Even better.

24  BY MS. MARSTON:

25  Q    I am going to show you what has been marked as

Agent Church - Direct                22

1   Government Exhibit 12I.  Do you recognize the

2   individual I'm showing you in Government Exhibit 12I?

3   A    Yes, I do.

4   Q    Does that help refresh your recollection as to who

5   was stopped on October 16th, 2009?

6   A    Yes.

7   Q    Who was stopped on October 16th, 2009?

8   A    Dawn Germany.

9   Q    You mentioned the name Angela Strand.  Do you know

10  somebody named Angela Strand?

11  A    Yes.

12  Q    And how do you know somebody named Angela Strand?

13  A    She was a customer of Jonathan Cobb's.

14  Q    Did you ever find her in the possession of -- did

15  you ever have a traffic stop with Angela Strand?

16  A    No, I did not.

17  Q    But, did you actually talk to Angela Strand at some

18  subsequent time?

19  A    Yes, I have.

20  Q    And did she admit that she was a customer of

21  defendant, Jonathan Cobb, as well as defendant, David

22  Cobb?

23  A    Yes.

24  Q    Now, going back to the interception of calls

25  between September 29th and into October of 2009, and we

Agent Church - Direct                    23

1   are talking specifically about calls to the supplier,

2   how many suppliers did you determine were -- that

3   Jonathan Cobb was contacting on this telephone?

4   A    Two.

5            THE COURT:  Well, we were at the top.  So,

6   what happened?  Are we just moving on or that's all,

7   you just stopped on October 16th, 2009?

8            MS. MARSTON:  I thought he had already

9   mentioned before he identified who it was, but let me

10  go back to that, Your Honor.

11           THE COURT:  Okay.

12  BY MS. MARSTON:

13  Q    When Ms. Germany was stopped on October 16th, 2009

14  what was found in her possession?

15  A    Cocaine.

16  Q    And do you know approximately how much cocaine was

17  found in her possession?

18  A    I believe it was approximately an ounce, a little

19  bit more.

20  Q    And an ounce is how much in grams?

21  A    There's twenty-eight grams in an ounce.

22  Q    And at that time, that cocaine was seized?

23  A    Yes.

24  Q    And approximately from the time that you had

25  intercepted her conversations with defendant, Jonathan

Agent Church - Direct                24

1  Cobb on the wire and the time that that traffic stop

2  was conducted, how much time had passed?

3  A    Oh, a matter of minutes.

4  Q    Okay.  And was physical surveillance being used at

5  the time of that as well as the wire being intercepted?

6  A    Yes.

7  Q    And so physical surveillance actually saw --

8         MR. JARVIS:  Objection, Your Honor, she is

9  leading the witness.

10        THE COURT:  Yes, sustained.

11  BY MS. MARSTON:

12  Q    What did physical surveillance see?

13  A    Physically surveillance saw Mr. Cobb meet with --

14  meet with Dawn Germany and when she pulled off, they

15  followed the car to a location to stop it.

16  Q    Now, I'm going to direct your attention to the two

17  different suppliers that you intercepted during the

18  course of this wire.

19        How did you determine those were two

20  different suppliers?

21  A    They were two different voices, they were two

22  different telephone numbers.

23  Q    And did you have a way of identifying who the two

24  different suppliers were?

25  A    Of where they were located?

1  Q    Did you have a way of referring to the two

2  different suppliers?

3  A    Yes.

4  Q    And how did you that?

5  A    I referred to one as the West Philadelphia supplier

6  and one as the North Philadelphia supplier.

7  Q    And why did you refer to them as the North

8  Philadelphia supplier and a West Philadelphia supplier?

9  A    Because when he would -- when he would talk to

10  these suppliers and would go to meet with them, we were

11  able to -- if he would telephone calls or

12  (indiscernible) telephone calls, we can track the cell

13  phone tower that the call is hitting off.

14        So, when he would go to meet with the West

15  Philadelphia supplier, while he was on his way, he

16  would be making telephone calls and those calls would

17  hit off towers that would lead right to West

18  Philadelphia.

19        Then same thing happened when he would meet

20  with the North Philadelphia supplier, he would be

21  making telephone calls during the time that he was

22  traveling, and those cell phone towers would indicate

23  where to travel to North Philadelphia.

24  Q    Now, in a moment I am going to direct your

25  attention specifically to October 20th, 2009.  But,

Agent Church - Direct                          26

1   before we do that, who was defendant, Jonathan Cobb,

2   talking to on October 20th, 2009, which supplier?

3   A    On October 20th he was talking with the North

4   Philadelphia supplier.

5   Q    Had you intercepted calls between defendant, David

6   Cobb, and the North Philadelphia supplier prior to

7   October 20th?

8   A    Yes.

9   Q    And can you tell us about those calls?

10  A    On October 16th, there was a series of calls.  It

11  began with David Cobb calling Jonathan Cobb, and asking

12  if --

13          MR. JARVIS:  Objection, Your Honor.  She

14  asked about the calls with the supplier, not with my

15  client.

16          THE COURT:  Non-responsive.

17          MR. JARVIS:  Non-responsive.

18          THE COURT:  Okay.

19  BY MS. MARSTON:

20  Q    So, on October 16th, there were calls between

21  defendant, Jonathan Cobb, and the North Philadelphia

22  supplier, is that correct?

23  A    Yes.

24  Q    Okay.  Prior to those calls taking place, what

25  happened?

Agent Church - Direct                    27

A    Prior to those calls taking place, Jonathan Cobb
and David Cobb spoke, and David asked "Are we going up
to see him," and Jonathan said that he had been trying
to call him, the guy's not answering his phone, and if
he's not able to get in touch with him, they are going
to have to see the Spanish, and I don't like to do
that, and David agreed.

Q    Now, based on the interception of calls prior to
that telephone call between defendant, Jonathan Cobb
and defendant, David Cobb, what had you learned about
the North Philadelphia supplier?

A    That he was Hispanic.

Q    And what else had you learned in terms of defendant
Jonathan Cobb's dealing with him?

A    That he had been unhappy with the quality of
cocaine that he had purchased from the North
Philadelphia supplier.

Q    So, who had he been dealing with prior to this
date?

A    The West Philadelphia supplier.

Q    What happens after he has that conversation with
defendant, Jonathan Cobb?

             MR. JARVIS:  On what date, Your Honor?

BY MS. MARSTON:

Q    On October 16th, 2009?

Agent Church - Direct                    28

A    He has a conversation with the North Philadelphia
supplier, and he explained -- well, first he has
another conversation with David Cobb first, and he says
that he's still not answering his phone, we're going to
have to -- I'm going to have to call whatcha call it, I
think is his term, and see if it's solid.

        After that, he has a conversation with the
North Philadelphia supplier, and he explains that he
hasn't called him in a while because he's unhappy with
the quality of cocaine he's been getting.

        He says that, every time I crack, every time
I open it, it's real soft, it's not a hard chunky
substance like you want it to be, and he describes it
as light in the ass, and then he proceeds to say "The
last one was fourteen short."

        My training and experience tells me that
fourteen short is fourteen grams short of a kilograms,
a thousand grams being in a kilogram.

        Shortly thereafter he has another
conversation with the North Philadelphia supplier and
he asks for a number.  Well, excuse me.  First the
North Philadelphia supplier says "these are good."
Then he has another conversation with him, and he asks
for a number, and the North Philadelphia supplier says
thirty-three.  Based on my training and experience,

Agent Church - Direct                      29

1   that means thirty-three thousand dollars for a kilogram

2   of cocaine.

3   Q    Okay.   Now, at some point on October 16th, 2009,

4   did your cell site information show that defendant,

5   Jonathan Cobb, was actually traveling to North

6   Philadelphia?

7   A    Yes.

8   Q    Now, I want to direct your attention to October

9   20th, 2009.   On that day what occurred?

10  A    Well, there were a number of telephone calls

11  between David Cobb and Jonathan Cobb and the North

12  Philadelphia supplier.

13  Q    And what did you believe was going to be happening

14  on that day?

15  A    David Cobb and Jonathan Cobb were --

16          MR. JARVIS:   Objection, Your Honor.   No

17  foundation for his belief.   I understand he's trained

18  and everything, Your Honor, I understand that.

19          THE COURT:   Rephrase the question.

20  BY MS. MARSTON:

21  Q    Based on listening to those calls that were being

22  intercepted that day, did you actually put in place

23  certain investigative things to happen?

24  A    Yes.

25  Q    And what did you put into place?

Agent Church - Direct                30

1    A    We put physical surveillance on the street trying

2    to follow David and Jonathan Cobb and Darren Macklin to

3    North Philadelphia.

4             MS. MARSTON:  Your Honor, if I may approach.

5             THE COURT:  Yes, you may.

6             (Pause in proceedings.)

7    BY MS. MARSTON:

8    Q    I am going to show you what has been marked as

9    Government Exhibit 2.  Do you recognize what you see in

10   Government Exhibit 2?

11   A    Yes.

12   Q    I am going to show you what has been marked as

13   Government Exhibit 3A through I.  Do you recognize what

14   you see in Government Exhibit 3A through I?

15   A    Yes.

16   Q    Tell us what Government Exhibit 2 is?

17   A    Government Exhibit 2 is a CD containing a series of

18   telephone calls.

19   Q    From what date?

20   A    From October 20th, 2009.

21   Q    And have those calls been taken from the wire that

22   was -- from the calls that were intercepted pursuant to

23   the Title 3 investigation?

24   A    Yes.

25   Q    And what is Government Exhibit 3A through 3I?

Agent Church - Direct                    31

A    It's a series of transcripts of these telephone

calls.

Q    And who prepared these transcripts?

A    I did.

Q    And are those transcripts a fair and accurate

reflection of the calls that are on Government Exhibit

2?

A    Yes.

MS. MARSTON:  Your Honor, the government

would introduced Government Exhibit 2 as well as

Government Exhibit 3A through 3I.

MR. JARVIS:  No objection, Your Honor.

THE COURT:  Admitted.

(Government Exhibit 2, CD, is admitted into

evidence.)

(Government Exhibit 3A through 3I,

transcripts, is admitted into evidence.)

BY MS. MARSTON:

Q    Now, just to be clear, Government Exhibit 2 doesn't

contain all of the telephone calls that occurred on

October 20th, 2009, is that correct?

A    That's correct.

MS. MARSTON:  At this time, we're going to

play a series of calls that are in Government Exhibit

2, beginning with call 3429.

Agent Church - Direct                    32

1          MR. JARVIS:  Well, respectfully, Your Honor,

2    maybe there's an explanation as to why the disk doesn't

3    contain them.

4          MS. MARSTON:  Because we're only using

5    certain ones for the purposes of this hearing.

6          MR. JARVIS:  For this hearing, very well,

7    Your Honor.  If that's it, no problem.

8          THE COURT:  Okay.

9          (Pause in proceedings.)

10         (Telephone recording 3429 is being played at

11   this time.)

12         MS. MARSTON:  Your Honor, I have a copy for

13   you as well.  I'm not sure which is easier.  I

14   apologize for the small type.

15   BY MS. MARSTON:

16   Q    First of all, I noticed on this transcript that

17   there are certain identification for the voice.  Can

18   you explain what those identifications are, please?

19   A    JC is Jonathan Cobb; NPS is North Philadelphia

20   supplier.

21   Q    Now, can you tell us based on your training and

22   experience what Jonathan Cobb meant when he was saying

23   anything broken down?

24   A    Does he have a quantity of cocaine less than a

25   kilogram.

Agent Church - Direct                     33

1    Q    And what happens when he asked that question?

2    A    The North Philadelphia supplier gives him a price

3    of forty-three, and Jonathan Cobb reacts somewhat

4    startled, like it's way too high, and he says "My

5    goodness gracious, I'm going to have to go back to

6    where I was the other day."

7    Q    What is that referring to, "Going back to where I

8    was the other day"?

9    A    That's a reference to October 16th when he bought a

10   kilogram, and the North Philadelphia supplier says

11   "Yeah, it's better" --

12         MR. JARVIS:  Objection to that, Your Honor.

13   There was no testimony, no evidence presented to us of

14   a kilogram transaction on October 16th, just this

15   agent's testimony.

16         THE COURT:  Sustained.

17   BY MS. MARSTON:

18   Q    What is there is a reference to, what day?

19   A    To the 16th.

20   Q    When you intercepted conversations between

21   defendant, Jonathan Cobb, and the North Philadelphia

22   supplier also?

23   A    Yes.

24   Q    And on that day, you did have indications that he

25   traveled to North Philadelphia based on the cell site

Agent Church - Direct                34

1  information?

2  A    Yes.

3  Q    Okay.  So, this is referring back to whatever they

4  had discussed on October 16th, is that what your

5  understanding is?

6  A    Correct.

7  Q    Now, how does this conversation end?

8  A    He says "He's going to have to go back to where he

9  was the other day," he says, "Yeah.  It's better that

10  way," and I don't recall exactly how it ends.

11  Q    Well, is there a subsequent telephone conversation

12  after this?

13  A    Yes.

14         MS. MARSTON:  At this time the government

15  would play Government Exhibit 3431.

16         MR. JARVIS:  3431, Counsel?

17         MS. MARSTON:  3431.

18         THE COURT:  Yes.

19         MR. JARVIS:  So that would be 3B?

20         MS. MARSTON:  Correct.

21         MR. JARVIS:  Very well.

22         (Telephone recording, 3431, is being played

23  at this time.)

24  BY MS. MARSTON:

25  Q    And, again, whose voices are on this telephone

Agent Church - Direct                    35

1    call?

2    A    That's Jonathan Cobb and the North Philadelphia

3    supplier.

4    Q    And what is going on during this conversation?

5    A    The North Philadelphia supplier tells him that the

6    one they have is already broken down and asked him if

7    that's going to be a problem.  Jonathan says no, and

8    says same number, and the supplier indicates yes, same

9    number.

10   Q    Same number as referring to what based on your

11   training and experience?

12   A    As what they had just talked about.

13   Q    Meaning price?

14   A    Right.

15            MR. CANNON:  Objection, leading.

16            THE COURT:  Overruled, he answered.

17   BY MS. MARSTON:

18   Q    I'm going to direct your attention to the next

19   call, it's 3442.

20            MS. MARSTON:  That will be 3C, Counsel.

21            MR. JARVIS:  Thank you.

22            (Telephone recording, 3442, is being played

23   at this time.)

24   BY MS. MARSTON:

25   Q    And, again, what voices are identified on this

1  call?

2  A    It's Jonathan Cobb and the North Philadelphia

3  supplier.

4  Q    And what is the purpose of this call?

5  A    The North Philadelphia supplier asked i he's

6  coming, and Jonathan says yeah, he's just waiting for

7  his brother.

8  Q    And that brother being who?

9  A    David Cobb.

10            MS. MARSTON:   At this time the government is

11  going to play call 3444, and it would be 3D.

12            (Telephone recording, 3444, is being played

13  at this time.)

14  BY MS. MARSTON:

15  Q    Now, there is a different reference on this phone,

16  Other than JC, what is the other abbreviation on this

17  transcript?

18  A    DC.

19  Q    And who is that referencing?

20  A    David Cobb.

21  Q    And what is happening in this conversation between

22  defendants and Jonathan Cobb and David Cobb?

23  A    Jonathan is telling him that the boy keeps hitting

24  his phone.  He keeps getting a phone call from the

25  North Philadelphia supplier and David Cobb says he's

FORM 2084   PENGAD • 1-800-631-6989 • www.pengad.com

Agent Church - Direct                    37

1  just taking care of -- he had to do something with his

2  truck and he'll be ready shortly.

3  Q   Now, does he mention his truck on this?

4  A   I don't know if he said truck, but he said he was

5  doing something, he was running some errands.

6  Q   He had something else to do before he can --

7  A   Yes.

8  Q   -- ready to go?

9  A   Yes.

10 Q   I am going to direct your attention to the next one

11 which is 3449.

12          MS. MARSTON:  3E will be the transcript.

13          (Telephone recording, 3449, is being played

14 at this time.)

15 BY MS. MARSTON:

16 Q   Now, there is another abbreviation on this

17 transcript at the beginning.  What abbreviation is

18 that?

19 A   DM.

20 Q   And who does that stand for?

21 A   Darren Macklin.

22          MS. GRASSO:  Objection, Your Honor.  No

23 foundation, any familiarity with the voice or anything.

24          THE COURT:  Okay.  Lay a foundation.

25 BY MS. MARSTON:

Agent Church - Direct                    38

Q    How were you able to determine that that was Darren

Macklin on that call?

A    We had identified Darren Macklin as Sporty through

Officer Dave Tyler, through a network of informants

that Darren Macklin's nickname was Sporty.

Q    Did you also do that based on other calls?

          MR. JARVIS:  Objection, Your Honor, leading.

          THE COURT:  Sustained.

BY MS. MARSTON:

Q    Were you also able to do that in another way other

than law enforcement and informants?

A    Yes.

Q    How else were you able to do it?

A    On the telephone Jonathan would constantly refer to

him as Sporty.  Well, there were several calls where he

was referred to as Sporty on the telephone, and we knew

that Sporty and Darren Macklin -- that Sporty was a

nickname for Darren Macklin, and that Darren Macklin

was constantly in Jonathan Cobb's presence.

Q    Is this the first call intercepted with Darren

Macklin on it?

A    No.

Q    Have you also had the opportunity to talk or hear

Sporty's voice?

A    Yes.

Agent Church - Direct                    39

Q    And are you able to determine that that is Sporty's

voice then on this call?

A    Yes.

Q    Now, what is going on in this telephone call?

A    Originally David Cobb calls Jonathan's phone.

Darren Macklin answers the telephone.  David tells

Macklin, tell Jon that I'll meet you guys on the

highway because my phone is dying.  He just says I'll

meet you guys on the highway.

        Macklin says "We're not up there yet, we're

at the Mrs. crib."  Then Jonathan gets on the telephone

and speaks with David and they agree to meet -- I

believe David says "I'll met you on the highway," and

Jonathan says "Okay."

Q    Based on your investigation up to this point, were

you able to determine what the Mrs. crib was referring

to?

A    Yes.

Q    And how were you able to do that?

A    It was a term we heard before, and we knew that

Jonathan Cobb spent a lot of time at Donna Hill's

house, and we just -- we determined that when he was

referring to the Mrs. that he would go over there all

the time, and that this is where he was going.

Q    Well, how did you actually know that he went to

Agent Church - Direct                    40

1    Donna Hill's house?  What investigative technique were

2    you using?

3    A    Physical surveillance.

4    Q    And what were you directing with your physical

5    surveillance at the time of this telephone call?

6    A    Excuse me?

7    Q    Where were you when this call was intercepted, you

8    personally?

9    A    Me personally?  I was in the Title 3 room.

10   Q    And were you giving directions to anybody from that

11   Title 3 room?

12   A    Yes.

13   Q    What direction did you give after hearing this

14   call?

15   A    We asked them to go to Donna Hill's house at 2611

16   People Street.

17   Q    And who is them?

18   A    Our surveillance units.

19   Q    Turning now to call 3450, Government Exhibit 3F.

20           (Telephone recording, 3450, is being played

21   at this time.)

22   BY MS. MARSTON:

23   Q    Now, again, what voices are identified on this?

24   A    That's defendant and Darren Macklin.

25   Q    And what is the purpose of this call?

1  A    Darren Macklin tells David Cobb that they're at the

2  Mrs. crib, which is Donna Hill's house, and David Cobb

3  says that his phone is dying, so he's just going to

4  come up there and meet them rather than meeting on the

5  highway.

6  Q    And what did you learn about your physical

7  surveillance at this time?

8  A    That David Cobb did arrive at that residence, 2611

9  People Street.

10 Q    Going now to call 3451, 3G.

11          (Telephone recording, 3451, is being played

12 at this time.)

13 BY MS. MARSTON:

14 Q    What voices are identified on this transcript?

15 A    David Cobb and Jonathan Cobb.

16 Q    And what is the purpose of this call?

17 A    Jonathan Cobb asked David Cobb if he saw the Danali

18 (ph), which based on my training and experience he's

19 making a reference to did you see that surveillance

20 vehicle.

21          MS. MARSTON:   Your Honor, I'm going to object

22 at this point.  The agent's testimony is simply

23 restating the obvious.  The transcript speaks for

24 itself and he has not been qualified with any expertise

25 as to the conclusions that he's making.  (Inaudible) on

1    these transcripts, Your Honor, and I would object.

2              THE COURT:  The expertise goes to areas that

3    may be code words, et cetera.  But, ordinary

4    conversation, he doesn't have to restate it.  I don't

5    think he can testify as to the state of mind of the

6    speakers, but he can relate to areas which he is

7    experience, may be shorthand for drug language.

8              MS. MARSTON:  Yes, Your Honor.

9    BY MS. MARSTON:

10   Q    What was going on at the time of this conversation?

11   A    They had just left Donna Hill's house and were

12   driving to North Philadelphia.

13   Q    But, what was going on with your physical

14   surveillance?

15   A    They were trying to follow them.

16   Q    We are going to go to call 3473, 3H.

17             (Telephone recording, 3473, is being played

18   at this time.)

19   BY MS. MARSTON:

20   Q    Who is identified on this transcript?

21   A    Jonathan Cobb and the North Philadelphia supplier.

22   Q    Now, at the time same time that this call is

23   intercepted, what is your cell site information telling

24   you?

25   A    It shows Jonathan Cobb's cell phone hitting off of

1    a cell tower in North Philadelphia.

2    Q   We're going to go to call 3475, 3I.

3              (Telephone recording, 3475, is being played

4    at this time.)

5    BY MS. MARSTON:

6    Q   Who is identified on this transcript?

7    A   Jonathan Cobb and the North Philadelphia supplier.

8    Q   The reference to "back to back," what did that

9    mean?

10   A   Two cars parked next to each other.

11   Q   How did you know there were two cars?

12   A   Because physical surveillance had seen two cars

13   driving, pull out of Donna Hill's residence.

14   Q   And did they get a description of those two cars?

15   A   Yes.

16   Q   And what was the description?

17   A   One was a white Impala and one was a white Kia.

18   Q   Okay.  Now, were you aware who had a white Impala

19   based on the investigation you had conducted during the

20   course?

21   A   Yes.

22   Q   And who owned the white Impala?

23   A   It was in the name of Kenya Cobb.  David Cobb used

24   it.

25   Q   And the other white car, did you know at the time

Agent Church - Direct                          44

1  who that car belonged to?

2  A    I believe we had the tag --

3           MR. JARVIS:  Objection, Your Honor.

4  Objection.

5           THE COURT:  Basis?

6           MR. JARVIS:  Well, the question implies that

7  he may not have known, therefore, there is a question

8  as to whether or not she is leading.

9           THE COURT:  Restate the question, please.

10  BY MS. MARSTON:

11  Q    What was the second car?

12  A    It was a white Kia.

13  Q    When did you learn that information?

14  A    That day when they were leaving.

15  Q    What happened after that last call?  What did you

16  direct physical surveillance to do?

17  A    I directed physical surveillance to set up in the

18  area of 95 southbound on both I-95 and other streets,

19  other roads traveling south from North Philadelphia to

20  Chester.  Our hopes was that --

21           MR. JARVIS:  Objection, Your Honor.

22           THE COURT:  Sustained.

23           THE WITNESS:  In an effort to --

24  BY MS. MARSTON:

25  Q    Well, let me ask you a new question.

Agent Church - Direct                45

1    A    Okay.

2    Q    What was the purpose of putting surveillance on 95

3    as well as other roads that led back to Chester?

4    A    We wanted to try to pick up the white Kia and the

5    white Impala as they were coming back to Chester from

6    North Philadelphia.

7              MS. MARSTON:  Your Honor, if I could have one

8    moment, please.

9              (Pause in proceedings.)

10             MS. MARSTON:  At this time, no more questions

11   for this witness.

12             THE COURT:  Cross-examination.

13             MR. JARVIS:  Your Honor, I'm prepared to

14   cross-examine this witness, but there was actually a

15   stop and a seizure in this case.

16             THE COURT:  Yes.  Maybe other witnesses will

17   testify to that.

18             MR. JARVIS:  Very well.

19             THE COURT:  There are other witnesses who

20   will be called in this case.

21             MS. MARSTON:  That is correct, Your Honor.

22   He obviously was in the wire room and --

23             MR. JARVIS:  And I respect that.  That's why

24   I'm kind of making the inquiry.  Let me check with my

25   client, Your Honor.

Agent Church - Direct                    46

THE COURT:  Sure.

(Pause in proceedings.)

MR. JARVIS:  Just a few questions, Your

Honor.

THE COURT:  Please proceed.

<u>CROSS-EXAMINATION</u>

BY MR. JARVIS:

Q    Good afternoon, Agent Luke Church.

A    Good afternoon

Q    You made mention of cell towers that were being

monitored.  Is that a way of phrasing what was going on

in terms of your determination of a West Philadelphia

supplier versus a North Philadelphia supplier?

A    Well, we weren't monitoring the cell towers.  We

could watch what cell towers Jonathan Cobb's telephone

would hit when he made a call.

Q    Okay.  So, as the cell phone hit a certain tower,

you were monitoring which tower his cell phone was

hitting, is that a fair --

A    Correct.

Q    -- representation of that?

A    Correct.

Q    Okay.  All right.  So, is it fair to say you were

not able to during this investigation to identify a

house or a location or a physical address for the North

Agent Church - Cross                    47

1   Philadelphia supplier, is that fair to say?

2   A    That's correct.

3   Q    Is it also fair to say that your objective to

4   surveil my client and the other car from the Mrs. crib

5   to the location of the North Philadelphia supplier

6   failed?

7   A    Yes.  We were not able to follow them away.

8   Q    Well, you weren't able to follow them to the

9   location of the alleged transaction, is that fair to

10  say, sir?

11  A    That's correct.

12  Q    All right.  So, it's true then, isn't it, that

13  neither you nor your surveillance team were able to

14  observe my client or anyone else actually meet with the

15  North Philadelphia supplier?

16  A    That's correct.

17  Q    Conduct a transaction with the North Philadelphia

18  supplier?

19  A    Correct.

20  Q    Of any kind?

21  A    Correct.

22  Q    And the last question.

23       You maintained your position at the Title 3

24  room throughout the duration of this whole surveillance

25  and ultimate seizure, is that fair to say?

Agent Church - Cross                    48

1   A    Yes.  I was in the wire room up until that point.

2   Q    So, you weren't on 95, you were in the location of

3   the stop of my client and the other vehicles?

4   A    Correct.

5             (Pause in proceedings.)

6             MR. JARVIS:  Those are my questions, Your

7   Honor.  Thank you.

8             THE COURT:  Cross-examination by any other

9   Counsel?

10            MR. CANNON:  I would like to ask some

11  questions, Your Honor, but I must admit that I did not

12  join in the motion to suppress the physical evidence

13  because it related to the seizure of the drugs from the

14  automobile that David Cobb was driving at the time of

15  the seizure.

16            THE COURT:  Right.  Okay.  So, do you want to

17  ask a question?

18            MR. CANNON:  Sure.

19            THE COURT:  Okay.

20            MR. CANNON:  Thanks.  I just want to be about

21  the I did file a motion, or joined in.

22            THE COURT:  Okay.

23                    CROSS-EXAMINATION

24  BY MR. CANNON:

25  Q    Agent Church, with regard to the pole camera that

Agent Church - Cross                    49

1  you referenced that was set up in the 300 block of

2  Norris Street, given that the takedown here was

3  October 20 of 2009, how long was that pole camera in

4  place?

5  A    It went up short -- I believe it became operational

6  I think it was shortly after the Title 3 became

7  operational.

8  Q    So, that would be roughly in late September --

9  A    Yeah, I think --

10  Q    -- of 2009?

11  A    My recollection is that the wire started September

12  of 2009.  My recollection is the pole started a day or

13  two afterwards.

14  Q    I see.  Did you have any difficulty in installing

15  the pole camera?

16  A    Yes.

17  Q    And what kind of difficulty?

18  A    I didn't install it.  I just know that it wasn't

19  working correctly.

20  Q    Well, you're talking about now it's functioning, is

21  that right?  You said it wasn't working properly.

22  A    Yeah, we weren't getting any video.

23  Q    I mean, the equipment was functioning properly.

24  You're saying that you didn't get the return that you

25  were hoping from the pole camera, is that what you are

1   saying?

2   A    Well, I don't --

3   Q    The pole camera did not give you any evidence, is

4   that what you are saying?

5   A    I don't think the equipment was working correctly,

6   because we weren't getting any picture.

7        THE COURT:  The question is were you getting

8   any pictures at all, or were you not getting any

9   pictures to your liking I guess is what Mr. Cannon is

10  suggesting?

11       THE WITNESS:  In the beginning, we weren't

12  getting any pictures at all.

13       THE COURT:  Okay.

14  BY MR. CANNON:

15  Q    All right.

16       THE COURT:  I think that may be beyond the

17  direct examination.

18       MR. CANNON:  Well, no, the agent brought up

19  the pole camera, Your Honor.

20       THE COURT:  Yes, but as of the date of the

21  takedown or thereabouts.  I mean, I think you're going

22  way back to late September now.

23  BY MR. CANNON:

24  Q    Okay.  Agent Church, you said that the pole camera

25  was set up on Norris Street where Jonathan Cobb had

1  done drug transactions.  What was the basis for that

2  statement?

3  A    We had several informants who had told us that he

4  would conduct drug transactions there.

5  Q    All right.  I assume then that no law enforcement

6  agent during the course of this investigation saw Mr.

7  Cobb, that is Jonathan Cobb involved in any transaction

8  on Norris Street?

9  A    Prior to this, no, I don't believe anybody had.

10 Q    You said you made a couple of attempts to stop

11 persons who you believe had made a purchase of drugs,

12 and you gave two instances, one involving Dawn Germany,

13 and the other I think was with regard to -- I'm trying

14 to think of the other young lady's name.

15        MR. JARVIS:   Strand.

16 BY MR. CANNON:

17 Q    Angela Strand, is that right?

18 A    No, I was confusing two people.  It was Dawn

19 Germany and somebody else.

20 Q    Somebody else, not Angela Strand?

21 A    Correct.

22 Q    Okay.  In the Strand instance, cocaine was

23 recovered, is that right?

24 A    No.  Strand wasn't stopped.

25 Q    We're talking about Germany now?

Agent Church - Cross                                        52

1    A    Correct.

2    Q    The car that Germany was in was stopped?

3    A    Correct.

4    Q    She was a passenger in a car?

5    A    Correct.

6    Q    Is that right?

7    A    That's correct.

8    Q    And is it your testimony that she was observed in

9    that car on the same day that she had met with Jonathan

10   Cobb?

11   A    Was he observed in it?

12   Q    Did you see her --

13   A    Yeah.  After we believe she had conducted a deal,

14   she was in that car.

15   Q    Well, what was the basis for your belief that she

16   had been involved in any transaction with Jonathan

17   Cobb?

18   A    Telephone calls.

19   Q    Telephone calls.  Do you mean a telephone

20   conversation that you heard between Jonathan Cobb and

21   Angela Strand?

22   A    No, we're not talking about Angela Strand.

23   Q    Okay.  I'm sorry.  Dawn Germany.  Was there a

24   conversation that you monitored between Jonathan Cobb

25   and Dawn Germany?

1    A    On that day?

2    Q    Yes.

3    A    Yes.

4    Q    On that day?

5    A    Yes.

6    Q    And you say the subject matter of that conversation

7    was her intent or her wish to possess or buy drugs?

8    A    Correct.

9    Q    Okay.  And was such a transaction observed by any

10   agent?

11   A    I don't know if they observed the exact

12   hand-to-hand or not.

13   Q    Well, in fact, in the entire course of this

14   investigation, no agent ever observed Jonathan Cobb in

15   a transaction, am I correct?

16   A    I don't know if you're asking if they ever seen him

17   hand drugs to somebody?  I don't think they ever

18   identified drugs that were being handed.  But, they saw

19   him meet with people based on telephone calls.

20   Q    Okay.  Nothing illegal about meeting with someone.

21   We can agree upon that, right, Agent?

22   A    I guess in normal circumstances, it's fine.

23   Q    With regard to the calls made to the North Philly

24   supplier supply and the West Philly supplier, did your

25   Pen Register give you the identity of the person who

Agent Church - Cross                    54

1   belonged to that telephone that you say Mr. Cobb was

2   calling?

3   A    No.

4   Q    Why not?

5   A    The Pen Register doesn't give you the identity of

6   the person.

7   Q    When Mr. Cobb was call the North Philly supplier,

8   the person you referred to as the North Philly

9   supplier, he was calling a particular phone number, is

10  that right?

11  A    Correct.

12  Q    You were never able to do anything with that phone

13  number in terms of linking it to an address or to a

14  person?

15  A    I believe there -- my recollection is that there

16  was not a -- we had subpoenaed the record for a

17  subscriber, and my recollection is it didn't have -- it

18  didn't have a name.

19  Q    And would that be true also of the calls made to

20  the "West Philly Supplier"?

21  A    No, that one had a name.

22  Q    And what is that name?

23  A    I can't remember it off the top of my head, but

24  there was a name.

25  Q    Was that person ever arrested?

Agent Church - Cross                    55

A    It was determined that that was a fictitious name,
and we tried to check as many records as we could, and
we never determined it to be anybody.

Q    Even as of today, are you telling us that you don't
know who the North Philly supplier is, or who the West
Philly supplier is?

A    Correct, we don't know their identities.

Q    And on October 20, 2009 when the stop of the car
was made, no one in law enforcement saw any of these
three defendants at any specific location where drugs
allegedly were obtained, is that correct?

A    On that day, correct.

Q    The stopping of the cars was based solely upon
telephone conversations which you intercepted pursuant
to the Title 3, is that right?

A    Well, telephone calls, the tracking of the cell
phone towers, those were the primary reasons for
initiating the stop.

Q    And just a question or two more.

        When you directed the agents while you were
at the wire room to go to the home of Donna Hill, did
you get a communication back that they had gone there?

A    Yes.

Q    Okay.  And when they arrived, were the two
automobiles about which you have spoken, were they

1   still there?

2   A    I don't know.  Are we talking about the Kia and the

3   Impala, is that what you're talking about?

4   Q    Yes.

5   A    Were they at --

6   Q    Were they at --

7   A    I'm sorry, I'm sorry, I misunderstood you.  When

8   they went -- before the car stop, before they went to

9   North Philadelphia is that what you're saying?

10  Q    Yes.  Didn't you tell us that before there was

11  travel to the North Philly supplier that the defendants

12  gathered so to speak at the Donna Hill home?

13  A    Correct.

14  Q    Okay.  So, I'm asking did your agents arrive there,

15  your surveillance agents arrive there and observe those

16  two white automobiles in place there at Donna Hill's

17  home?

18  A    My recollection is they did.

19  Q    Okay.  Now, when the two white cars left Donna

20  Hill's house, allegedly on the way to the home of the

21  North Philly supplier, did your surveillance agents

22  follow them?

23  A    They were not able to follow them.  They tried, but

24  they weren't able to.

25  Q    Why was that, sir?

Agent Church - Cross                    57

A     They lost them.

Q     Lost them.

          MR. CANNON:  Okay.  That's all I have, Judge.

          THE COURT:  Any cross-examination, Ms.

Grasso?

          MS. GRASSO:  Just briefly to follow up.

                    CROSS-EXAMINATION

BY MR. GRASSO:

Q     So, the only physical surveillance of the three

defendants on October 20th would have been an

observation by the other agents of them perhaps leaving

2611 People Street and getting into vehicles, is that

correct?

A     And then driving southbound on 95 later.

Q     And then once they're on southbound 95, they are

lost by the physical surveillance team that's out there

supposedly following them to the location you believe

them to be going to in North Philadelphia, correct?

A     Right.  When they leave People Street, yeah,

surveillance loses them.

Q     And your understanding is that they were lost on

95, is that correct?

A     I'm not sure where they lost them.

Q     Okay.  And after the point in time that they are

lost, there is no physical picking them up again until

1   they are on 95 shortly before the two vehicles are

2   stopped, correct?

3   A    Correct.

4   Q    All right.  And the only linkage with regard to the

5   defendants -- there is no other physical observations

6   made until the vehicles are stopped, correct?

7   A    Correct.

8   Q    And the reason you believe they were in the area of

9   North Philadelphia was because of the cell phone tower

10  hits on the phone that you believe to be Jonathan Cobb,

11  correct?

12  A    Correct.

13  Q    All right.  And the cell phone tower that you speak

14  there is a fairly large radius in which they could be

15  traveling in order for them to be hitting that cell

16  phone tower, correct?

17  A    Yes.

18  Q    All right.  So, they could be within ten miles of

19  that cell phone tower, fifteen miles of that cell phone

20  tower based upon your experience, correct?

21  A    I don't think it's that big -- I don't think it's

22  that big a distance.

23  Q    Well, what is your understanding of the maximum

24  distance they could be?

25  A    I don't know.

Agent Church - Cross                    59

1   Q    Okay.  And so you have -- you or none of the other

2   agents have any idea once the physical surveillance

3   is lost where they went, whether anyone ever left

4   those vehicles on that day prior to the point in time

5   that the vehicles were stopped by agents later,

6   correct?

7   A    Well, I have a fairly good idea where they went

8   based on the cell phone towers.

9   Q    I'm not asking whether or not you have a good idea.

10  You don't have any -- no agent, either yourself or any

11  other agent made any physical observation of them after

12  the original surveillance was lost prior to the time

13  that they got stopped, correct?

14  A    Correct.

15  Q    All right.

16           MS. GRASSO:  Thanks.  I have nothing else.

17           THE COURT:  Redirect.

18           MS. MARSTON:  Very briefly, Your Honor.

19                   REDIRECT EXAMINATION

20  BY MS. MARSTON:

21  Q    At the time of the stop on October 20th, it wasn't

22  just the actions of that day that led you to believe

23  what had occurred between Jonathan Cobb, David Cobb,

24  Darren Macklin and the North Philadelphia supplier?

25           MR. JARVIS:  Objection, Your Honor.  That's

Agent Church - Redirect                      60

1   outside the scope of the cross-examination.

2          MS. MARSTON:  Mr. Cannon specifically said it

3   was --

4          THE COURT:  Well, I think there was some

5   cross-examination as to whether that was the only basis

6   on which the probable cause had been satisfied, so I

7   suppose that goes back to that.

8          MR. JARVIS:  Very well, Your Honor.

9          THE COURT:  Okay.

10  BY MS. MARSTON:

11  Q   You had more than just the actions that occurred on

12  that day, is that right?

13         MR. CANNON:  Objection, leading.

14         THE COURT:  Okay.  Overruled.

15         THE WITNESS:  Yes.

16  BY MS. MARSTON:

17  Q   And can you just summarize what all you had on that

18  day?

19  A   On that day?

20         THE COURT:  Immediately prior to the stop,

21  what was the basis for your conclusion that there was

22  probable cause?

23         THE WITNESS:  Well, there had been a series

24  of these telephone calls throughout the course of the

25  wire where he was traveling to West Philadelphia and we

Agent Church - Redirect                     61

1  would track the cell phone to West Philadelphia.

2       Then based on the telephone calls it

3  indicated that he had just -- he was going to pick up

4  cocaine, that he pick up cocaine and then he would come

5  back and sell the cocaine.

6       So, this happened on several occasions to a

7  supplier in West Philadelphia and then it happened, we

8  believe one time before this --

9       MR. JARVIS:  Your Honor --

10       MS. GRASSO:  Objection.  There has been no

11  indication that they have ever observed these

12  transactions, that drugs were supplied under a

13  controlled buy type of a situation, Your Honor.  There

14  is no foundation.

15       THE COURT:  Well, he was asked what was his

16  belief for probable cause.  Maybe the belief was

17  erroneous, but that is a different question.

18       MS. GRASSO:  Very well, Your Honor.

19       THE COURT:  He's not testifying as to the

20  factual basis of those events, only what was inside the

21  agent's head when they reached this conclusion.

22       So, let's get a list of what it is so that we

23  can then made a legal judgment of whether or not that

24  is sufficient, either because  it's factually

25  inadequate or legally inadequate.

Agent Church - Redirect                          62

BY MS. MARSTON:

Q    You may continue.

A    So, there was a series of transactions with the
West Philadelphia supplier, and then there was the
transaction on the 16th with the North Philadelphia
supplier and then this transaction.  With the telephone
calls, we firmly believed that he was going to pick up
cocaine.

Q    And that is in conjunction with everything else
that even brought you to that Title 3 investigation in
the first place?

A    Correct.

Q    Which is your affidavit, Government Exhibit 1?

A    Correct.

        MS. MARSTON:  Nothing further.

        THE COURT:  Okay.  Any recross?

        MR. JARVIS:  Yes, Your Honor.

                    RECROSS-EXAMINATION

BY MR. JARVIS:

Q    Agent Church, when you tell this Court that you
believe that there were transactions in West
Philadelphia from the West Philadelphia connection,
and there was a transaction on October 16th with the
North Philadelphia connection or supplier, you are
basing that belief on recorded conversations solely,

Agent Church - Recross                63

1    correct?  Your interpretation of the recorded

2    conversations?

3    A    I'm trying to think -- that's certainly a big --

4    yeah, yeah, based on the recorded conversations, that's

5    what we believed.

6    Q    Well, you know what I'm getting at.  There was no

7    cocaine interdicted in any of those instances that you

8    just testified to, was there?

9    A    Correct.

10   Q    So, you weren't speculating, you're just assuming,

11   correct?

12   A    I'm sorry?

13   Q    You're assuming that there were drug transactions

14   in West Philadelphia and in North Philadelphia prior to

15   the stop of my client and the other car?

16   A    I'm making a conclusion, a logical conclusion based

17   on what I believe.

18   Q    Correct.  And as a matter of fact, you made the

19   decision for the surveillance team to conduct the stop

20   of my client and the other vehicle, correct?

21   A    Correct, myself and others.

22   Q    And at the time that you made that decision, sir,

23   you had no idea whether or not cocaine was in either

24   vehicle, did you?

25   A    I had a pretty good idea that cocaine was going to

Agent Church - Recross                     64

1    be in one of the vehicles.

2    Q    Okay.  You had a good idea.  But, you didn't have a

3    clue as to which vehicle it was going to be in, did

4    you?

5    A    I was not sure which vehicle it was going to be in,

6    no.

7    Q    You didn't have a clue?

8    A    I was pretty confident that it was going to be in

9    one of those two.

10   Q    I understand that.  But, you didn't have a clue as

11   to which vehicle --

12          MS. MARSTON:  Objection, argumentative.

13   BY MR. JARVIS:

14   Q    -- it was going to be in?

15          THE COURT:  Excuse me.

16   BY MR. JARVIS:

17   Q    -- did you?

18   A    My conclusion was it was going to be one of those

19   two.  I didn't know which one it was going to be in.

20   Q    Agent Church, I don't want to badger you, you

21   didn't have a clue as to which vehicle --

22          THE COURT:  Asked and answered.

23          MR. JARVIS:  But, he didn't answer.

24          THE COURT:  He has no answer maybe.

25          MR. JARVIS:  Very well then, Your Honor.

65

1    He will stand with that answer.  Very well.

2            THE COURT:  Okay.  Anything else?

3            MR. JARVIS:  Thank you.  Nothing else, Your

4    Honor.

5            MS. GRASSO:  I have nothing else, Your Honor.

6            THE COURT:  Very good.  Agent Church, you may

7    step down, thank you.

8            (Witness excused.)

9            MS. GRASSO:  Your Honor, may I step out

10   briefly?  I will be back before the next witness is

11   even on the stand.

12           THE COURT:  Sure.

13           MS. GRASSO:  Thank you.

14           (Pause in proceedings.)

15           MR. LEVERETT:  Your Honor, the government

16   calls Michael Boudwin.

17           THE COURT:  Please take the stand.

18           MICHAEL BOUDWIN, Government's Witness, Sworn.

19           COURTROOM DEPUTY:   Please state your name.

20           THE WITNESS:  Sergeant Michael Boudwin,

21   B-O-U-D-W-I-N.

22           MR. LEVERETT:  May I proceed, Your Honor?

23           THE COURT:  Please.

24                     DIRECT EXAMINATION

25   BY MR. LEVERETT:

Sergeant Boudwin - Direct                    66

1   Q    Good afternoon, sir.

2   A    Good afternoon.

3   Q    How are you employed, sir?

4   A    I'm a sergeant in charge of the Delaware County

5   criminal investigation division, narcotics unit.

6   Q    And how long have you been a sergeant in CID?

7   A    I've been a sergeant for eighteen years.

8   Q    And what are your duties as a sergeant in CID?

9   A    I'm in charge of the Delaware County drug task

10  force which is comprised of local, county and state

11  police officers.

12  Q    And in general terms, could you please describe for

13  the Court what tasks you typically perform in

14  connection with your duties?

15  A    I'm an undercover officer in that squad as well,

16  and we do search warrants, arrest warrants,

17  surveillance, participate with other state and local

18  agencies involving drug investigations.

19  Q    And specifically directing your attention to

20  October 20th, 2009 what, if any, investigation were you

21  involved in on that date?

22  A    We were investigating Jon and David Cobb.

23  Q    And how long had you been involved in the

24  investigation of Jonathan Cobb and David Cobb?

25  A    From the inception of the wire.

Sergeant Boudwin - Direct                    67

1    Q    And before October 20th, 2009 if you could also
2    describe for the Court what tasks you performed in
3    connection with the investigation of the defendants?
4    A    I was the primary surveillance officer as far as
5    the investigation was concerned.
6    Q    And could you briefly describe for the Court how
7    often you were conducting surveillance in connection
8    with this investigation?
9    A    We would conduct surveillance seven days a week and
10   we would run two shifts, like a morning shift and an
11   afternoon shift every day.
12   Q    And where were you conducting surveillance prior to
13   October 20th, 2009?
14   A    Through the City of Chester.
15   Q    And directing your attention specifically on
16   October 20, 2009, what tasks were you performing that
17   evening in connection with the investigation of the
18   defendants here?
19   A    As a result of phone calls we received from Agent
20   Church and Detective Tyler who were up at the plant,
21   the listening post --
22   Q    I'm sorry, may I stop you, sir?
23   A    Yes.
24   Q    When you say "the plant," would you please describe
25   for the Court what you mean?

Sergeant Boudwin - Direct                    68

A    The plant is where they were listening to the phone

calls over the hard wire.

Q    Okay.  Thank you.

A    I was asking you on the evening of October 20th,

2009, where you were conducting surveillance?

A    Again, I was in the City of Chester.  I was down in

the -- watching Mr. Cobb, Jon, in the 300 block of

Norris Street, and I received a phone call from the

plant stating that Mr. Cobb was going to the 2600 block

of People Street on the west side of Chester.

Q    Now, during the course of your involvement in this

investigation, had your responsibilities taken you to

the area of People Street before?

A    I had been by 2611 People Street on prior occasions

to check that house because it was part of the

investigation, and one of the target houses.

Q    And on October 20th when you received information

from the plant that Mr. Cobb was traveling to that

area, what did you do?

A    I went up there that evening, got there before Mr.

Cobb, took a quick ride down the street.  There was a

white Kia backed into the driveway of 2611 People

Street.

Q    I'm sorry, let me stop you for a second.

          Had you seen that vehicle, that white Kia

1  that you described?

2  A    I seen it on a number of occasions, prior occasions

3  when I was up on People Street and it was always backed

4  into the driveway of 2611 People Street.

5  Q    Okay.  I'm sorry, I interrupted you.  You were

6  saying how you were driving down People Street before

7  Mr. Cobb --

8  A    I went down, I made a quick loop through People

9  Street and got situated out on Bethel Road at the

10  intersection of Honing and Bethel Street where I could

11  watch People Street.

12  Q    Could you please describe for the Court the

13  configuration of People Street?

14  A    Bethel is a street that runs to 95, Highland Avenue

15  and the 95 interchange and People Street is like a

16  horseshoe shaped street that connects with Bethel on

17  two different locations.

18  Q    Thank you.  And once you did your ride through as

19  you called it, what did you do after that?

20  A    I got situated at the corner of Honing and People

21  Street which is a real short block from People -- I was

22  at Honing and Bethel, and I was watching People Street.

23  Q    Okay.

24  A    From the west side of that street.

25  Q    And what, if anything, happened relative to this

Sergeant Boudwin - Direct                                  70

1   investigation while you were situated at that location?

2   A   I was there for a short period of time and as I was

3   sitting there watching the intersection, Mr. Cobb, Mr.

4   Jon Cobb who is seated at the defense table next to the

5   attorney with his hand on his face --

6          MR. LEVERETT:  Your Honor, may the record

7   reflect that he's identified the defendant, Jonathan

8   Cobb.

9          THE COURT:  So noted.

10          THE WITNESS:  Mr. Cobb came driving at me and

11   turned left on to People Street.  He was driving a

12   green ford Explorer and in the passenger seat was the

13   defendant, that I did not know at the time by name, but

14   it turned out to be Mr. Macklin, who is seated at

15   defense table in the center section.

16          MR. LEVERETT:  May the record reflect that he

17   has identified defendant, Darren Macklin.

18          THE COURT:  So noted.

19   BY MR. LEVERETT:

20   Q   And what did you do, if anything, when you saw Mr.

21   Cobb and Mr. Macklin arrive on People Street in the

22   green Explorer?

23   A   I maintained my position and I had Detective

24   Sponagle posted at the other end of People Street where

25   it intersects with Bethel so we could watch both ends

Sergeant Boudwin - Direct                    71

1   of the street and at that time I radioed those

2   observations to my other surveillance officers,

3   Sponagle, Detective Newell and Detective Honicker.

4   Q   What happened after the green Explorer arrived on

5   People Street

6   A   I sat and waited for a good maybe twenty-five

7   minutes, half hour, maybe about that time, and then at

8   that time I noticed David Cobb who is seated at defense

9   table on the end --

10          MR. LEVERETT:  Your Honor, may the record

11  reflect that he's identified defendant, David Cobb.

12          THE COURT:  So noted.

13          MR. ELLIOTT:  He drives up in a white Chevy

14  Impala that I had seen him in on prior occasions during

15  my surveillance at times.

16  BY MR. LEVERETT:

17  Q   You said "he drove up."  Where exactly did he drive

18  in relation to you?

19  A   Again, Mr. Cobb came from the same direction.  He

20  came up Bethel Road and made a left-hand turn on to

21  People Street.

22  Q   Okay.  And after Mr. Cobb arrived in the white

23  Chevy Impala, what did you do?

24  A   Again, I maintained my position at that location

25  and radioed to my fellow officers as to what I had

Sergeant Boudwin - Direct                72

1   observed.

2   Q    And what happened after you radioed to your fellow

3   officers?

4   A    Again, I was there for maybe five minutes at that

5   time and the white Kia comes out from People Street --

6   Q    Had you seen that white Kia before that day?

7   A    It was the same white Kia that had been backed -- I

8   believe it to be the same white Kia that was backed

9   into 2611 People Street, but at that time, it comes out

10  of People Street on to Bethel, makes the left-hand

11  turn, it goes right by me and Jon Cobb is driving that

12  vehicle.

13  Q    And after you saw Mr. Cobb drive by you in the

14  white Kia, what did you do?

15  A    I radioed that information to the other

16  surveillance officers and advised the other

17  surveillance officers to put a loose tail on Mr. Cobb

18  as he was going up Bethel Road towards 95.

19  Q    And when was the next time, if at all, that you saw

20  the white Chevy Impala?

21  A    After Mr. Cobb was on the move, Mr. Jonathan Cobb

22  goes on the move and I radio that information to my

23  fellow officers.  I go down People Street to see where

24  the explorer happened to be and why -- or tried to get

25  a feel for why Mr. Cobb changed cars.

Sergeant Boudwin - Direct                    73

1  Q   And what did you see when you were driving down

2  People Street?

3  A   As I go down People Street, Mr. Macklin is starting

4  to get into the passenger side of the white Impala, and

5  Mr. David Cobb is getting the driver seat of the white

6  Impala.

7  Q   And what did you do when you saw those individuals

8  getting in the Chevy?

9  A   I just drove by them, observed them, and I went

10 back out on to Bethel Road, and I was parking a little

11 bit between where the two sections of People Street

12 come out on to Bethel in a church parking lot.   I

13 observed the Chevy Impala come by me and go on to -- up

14 Bethel Road towards 95.

15 Q   If I could just stop you for a second, Sergeant

16 Boudwin.   What were you driving that day?

17 A   I was driving a pickup truck, a GMC Sierra pickup

18 truck, champaign color.

19 Q   Now, after you saw the Chevy Impala get on to

20 Bethel Road, what did you do next?

21 A   I received a call from the plant that Mr. Jonathan

22 Cobb had believed that he observed my pickup truck in

23 the area, so at that point I was worried about being --

24         MR. JARVIS:  Objection, Your Honor.

25         THE COURT:  Basis?

Sergeant Boudwin - Direct                74

1      MR. JARVIS:  Well, first of all, it's hearsay
2  what he was told.  Second of all --
3      THE COURT:  Well, he was worried I thought.
4  Did you say you were worried?
5      THE WITNESS:  After I received the call that
6  Jonathan Cobb made reference to my pickup truck, I was
7  worried.
8      THE COURT:  So he's talking about his own
9  state of mind.
10      MR. JARVIS:  That's fine.  But, if he could
11  just avoid saying what he was told, that would be
12  helpful.
13      THE COURT:  Okay.  Go ahead.
14      THE WITNESS:  I stayed stationary and radioed
15  to other surveillance officers that I was going to hang
16  back and see if they could go find these two cars.
17  BY MR. LEVERETT:
18  Q    Okay.  And what happened next?
19  A    We were told by the plant that they believed the --
20      MR. JARVIS:  Objection.
21      THE COURT:  Overruled.
22      THE WITNESS:  That the Kia was southbound on
23  95, and I advised my guys to see if they could catch up
24  to it, just go down 95 south and see if they can find
25  it, and I had two, I think Sponagle and Honicker try to

Sergeant Boudwin - Direct                    75

1   go southbound on 95.

2   BY MR. LEVERETT:

3   Q    And did there come a point in time when

4   surveillance units were redirected?

5   A    Yes.

6   Q    And please tell the Court how that came about?

7   A    Again, we received a call from the plant that they

8   are --

9           MR. JARVIS:  Objection, Your Honor, to this

10  testimony (inaudible).

11          MR. LEVERETT:  Your Honor, he's testifying

12  about information that he received while agents were

13  listening to the calls.  First of all, hearsay

14  testimony is admissible during a suppression hearing to

15  indicate to the Court why law enforcement officers take

16  certain steps.

17          THE COURT:  This is double hearsay, correct

18          MR. JARVIS:  Correct.

19          THE COURT:  It gets from the source to the

20  officers to him?

21          MR. JARVIS:  That's correct, Your Honor.

22          MR. LEVERETT:  Correct.

23          THE COURT:  So, you have to satisfy each of

24  them.  So, what is the degree of trustworthiness of

25  this information?

Sergeant Boudwin - Direct                    76

1          MR. LEVERETT:  Well, the degree of

2     trustworthiness stems from -- the source of the

3     information is the direct communications of the

4     defendants, and the officers, the law enforcement

5     officers are making decisions based on real time

6     information and relaying that information to their

7     fellow officers who are in the field.

8          THE COURT:  The first prong is the

9     defendant's conversation over the telephone?

10          MR. LEVERETT:  Correct.

11          THE COURT:  Okay.  Overruled.

12          MR. JARVIS:  Thank you, Your Honor.

13     BY MR. LEVERETT:

14     Q    Please proceed.

15     A    We were told that Mr. Cobb was going northbound on

16     95, was down by the airport.  At that point, we all

17     jumped on to 95, myself and the other three

18     surveillance officers.  I proceeded to drive up 95 to

19     see if we could lucky enough to catch up to the two

20     white vehicles.

21     Q    And where specifically did you go?

22     A    We were running so far behind, I went up to 95 and

23     like the Aramingo Avenue -- I made a u-turn and come

24     back to face southbound.  I was hoping to catch the two

25     vehicles coming down Aramingo Avenue to access 95

1    south.

2    Q    And where did you direct your other officers to go?

3    A    The other two officers, Detective Newell and

4    Detective Honicker stayed up in the City of Chester at

5    the off-ramp of 320, the Widener Avenue exit or the

6    Widener University exit and Detective Sponagle was

7    posted out on 95, right by the Linc.  There was

8    construction going on at the time on 95, and he was

9    posted out there to blend in with traffic.

10   Q    Did there come a point in time on the evening of

11   October 20th, 2009 that you left your position at

12   Aramingo Avenue?

13   A    Yes.

14   Q    And why did you leave your position on Aramingo

15   Avenue?

16   A    At that time I received a Nextel direct connect

17   message from Detective Sponagle that he had just

18   spotted the two vehicles.

19   Q    And what did you do after you received that

20   communication?

21   A    I started heading southbound on I-95 and I was in

22   radio contact or Nextel contact with my fellow officers

23   and advised them that I had talked to Agent Church at

24   the plant, and if we had the opportunity to safety stop

25   those two vehicles, we were going to do that.

Sergeant Boudwin - Direct                    78

Q    And please walk the Court through what happened as
you traveled southbound on 95?

A    As we traveled southbound on 95, again, I was in
Nextel communication with my officers and I advised
them that should the -- we were shorthanded on
manpower, we only had three vehicles at that time
because I was out of play, and that there was two
vehicles and we weren't sure where the product might
be.  So, if they didn't get off at the 320 ramp, which
is a cattle shoot, we would have to play it as it goes.

Q    When you say "cattle shoot," what do you mean by
that?

A    When you go up to the 320 off-ramp from 95, the
Widener exit, or the Widener University exit, it is
just one lane and there's high fences on each side and
there is no way -- it's easy for us to defend, we can
block that ramp very easily.

Q    And did there come a time when you yourself arrived
at that off-ramp?

A    By the time I got to that off-ramp, they were just
moving the cars and unlocking the ramp and putting them
into the parking lot of Widener University.

Q    Thank you.

          MR. LEVERETT:   No further questions at this
time, Your Honor.

79

1          THE COURT:  Cross-examination

2  BY MR. JARVIS

3  Q    Sergeant, I missed your name.  What is your name,

4  sir?

5  A    It's Boudwin, B-O-U-D-W-I-N.

6  Q    Sergeant Boudwin, you were the supervising

7  surveillance officer, did you say that?

8  A    Yes, sir.

9  Q    Okay.  So that means that your job was to

10  coordinate as best you could surveillance activity on

11  the two vehicles

12  A    Yes.

13  Q    And your surveillance of the two vehicles began in

14  and around People Street?

15  A    The two white vehicles, yes.

16  Q    I'm only talking about two vehicles, sir.  When I

17  saw two vehicles, forgive me, those are the two

18  vehicles I'm referring to --

19  A    Okay.

20  Q    -- the Kia and the Impala?

21  A    Yes.

22  Q    The two vehicles, okay?

23  A    Correct.

24  Q    All right.  Your surveillance of those vehicles

25  begin on People Street, correct?

Sergeant Boudwin - Cross                    80

1  A   Correct.

2  Q   That day, we're talking about the 20th.

3  A   I probably had seen the Impala down on Norris Drive

4  earlier in the day.

5  Q   Okay.  All right.  But, the decision to follow the

6  vehicles began on People Street?

7  A   As they were going to People Street, we then made

8  the decision to follow the vehicles, yes.

9  Q   Okay.  Well, and I want you to be clear on your

10  testimony because you have the tendency to say "we,"

11  and I want to be clear on whether or not you were

12  making the decision or Agent Luke was making the

13  decision or someone else, okay?

14  A   Okay.

15  Q   All right.  Now, who made the decision to follow

16  the vehicles?

17  A   Agent Church.

18  Q   All right.  And you followed that direction?

19  A   Correct.

20  Q   All right.  So, you followed both vehicles as far

21  as you could?

22  A   We didn't do a very good job, but we did try to

23  follow them, yes.

24  Q   All right.  And you lost your surveillance at what

25  point, sir?

Sergeant Boudwin - Cross                           81

1    A    Right from the beginning.

2    Q    Right at People Street?

3    A    Correct.

4    Q    Not even at Bell -- Bechtel --

5              THE COURT:   Bethel?

6    BY MR. JARVIS

7    Q    Bethel, not even at Bethel?

8    A    I stayed right at Bethel when they -- I never got

9    off Bethel --

10   Q    Okay.

11   A    -- until after they were long gone.

12   Q    Okay.  So, you lost them there?

13   A    I lost them there.

14   Q    And the next time you saw those vehicles was after

15   they had been stopped southbound by the Widener Street

16   exit, correct?

17   A    Correct.

18   Q    So, you didn't observe -- you weren't there when

19   the vehicles were stopped?

20   A    No.

21   Q    You have no idea -- well, you didn't surveil them

22   to any locations from the Bethel Street?

23   A    That was our intention to try to put them down.

24   Q    I understand your intention.  But, you didn't make

25   any observations --

Sergeant Boudwin - Cross                    82

1   A    No.

2   Q    -- from there?

3   A    I did not.

4   Q    Okay.  Now, by the time you regained observations

5   of the vehicles, they had been stopped, is that fair to

6   say?

7   A    Yes, sir.

8   Q    And I think you said that they were being relocated

9   or --

10  A    Yes.

11  Q    -- moved to a particular area?

12  A    Just to open a ramp up so it wasn't a traffic

13  hazard.  The ramp was starting to back up all the way

14  out on to 95 --

15  Q    Okay.

16  A    -- so we moved them like right around the corner to

17  a parking lot at Widener University.

18  Q    To a more secure location and safe location?

19  A    Correct.

20  Q    Out of traffic?

21  A    Out of traffic, yes.

22  Q    Okay.  Now, you observed my client at that time,

23  correct?

24  A    Yes.

25  Q    Where was he situated?

Sergeant Boudwin - Cross                                83

1   A    In the back of a police car.

2   Q    Was he handcuffed?

3   A    Yes.

4   Q    Was it a marked police car?

5   A    Yes.

6   Q    He was out of whatever vehicle that he was

7   traveling in the last time you saw him, I think you

8   said it was the Impala, correct?

9   A    Correct.

10   Q    The other two individuals that you have identified

11   here today, they too were removed from whatever

12   vehicles they had been traveling in, correct?

13   A    Yes.

14   Q    Where were they?

15   A    In the back of marked police cars handcuffed.

16   Q    And they were in separate police cars?

17   A    Yes.

18   Q    Correct?

19   A    Yes.

20   Q    Now, when you got there, had a search of either of

21   the vehicles been conducted?

22   A    I believe it had, yes.

23   Q    Okay.  All right.  And what is the basis of that

24   belief?

25   A    Through conversation with Detective Newell.

Sergeant Boudwin - Cross                          84

Q    Detective who?

A    Newell.

Q    Was he the detective responsible for securing and
conducting searches at that time?

A    There was no one individual detailed to do that.

Q    It just happened that he --

A    Yes.

Q    -- updated you on what had happened?

A    Yes.

Q    Well, what did he tell you he did?

A    That he had moved the car off of the ramp and found
a kilo of cocaine in the car.

Q    Okay.  So, Detective Newell told you that he moved
one of the cars, or did he tell you he moved both
vehicles?

A    No, he told me he moved the Kia.

Q    He moved the kia?

A    Correct.

Q    All right.  Did he tell you that he had searched it
before he moved it or after he moved it?

A    I believe he said he searched it after he moved it.
At the point he moved it, we were just looking to get
it off the ramp at that time.

Q    We understand that because traffic was backed up?

A    Correct.

Sergeant Boudwin - Cross                    85

1   Q    So, your belief was that no search was conducted

2   until both vehicles were removed to the parking lot

3   area?

4   A    Correct.

5   Q    Okay.  And did he tell you why he searched the

6   vehicle?

7   A    Well, I knew why.  He didn't have to tell me that.

8   Q    Oh, you knew why he searched the vehicle?

9   A    Sure.

10  Q    Why did he search the vehicle?

11  A    We were looking for a kilo of cocaine.

12  Q    You were looking for a kilo of cocaine?

13  A    Yes, sir.

14  Q    Okay.  Now, we know that you didn't make it for

15  surveillance, but I am going to ask you anyway.

16          Did you see my client or any of these

17  individuals purchase a kilo of cocaine?

18  A    No, sir, I did not.

19  Q    Did you see a house or a barn or some other

20  establishment that my client and the other individuals

21  went into to make any type of drug transaction?

22  A    No, sir, I did not.

23  Q    At the time the vehicles were stopped, they weren't

24  stopped for any traffic violations or anything, were

25  they?

1   A    No, sir.

2   Q    At the time they were stopped there wasn't any type

3   of drug activity in terms of transactions that were

4   being observed, correct?

5   A    No transaction, transportation.

6            THE COURT:  Well, when you say at the time

7   they were stopped, what do you mean?  He wasn't there

8   at the time they were stopped.  You mean literally when

9   they were pulled over.

10           MR. JARVIS:  When they were pulled over.

11           THE COURT:  So, he wasn't there.

12           MR. JARVIS:  I understand, Your Honor.  I now

13  appreciate it.

14  BY MR. JARVIS:

15  Q    Did Detective Newell report to you that there was

16  any type of drug activity that he observed other than

17  the belief that there may have been cocaine in one of

18  the vehicles?

19  A    No.

20           MR. JARVIS:  Those are my questions, Your

21  Honor.  Thank you.

22           THE COURT:  Okay.  Anyone else?

23           MR. CANNON:  I just have some very briefly,

24  Your Honor.

25           THE COURT:  Okay.  Last time you had one

Sergeant Boudwin - Cross                                87

1  question.  How many do you have this time?

2         MR. CANNON:   This will be even briefer.

3                   CROSS-EXAMINATION

4  BY MR. CANNON:

5  Q   Sergeant Boudwin, did you advise us that your first

6  involvement in this investigation was only after the

7  wire was up?

8  A   I was involved prior to that.  I thought you meant

9  as surveillance purposes.

10 Q   Okay.  Well, when you talked about conducting

11 surveillance seven days a week, when do you believe

12 that commenced?

13 A   Whenever the wire went up.

14 Q   Well, the wire went up on September 29, 2009,

15 is that about the time that you began your

16 surveillance?

17 A   Yes, sir.

18 Q   So, you were doing the surveillance for roughly

19 three weeks before the takedown on October 20, 2009,

20 would that be correct?

21 A   Yes, sir.

22 Q   It was being done sixteen hours a day, you say a.m.

23 shift and a p.m. shift?

24 A   Correct.  Myself and other officers.

25 Q   Okay.  And during the period when you were carrying

Sergeant Boudwin - Cross                    88

1   out your surveillance activities, did you have a

2   particular focus in terms of any individual?

3   A    Yes.

4   Q    And who was that?

5   A    John Cobb and David Cobb.

6   Q    Okay.  And in a typical surveillance day, could you

7   tell us in what manner you approached that task?

8   A    In what respect?

9   Q    In terms of how you carried out your surveillance.

10  Did you go to my client's home?

11  A    Yes.

12  Q    Can you take it from there?

13  A    I would sit there and for the most part I was a

14  primary surveillance officer.  I had the pickup truck.

15  There was a lot of construction happening down on Route

16  291 in the City of Chester, so I could blend in pretty

17  easy during the day.

18          I would park my vehicle and get a vantage

19  point down the bottom of the street and watched Mr.

20  Cobb, both Cobbs.

21  Q    Is this on Norris Street?

22  A    Yes.

23  Q    In Chester?

24  A    Yes.

25  Q    Okay.  And if one of them got into an automobile

Sergeant Boudwin - Cross                89

1  and drove away would you follow them?

2  A    I would not.  I would call it out to the other

3  surveillance officers and give them a direction of

4  travel.  Norris Street is a dead end street.  You've

5  got to come out and go east or west on Third Street, or

6  you can go down to 291 which is Second Street.

7         It is a very tight neighborhood, it was hard

8  to surveil, so we would have to sit on the outer

9  perimeter and I would sit there up the street with

10 binoculars and watch, listen to the phone calls come in

11 from the plant, watch the movement of the Cobb brothers

12 and I would call out the car directions to -- and other

13 potential buyers or customers coming up the street.

14 Q    During the period of surveillance did you ever see

15 either Jonathan Cobb or David Cobb involved in a drug

16 transaction?

17 A    I saw them involved in what I believed to be drug

18 transactions.  Did I see drugs, no I did not, but I saw

19 them meet with people many times on the street.

20 Q    Well, what forms the basis for --

21         THE COURT:  Why don't we take them one at a

22 time instead of both?

23         MR. CANNON:  Yes, of course.

24 BY MR. CANNON:

25 Q    What forms the basis for your belief that you saw

Sergeant Boudwin - Cross                          90

1    Jonathan Cobb involved in a drug transaction?

2    A    From my prior knowledge of Mr. Cobb.

3    Q    You mean the fact that he was convicted previously

4    of drug distribution formed the basis for your belief

5    that because he was meeting with someone that he was

6    involved in transacting drugs?

7    A    No, I had met him once in an undercover capacity.

8    I was trying to buy cocaine from him, but he wouldn't

9    sell to me because he thought I was a police officer.

10   Q    Well, how many years ago was that?

11   A    Quite a number of years.  I met him at the 200

12   block of Congress Street through another individual.

13   Q    Well, coming back to the period of surveillance

14   which was just for a period of roughly three weeks

15   before the takedown on October 20, 2009, is there

16   anything that you can identify to support your belief

17   that when Mr. Cobb, that is Jonathan Cobb met with

18   someone that he was meeting with them for the purpose

19   of selling them drugs?

20   A    Well, based on the phone calls that the plant was

21   receiving and relaying to me who to watch for, then

22   that specific person would come up the street or

23   someone would come up the street, at that particular

24   time Mr. Cobb would go out and jump in their car with

25   them, sit there with them like two or three minutes, or

Sergeant Boudwin - Cross                                      91

1  they would get out of the car and meet with Mr. Cobb

2  behind like an open trunk of another car and then that

3  person would stay two or three minutes and then drive

4  off.

5  Q   Okay.  Did you ever see an exchange of money?

6  A   Like I said, I couldn't see anything, you know,

7  either below the windows of the car.  They were

8  standing behind the car with the trunks open.

9  Q   You saw no exchange of money and I assume you saw

10 no exchange of drugs?

11 A   That is correct.

12 Q   You never stopped anyone who you believe had just

13 made a purchase from Jonathan Cobb and confirmed or

14 verified that that person was then in possession of

15 drugs, am I right?

16 A   I didn't personally do it, but there was one person

17 that was stopped, yes.

18 Q   You, yourself, did not engage in that activity?

19 A   I was a primary surveillance officer.  I called

20 that vehicle out.  I called the description of the

21 black female out and radioed it to the officers to

22 watch for her on the way out and she was ultimately

23 stopped and was found to be in possession of cocaine.

24         MR. CANNON:   I have no other questions, Your

25 Honor.

Sergeant Boudwin - Cross                92

1       CROSS-EXAMINATION

2   BY MS. GRASSO:

3   Q    Good afternoon, Sergeant.

4   A    Good afternoon.

5   Q    Just so we are clear, on October 20th, 2010, the

6   first time you see Darren Macklin is when he arrives

7   with Jonathan Cobb in the green Explorer, is that

8   correct?

9   A    Yes.

10  Q    Okay.  And prior to October 20th, 2009 what were

11  your observations of Darren Macklin, if any?  Had you

12  ever seen him before?

13  A    You know, if I had seen him -- if he had been on

14  the street I wouldn't have been able to tell you.  I

15  didn't know him.

16  Q    All right.  So, you are identifying him basically

17  based upon your interaction with him on October 20th

18  after the vehicles had been stopped, is that fair to

19  say?

20  A    That's correct.

21  Q    Okay.  And can you give me an approximate time the

22  Ford Explorer arrives on People Street?

23  A    I thought it was right around 7:00.

24  Q    And at that point you are making observations in

25  the champagne colored GMC pickup truck, correct?

Sergeant Boudwin - Cross                93

1   A    Yes.

2   Q    Using binoculars, I take it?

3   A    I had real small binoculars I could use there, yes.

4   Q    Okay.  And all of your observations are made from

5   the vehicle.  At no point in time are you on the street

6   on foot, is that fair to say?

7   A    No, it was an all black neighborhood.  I was in the

8   vehicle the whole time.

9   Q    Okay.  And you said that when Darren Macklin --

10  well, you see him walking into People Street with

11  Jonathan Cobb, correct?

12  A    When they drive into People Street they make the

13  turn in front of me off Bethel, I lose sight of them

14  once they go down People Street.

15  Q    Okay.  So, you don't actually see them physically

16  walking into 2611 People Street, correct?

17  A    No, I did not.  That's correct.

18  Q    And you don't actually see them -- you don't ever

19  see them walk out of 2611 People Street, is that

20  correct?

21  A    Correct.  And the next time I see your client, Mr.

22  Macklin, he is getting into the passenger side of that

23  white Chevy.

24  Q    And at that point he is with David Cobb, is that

25  correct?

1   A    Yes.

2   Q    So, you never observed Darren Macklin carrying

3   anything on that day whatsoever, because you only see

4   him when he is actually physically in a vehicle or just

5   about to get into a vehicle, correct?

6   A    That's correct.

7   Q    All right.  Thank you.

8              MS. GRASSO:  I have nothing else.

9              THE COURT:  Any redirect?

10             MR. LEVERETT:  None, Your Honor.

11             MR. JARVIS:  Your Honor, I just have one

12  quick question, Your Honor.

13             THE COURT:  Okay.

14                    CROSS-EXAMINATION

15  BY MR. JARVIS:

16  Q    Was it your testimony that when the vehicles were

17  stopped that you were aware of who was driving which

18  vehicles?  Did you testify to that?

19  A    I learned it later on.

20  Q    Oh, you learned it later on?

21  A    Yes.

22  Q    Okay.  But, you didn't know until later on?

23  A    Until I had contact with Newell, that is when I

24  found out.

25  Q    Okay.  And I believe you also testified on my cross

Sergeant Boudwin - Cross                              95

1   that all three individuals were handcuffed in the back

2   of police vehicles, correct?

3   A    Yes.

4   Q    Now, were there law enforcement officers around

5   those vehicles with firearms drawn at that time?

6            THE COURT:  Well, was he there?  Again, we go

7   back to that question.

8            MR. JARVIS:  At the time he arrived, Your

9   Honor.  I apologize.

10           THE COURT:  I think there is some other

11  witnesses who may testify to that.  So, it would only

12  tell us what somebody told them.

13           MR. JARVIS:  Okay.  Very well.

14  BY MR. JARVIS:

15  Q    You can tell us and the Court, though, whether or

16  not my client or any of the other individuals were

17  actually arrested or released after the stop and

18  seizure of that cocaine, can't you?

19  A    I can tell you that.

20  Q    What happened?

21  A    They were detained.  They were taken to Chester

22  Police Department and then they were released.

23  Q    So, they weren't arrested.

24  Q    Technically under Pennsylvania law they were

25  arrested.  They were detained of their freedom, so they

Sergeant Boudwin - Cross                          96

1    were arrested, but they weren't charged.

2    Q    Sir, how long have you been a law enforcement

3    officer?

4    A    Thirty-four years.

5    Q    Okay.  And how many arrests for drugs have you made

6    over that period?

7    A    Over ten thousand.

8    Q    And those involving drugs, when they are arrested

9    they are put in the pokey and the jail doors are

10   slammed, correct?  You know what an arrest is, don't

11   you?

12   A    They were arrested, but they were not charged at

13   that time.

14   Q    So, they were unarrested, is that your testimony?

15             MR. LEVERETT:  Objection, Your Honor.

16             MR. JARVIS:  Nothing further, Your Honor.

17             THE COURT:  Wait a minute.  Sustained.  Okay.

18   Sergeant Boudwin, you may step down.

19             THE WITNESS:   Thank you.

20             (Witness excused.)

21             THE COURT:  Let's take just a brief recess.

22   I believe you have one more witness?

23             MR. LEVERETT:  That's correct, Your Honor.

24             THE COURT:  Okay.  We will take ten minutes.

25             (Recess, 3:56 p.m. to 4:07 p.m.)

97

1    THE COURT:  Okay.  Please be seated.  Okay.

2  Ms. Marston, any other witnesses?

3    THE COURT:  Okay.

4    MR. LEVERETT:  Yes, Your Honor.  The

5  government calls Detective John Newell.

6    JOHN NEWELL, Government's Witness, Sworn.

7    THE WITNESS:  John Newell, N-E-W-E-L-L.

8    MR. LEVERETT:  May I proceed, Your Honor?

9    THE COURT:  Yes.

10    MR. LEVERETT:  Thank you.

11                   DIRECT EXAMINATION

12  BY MR. LEVERETT:

13  Q    Good afternoon, sir.

14  A    Good afternoon.

15  Q    How are you employed, sir?

16  A    I am employed by the Newtown Township Police

17  Department.  I have been employed as a police officer

18  for the past twenty years, and I have been assigned to

19  the Delaware County criminal investigation division for

20  the past twelve years.

21  Q    And what is your job title?

22  A    I am a detective assigned to a county narcotics

23  unit?

24    MR. JARVIS:  Can the witness speak up?  I

25  cannot even hear him, Your Honor.

Detective Newell - Direct                98

1          THE COURT:  Okay.  Well, let's start all over

2    again.  If you could just speak a little louder, sir,

3    please.

4          MR. JARVIS:  He is not even speaking -- can

5    he speak into the microphone and turn it to you?

6          THE COURT:  Excuse me.  I will give the

7    directions.

8          MR. JARVIS:  Thank you, Your Honor.  I

9    apologize.

10          THE COURT:  If you could speak a little

11    louder?

12          THE WITNESS:   No problem.

13          THE COURT:  Thank you.

14          THE WITNESS:   I am a detective with the

15    Newtown Township Police Department.  I have been a

16    police officer for the past twenty years.

17          THE COURT:  Can you hear him now?

18          MR. JARVIS:  I can hear him now.  He is

19    speaking right there.

20          THE COURT:  Good.

21          THE WITNESS:   I am assigned to the Delaware

22    County criminal investigation division narcotics unit.

23    I have been assigned to that unit for the past twelve

24    years.  I am a detective assigned to the county

25    narcotics unit.

Detective Newell - Direct                    99

BY MR. LEVERETT:

Q   And could you please describe for the Court in general terms what your duties are as a detective with CID?

A   Sure.  I function in an undercover capacity throughout Delaware County.  I act as a seller or purchaser of drugs, illegal drugs and controlled substances.

I conduct surveillance details, execute and prepare search warrants and assist other agencies as required or requested.

Q   I want to direct your attention specifically to October 20th, 2009.  What, if any, investigation were you involved in on that date?

A   I was involved in an investigation with John Cobb and David Cobb involving the cocaine sales.  On that particular date I was assigned to conduct surveillance.

Q   And what time did you start conducting surveillance on that date?

A   I believe it was about 4:00 in the afternoon.

Q   I want to direct your attention specifically to the evening of October 20, 2009.  Where were you conducting surveillance on the evening of October 20, 2009?

A   During the evening hours, I was conducting surveillance for the most part around the People Street

Detective Newell - Direct          100

1    area of Chester.

2    Q    Okay.  And why were you conducting surveillance

3    there?

4    A    At hat point we were -- I had received information

5    and was given information through the command center,

6    which would be through Special Agent -- actually

7    Officer Tyler, that John and David Cobb were going to

8    pick up a large supply of cocaine that night.

9          So, my responsibilities at that point were to

10   conduct surveillance on the People Street where

11   Sergeant Boudwin had last observed both John and David

12   Cobb.

13   Q    Now, you mentioned a few people.  I want to make

14   sure the Court is clear who these individuals are.  You

15   mentioned an individual named Dave Tyler, is that

16   correct?

17   A    Officer Tyler, correct.

18   Q    Officer Tyler.

19   A    Yes.

20   Q    And you also mentioned something called the command

21   center, right?

22   A    Yeah.  Operations center, that would be where the

23   wire was being run out of.

24   Q    Okay.  And you also mentioned a Sergeant Boudwin,

25   who is that?

1    A    That's correct.  He is a Sergeant in my narcotics

2    unit.

3    Q    Okay.  And who else was conducting surveillance

4    with you on October 20, 2009, if anyone?

5    A    Detective Sponagle.  He is with the Delaware County

6    criminal investigation division narcotics unit and

7    Detective Honicker, who is also with the same unit.

8    Q    And what kind of car were you driving while you

9    were conducting surveillance that day?

10   A    An SUV.

11   Q    And you said you were conducting surveillance in

12   the area of People Street, is that correct?

13   A    That's correct.

14   Q    And could you please describe for the Court what

15   you did in relation to this investigation?  Why you

16   were conducting surveillance on the evening of October

17   20, 2009 in the area of People Street?

18   A    Sure.  Again, my responsibilities that night were

19   to conduct surveillance.  I wasn't on People Street

20   itself.  I was actually several streets away and

21   Sergeant Boudwin's responsibilities were to conduct a

22   surveillance on People Street.

23        Sergeant Boudwin, for the most part, through

24   the information that I was getting through the radio,

25   was that he was driving up and down People Street

Detective Newell - Direct                102

1    occasionally and able to observe David and John Cobb at

2    one of the residences there.

3              He had also -- originally we had observed Jon

4    Cobb drive over in a green explorer, and at some point

5    he had switched over into a white Chevy Impala  and a

6    white Kia that both Jon and David were in.

7    Q    And how did this information come to you?

8    A    Through Sergeant Boudwin.

9    Q    Okay.  And what did you do in response to this

10   information?

11   A    At some point during that time period Sergeant

12   Boudwin advised the other officers through the radio or

13   the Nextel, I can't remember which one, that John and

14   David Cobb were leaving the residence on People Street.

15   They both got into white colored vehicles and were

16   headed back from People Street out onto Bethel Avenue.

17   Q    And based on your understanding of what was being

18   communicated to you from Sergeant Boudwin, how many

19   cars were leaving People Street?

20   A    Two cars.

21   Q    And what color were those cars?

22   A    They were both white.

23   Q    Okay.  And after you received that information what

24   did you do?

25   A    At that point I tried to follow those vehicles.

Detective Newell - Direct                103

1   The vehicles exited onto Bethel Avenue towards Highland

2   Avenue and onto the on-ramp for either Southbound 95 or

3   322.

4        It is both the same on-ramp and you can get

5   onto either highway from that.  At that point I lost

6   site of them and traveled south on 95 where I no longer

7   observed the vehicles.

8   Q    And did there come a point in time where you

9   started traveling northbound on 95?

10  A    Not until later on that night.

11  Q    Okay.  And what did you do after you went

12  southbound on 95?

13  A    Well, yeah, actually eventually I turned around,

14  got north on 95 and went back into Chester City and

15  basically stayed there until we had received

16  information from the command center which would have

17  been either Special Agent Church or Officer Tyler.

18  Q    Now, I want to back up a step.  Why did you go from

19  traveling southbound to traveling northbound and set

20  up?

21  A    To go back to the City of Chester.  That is where

22  we were conducting most of the surveillance and at that

23  point we weren't aware where the Cobb brothers had

24  gone.

25  Q    And did there come a point in time that evening

1  where you received information that identified where

2  they were?

3  A    I did.

4  Q    And how did that information come to you?

5  A    That was through Sergeant Boudwin.

6  Q    And what did he say?

7  A    Sergeant Boudwin advised me and the other officers,

8  again, through either radio or the Nextel, that he had

9  received information from it was either Special Agent

10  Church or Officer Tyler that the Cobb brothers' phones

11  were pinging, and by pinging I mean their cell signals

12  were being bounced off of towers down towards 291 near

13  the airport.  So, they looked to them and through I

14  think some phone calls that they were going to

15  Philadelphia to pick cocaine up.

16  Q    And what did you do in response to those calls?

17  A    The decision was made to conduct surveillance and

18  to kind of set up two different surveillance points,

19  one being on 291 where I was in Tinicum Township and

20  one being on 95 and to hope to catch them on the way

21  back from Philadelphia after they had picked up their

22  supply of cocaine.

23  Q    Did there come a point in time where you received

24  information that they were, in fact, traveling back

25  down 95?

Detective Newell - Direct                    105

1   A   Yes, I did.  We received information from Detective

2   Sponagle who was on 95 on the southbound side somewhere

3   near the stadiums, I am not sure exactly where, that he

4   had observed both John and David traveling south on 95

5   in those white vehicles, the Kia and a Chevy Impala.

6   Q   And what did you do when you heard this

7   information?

8   A   The decision was made for myself and Detective

9   Honicker along with Sergeant Boudwin to get onto 95 and

10  to start to attempt to follow both John and David while

11  they are traveling on 95.

12  Q   Detective Sponagle was behind them and was advising

13  us of their location at some point.  I was in front of

14  them, them meaning John and David Cobb in the white

15  vehicles.

16          I had observed through my rear-view mirror

17  that they both had their right turn signals on and were

18  exiting the ramp, the Widener ramp off of 95 into

19  Chester City.

20  Q   May I stop you sir.  So, my understanding based on

21  what you just said is that there came a point in time

22  where you were able to see those two white vehicles on

23  95?

24  A   That's correct.

25  Q   And where were they in relation to you?

Detective Newell - Direct                    106

1    A    At first they were parallel with me and then I sped

2    up and I was ahead of those vehicles.

3    Q    Okay.  And then what happened?  You said you saw

4    them in your rear-view mirror with their signals on --

5    A    Right.

6    Q    -- what happened after that?

7    A    That's correct.  At that point the decision was

8    made that if they both exited off of that ramp that we

9    were going to conduct a vehicle stop on those vehicles

10   once they got to the top of the ramp, and that is what

11   happened.

12         I stopped my vehicle at the stop sign and the

13   other vehicles, other unmarked police vehicles who were

14   behind John and David Cobb in the white vehicle were

15   behind them and stopped their vehicles, and in

16   essence -- which kept them from fleeing the area.

17   Q    And what happened after you got out of your car?

18   A    After I got our of my car I ordered David Cobb who

19   was the driver of the first car, which was the white

20   Kia.  David -- when I got out of the car I ordered his

21   hands up.  He was playing around under the driver's

22   seat or the console area.

23   Q    I am sorry.  Let me stop you.  What do you mean

24   by -- what did you see?

25   A    I could see him lean down and his both hands

1  towards the underneath of his seat or the console area,

2  or the passenger seat area.  I couldn't tell where his

3  hands were.  I just knew they were down below the seat

4  area.

5          I had asked him a couple times to put his

6  hands up where I Could see them, and probably within

7  ten or fifteen seconds he eventually did comply with

8  that and was cooperative at that point.

9  Q   Okay.  And then what happened after you arrived at

10 that white Kia that David Cobb was driving?

11 A   I asked David to step from the car, detained David,

12 handcuffed him and placed him on the side of the road

13 sitting on the curb side.  Once David was placed into

14 custody or detained and then Jon Cobb and the passenger

15 of the vehicle, which was I believe Darryl Macklin,

16 they were all detained, placed on the curb.

17         Once at that point everybody was secured, we

18 immediately got the vehicles off the exit ramp into a

19 parking lot which was part of the Widener Campus which

20 was directly next to the off-ramp.

21 Q   How far is that parking lot from where you stopped

22 the cars?

23 A   Maybe fifty yards.

24 Q   Okay.

25 A   We just got them off the road, basically.  And then

1  I drove the white Kia from the off-ramp to the parking

2  lot and I could see a -- the partial -- the top portion

3  of a clear or opaque shopping bag from under the

4  passenger seat.

5      Once I got into the parking lot of Widener I

6  spoke with Officer Tyler, went around to the passenger

7  side and removed a brick, a kilo of cocaine which was

8  contained in that plastic bag.

9  Q   Now, you said that there were other individuals who

10 were in another car, is that correct?

11 A   That's correct.

12 Q   Where was that -- what kind of car was that second

13 car?

14 A   That was a Chevy Impala, white in color.

15 Q   And who was in that car?

16 A   John Cobb and Darryl Macklin.

17     MR. LEVERETT:  May I have a moment, Your

18 Honor?

19     (Pause in proceedings.)

20     MR. LEVERETT:  No further questions at this

21 point.

22     THE COURT:  Cross-examination.

23         CROSS-EXAMINATION

24 BY MR. JARVIS:

25 Q   Detective Newell?

1   A    Correct.

2   Q    Can you tell us -- can you tell us -- give us a

3   time frame when this activity was taking place?  What

4   time did you observe the two vehicles traveling

5   southbound?

6   A    Southbound on 95?

7   Q    On 95.

8   A    Right.  It was probably around 7:00 at night, some

9   time around that time.

10  Q    All right.  So, around 7:00 p.m.?

11  A    Correct.

12  Q    You first observed both vehicles, the two white

13  vehicles?

14  A    That's correct.

15  Q    Southbound on 95?

16  A    Well, I can't say for sure if they went southbound

17  on 95.  I can say for sure they pulled off of People

18  Street onto Bethel Avenue, across Highland Avenue and

19  on the on-ramp to southbound 95, but it is also the

20  on-ramp to I believe it is westbound 322.

21       So, I can't say -- that's why we lost them,

22  because I couldn't see if they had traveled south on 95

23  or got on 322.  So, at that point I just went south on

24  95, tried to catch up, speed ahead, and I never saw

25  their vehicle.  So, I don't know which way they went on

Detective Newell - Cross                110

1   95, or if they even went on 95.  They could have went

2   on 322.

3   Q   All right.  Well, let me be a little clearer with

4   my question.

5   A   Sure.

6   Q   I believe you testified that you lost surveillance

7   but then you regained surveillance while the vehicles

8   were southbound on I-95, wasn't that your testimony?

9   A   No, that is not my testimony.  My testimony was

10  that I got on the on-ramp and maybe it was a little

11  confusing to you, but I got on the on-ramp --

12  Q   No. sir.

13  A   -- to southbound 95 which is also to --

14          MR. JARVIS:  Respectfully, Your Honor.

15  BY MR. JARVIS

16  Q   Let me try to rephrase my question.

17          Your testimony that I am referring to was

18  that at some point during your surveillance you were

19  southbound on 95, you observed the vehicles pass you,

20  you sped up and saw their blinker lights on --

21  A   Okay.  That is later in the evening.

22  Q   Well, that is what I am talking about.

23  A   Okay.  Well, you need to be a little bit more

24  clear.

25          THE COURT:  Okay.  So, let's go to --

Detective Newell - Cross                    111

1          MR. JARVIS:  I want to go to the heart of the

2     matter.

3          THE COURT:  -- when the vehicle was stopped.

4     BY MR. JARVIS:

5     Q   Yes, let's go there.

6     A   Okay.

7     Q   What time did that happen?

8     A   That was about -- I believe it was around eight or

9     9:00.  I am not sure of the exact time.

10    Q   All right.  Well, you know, you have been an

11    officer for thirty years?

12    A   Twenty years.

13    Q   Twenty-two years?

14    A   Twenty years?

15    A   That's correct.

16    Q   What time was it?

17    A   Again, as I said once, it was somewhere between

18    around eight or 9:00.  I am not sure of the exact time.

19    Q   Well, I don't want to argue with you, but there is

20    a big difference between eight and 9:00, sir.

21    A   Well, that's my answer.

22         THE COURT:  It is an hour difference.

23    BY MR. JARVIS:

24    Q   An hour difference.

25    A   Right.  That's my answer.

Detective Newell - Cross                    112

1    THE COURT:  Okay.  Next question.

2  BY MR. JARVIS:

3  Q   All right.  And when you first observed my client,

4  I believe you said that he was driving the Kia?

5  A   Correct.

6  Q   All right.  And at some point the decision was made

7  to conduct a traffic stop?

8  A   Correct.

9  Q   Of both vehicles?

10  A   To stop the vehicles, correct.

11  Q   Now, can you tell us who made that decision?

12  A   I believe it was Officer Tyler.

13  Q   Officer Tyler?

14  A   Correct.

15  Q   We didn't hear from him today.  Is he here?

16  A   Yes.

17  Q   He is outside?

18  A   Yes.

19  Q   Okay.  Can you tell us what it was -- what

20  information you received that caused you to take action

21  to stop these vehicles, what were you told?

22  A   It was more of a tactical decision.  The decision

23  had been made that if both vehicles exited the highway

24  on a ramp that we felt safe and secure enough to stop

25  the vehicles, which would keep either the vehicle from

Detective Newell - Cross                113

1  fleeing the scene or the occupants of the vehicle from

2  fleeing the scene, or the occupants of the vehicle from

3  dumping any evidence, once we felt that that was

4  secure, and tactically we felt that that was secure

5  particularly on the Widener ramp, because it is an

6  elevated ramp with about twelve foot length of chain

7  fence on either side with a very narrow highway.

8          So, the decision was made that that would be

9  a safe spot to stop them to try to avoid any kind of

10  pursuits or any destruction of evidence and that is

11  where we stopped them.

12  Q    What were you told?

13  A    To stop the vehicle.

14  Q    Is that all -- and -- it was detective of Officer

15  Tyler told you hey, Detective Newell, stop the vehicles

16  in a safe manner, in a safe location?

17  A    It was an ongoing conversation from the time that

18  they were on the way back, they meaning John and David

19  Cobb were on the way back from the drug supplier's

20  house from picking up a large amount of cocaine, during

21  that time period there were some tactical decisions to

22  be made as to how to stop the car and where to stop the

23  car.

24          So, there was no -- it wasn't just a complete

25  silence for that twenty minutes of surveillance and

Detective Newell - Cross                    114

1   then someone just said stop the car.  It was more a

2   discussion that we are going to stop the car, but only

3   if we can stop it safely and that is when the decision

4   was made that when we saw they were both exiting the

5   Widener ramp we relayed that they were exiting the

6   Widener ramp and that is when the vehicles were

7   stopped.

8   Q   Okay.  What information did you receive in your ear

9   to cause you to stop the vehicles?  What were you told?

10  A   Again, I was told by Officer Tyler that once the

11  vehicles were leaving the ramp and we felt secure to

12  stop the vehicles.

13  Q   Okay.  All right.  And do you recall what time that

14  was?

15  A   Again, it was around eight or nine at night.  I

16  don't have the exact time.  At least I don't recall the

17  exact time.

18  Q   Okay.  So, Officer Tyler told -- made a radio call

19  to you and the other people, the other officers

20  surveilling?

21  A   Correct.

22  Q   The ones that were in the rear of the two white

23  vehicles, correct?

24  A   That's correct.

25  Q   To stop the vehicles?

Detective Newell - Cross                    115

1   A    That's correct.

2   Q    All right.  Now, at the time you observed the

3   vehicles, at least the one that my client was

4   operating, there was no traffic infractions, correct?

5   A    That's correct.

6   Q    And I believe you said that you positioned your

7   vehicle in front of my client's vehicle, the one that

8   he was operating --

9   A    That's correct.

10  Q    -- in a manner that caused him to come to a stop?

11  A    No, that's not correct.

12  Q    Okay.

13  A    When we got off the ramp there is a stop sign at

14  the top of the ramp.  I stopped my vehicle, which would

15  force any vehicles from behind me from stopping.  So,

16  that is how we did the stop.

17  Q    Okay.  All right.  So, you were able to position

18  yourself in front -- you were already in front of --

19  A    Yes.

20  Q    Okay.  So, at the top of the ramp, the Widener

21  ramp?

22  A    That's correct.

23  Q    Just at the stop sign you stopped, my client's car

24  stopped?

25  A    That's correct.

1    Q    And you believe the vehicles behind him stopped?

2    A    That's correct.

3    Q    You immediately jumped out of your vehicle,

4    correct?

5    A    That's correct.

6    Q    With your firearm drawn?

7    A    That's correct.

8    Q    What type of firearm did you have, by the way?

9    A    Sig forty caliber.

10   Q    Is that a SIG Sauer?

11   A    That's correct.

12   Q    Forty caliber?

13   A    Just like I said.

14   Q    Semiautomatic?

15   A    Yes, sir.

16   Q    And you had it drawn?

17   A    That's correct.

18   Q    And it was pointed directly at my client?

19   A    Yes, it was.

20   Q    You ordered him out.  You said about after ten

21   seconds he got out?

22   A    When I got out of the car he was reaching under the

23   seat console area.

24   Q    I understand that, but after ten seconds you said

25   he got out?

1  A    No, after about ten or fifteen seconds I said his

2  hands came up from underneath the console passenger

3  front -- underneath from my view, put it that way.  And

4  he got out of the car.  Once his hands came up, then I

5  gave him directions to come out of the car and then he

6  came out of the car.

7  Q    He got out of the car?  Did you put handcuffs on

8  him right away?

9  A    Yes, I did.

10 Q    So, you placed him under arrest?

11 A    He was detained.

12 Q    Okay. You put handcuffs on him?

13 A    Correct.

14 Q    He wasn't free to go anywhere, right?

15 A    Correct.

16 Q    And did you take him immediately from that location

17 to a marked police vehicl or, did you leave him

18 standing there until a vehicle arrived to the scene?

19 A    He was originally set on the curb and then a marked

20 vehicle got there and he was placed in the vehicle.

21 Q    Did you detain and handcuff the other individuals

22 as well, or did your colleagues take care of them?

23 A    My colleagues took care of them.

24 Q    What time was that?

25 A    Again, it was around 8:00 at night or 9:00 at

1    night, somewhere in that time frame.

2    Q    How long were you there at the top of the ramp with

3    my client sitting handcuffed on the curb before they

4    were removed from that location?

5    A    Five minutes.

6    Q    Okay.  What happened within that five minute

7    period?

8    A    Everybody was detained, secured.  Once we got

9    enough units to transport your client and the other two

10   they were moved fifty yards to the parking lot next to

11   us.

12   Q    That all took place in the span of five minutes,

13   sir?

14   A    Yeah.

15   Q    Okay.  Now, I believe you said you were responsible

16   for driving the Impala from that location or the Kia?

17   A    The Kia.

18   Q    All right.  My client didn't resist arrest.  He

19   didn't try to run, did he?  He sat there?

20   A    No, he was cooperative.

21   Q    He was very cooperative, wasn't he?

22   A    Well, he didn't run and he didn't resist arrest.

23   He didn't give me a hard time or anything.

24   Q    Okay.  And once the vehicles were re-located to the

25   parking lot, within that five minute time frame which

Detective Newell - Cross                119

1   one of you called for the drug sniffing dog?

2   A    I don't even know if there was a drug sniffing dog

3   that night that I saw.  I am not saying there was or

4   wasn't  I don't remember seeing one.  I didn't call for

5   them, put it that way.

6   Q    Okay.  So, there wasn't a drug sniffing dog called?

7   A    I don't know if there was.  I do not recall seeing

8   one.  There could have been one there.  I didn't call

9   for one and I didn't see one.

10  Q    Okay.  Which one of you called the judge to request

11  a search warrant?

12  A    I did not.  I can't speak for any of the other

13  officers.  I know I didn't.

14  Q    How much time lapsed between you locating or

15  repositioning the Kia to the parking lot between the

16  time you got there with the car to the time that you

17  conducted your search of the vehicle?

18  A    A couple of minutes.  There was a bag sticking out

19  from the seat.  You could see it.

20  Q    Okay.  Two minutes?

21  A    Sure.

22  Q    Three minutes?

23  A    Yeah, I mean, you know, it wasn't a great deal of

24  time.

25  Q    Okay.  Two or three minutes?

Detective Newell - Cross                    120

1    A    Between two and five minutes we will say.

2    Q    Now, I believe you testified earlier that something

3    about my client and the others coming from a drug house

4    after making a purchase, do you remember testifying to

5    that or stating that?

6    A    No, I don't think I said that.  I said they came

7    from the house.  I don't know if it was a drug house or

8    not.

9    Q    They came from a house?

10   A    That is the information I was given.  I never saw

11   your clients come from anywhere other than driving out

12   from People Street onto Bethel Avenue.

13   Q    So, the information that you were given was that my

14   clients -- or my client and the others went to a house

15   in Philadelphia?

16   A    Can you try to be a little more specific about

17   which house we are talking about.  Are we talking about

18   People Street?

19   A    No, I am talking about where the drugs were

20   allegedly purchased.

21   A    From somewhere in Philadelphia with the information

22   that was given to me, correct.

23   Q    Okay.  But, you don't know.  You didn't surveil

24   them to Philadelphia?

25   A    No.

Detective Newell - Cross                    121

1  Q    Nobody did.

2  A    Nobody did.

3  Q    So, when you say you saw a bag up under one of the

4  seats you assumed that that was drugs, is that fair to

5  say?

6  A    I had an intuition that it was probably drugs.

7  Q    And I think you said -- I couldn't remember, you

8  said either passenger seat side -- where were these

9  drugs found?

10 A    Under the passenger seat.

11 Q    Under the passenger seat?

12 A    That's correct.

13 Q    And you said that it was an opaque clear bag, was

14 that your testimony?

15 A    It was an opaque shopping bag.

16 Q    When you say opaque, does that mean that you can

17 see through it?

18 A    No.

19 Q    That means you can't see through it.

20 A    It was just a shopping bag.

21           THE COURT:  Is that a brown paper bag type?

22           THE WITNESS:  Judge, I would call like if

23 you see them in a ACME or a supermarket you really

24 can't -- you wouldn't be able to read writing if it was

25 on something.  You could see a shape, but you can't see

Detective Newell - Cross                    122

1   through it, it is not a clear bag.

2   BY MR. JARVIS:

3   Q   Okay.  So, you didn't know what was in that bag,

4   did you?

5   A   Not at that point, no.

6   Q   Okay.  And I know you have been in law enforcement

7   for at least twenty years, you didn't smell cocaine,

8   did you?

9   A   At that time, no.

10           MR. JARVIS:  One moment, Your Honor.

11           (Pause in proceedings.)

12   BY MR. JARVIS:

13   Q   Just one other question.  You said that you had

14   received an order or directions from Officer Tyler to

15   make the stop, that was your testimony, right?

16   A   Yes, that's correct.

17   Q   Now, was Officer Tyler on location, part of the

18   surveillance or was he at the wire room?

19   A   He was at the command room, or operations room.

20           MR. JARVIS:  Those are my questions, Your

21   Honor.

22           (Pause in proceedings.)

23                   CROSS-EXAMINATION

24   BY MR. CANNON:

25   Q   Okay.  Detective, was there any discussion prior to

1  the actual car stops about whether a search of the

2  vehicles would be carried out after the vehicles were

3  stopped?

4  A   I don't recall any kind of in-depth conversation

5  about it and, again, that is why I deferred back to

6  Officer Tyler who was the case agent of this as to how

7  we wanted to proceed in this.

8  Q   Well, it was you that carried out the search of the

9  automobile where the kilo was found, is that right?

10 A   That's correct.

11 Q   Okay.  Were you directed to search the car?

12 A   I spoke with Officer Tyler and asked him what he

13 wanted me to do.  I told him what happened as far as

14 what I observed during the stop and then the bag

15 sticking out, and Officer Tyler told me to go ahead and

16 remove the bag or check the bag.

17 Q   Well, when you had David Cobb exit the car, did you

18 close the door to the car?

19 A   At some point the door was closed, I don't know

20 when the door was closed.

21 Q   I assume the car doors were closed before the

22 search took place?

23 A   Yeah.

24 Q   Okay.  And you conferred with Officer Tyler about

25 whether you should at that point, now that the

1 gentlemen were all in custody, whether a search of the

2 automobiles ought to be carried out, is that right?

3 A    Yeah, again I told him what I observed and the

4 actions, and I asked him what he wanted me to do and

5 that is when he told me to check under the seat.

6 Q    And that is when he said to do what?

7 A    Check under the seat.

8 Q    Check under the seat, which you took to mean that

9 you should go, enter into the car, and look inside, is

10 that right?

11 A    Just to remove the bag that was under the seat.

12 Q    Okay.  Did you ask Mr. David Cobb for permission to

13 search the car that he was operating?

14 A    No, I didn't.

15 Q    Did you have a search warrant with you at that

16 time?

17 A    No, I did not.

18 Q    Had there ever been a discussion that evening

19 during the course of the surveillance and the stop,

20 about obtaining a search warrant?

21 A    Not that I am aware of.

22 Q    I assume a search was also carried out of the other

23 automobile, is that correct?

24 A    I wasn't involved in it, so if there was, you would

25 have to check with somebody else.

Detective Newell - Cross                    125

1   Q    You know nothing about the other car being

2   searched?

3   A    No.  I am not saying it wasn't, but I just don't

4   know if there was or wasn't.

5   Q    You didn't see anyone searching the car during the

6   time that you were on location?

7   A    Not that I recall, because my focus was more for

8   the Kia.  It could have been searched.

9   Q    Can I assume that none of the three gentlemen were

10  in possession of any contraband at the time of the

11  stop, on their person is what I mean.

12  A    Mr. Jon Cobb I think had about four or five

13  thousand dollars on him.  There were no weapons on

14  them.

15  Q    No weapons, no drugs, no paraphernalia?

16  A    No.

17  Q    Okay.  Thank you.

18                  CROSS-EXAMINATION

19  BY MS. GRASSO:

20  Q    Was the first time you made observation of Darren

21  Macklin when he was in custody after the vehicles were

22  stopped?

23  A    That's correct.

24  Q    Okay.  And you were involved with the investigation

25  of Jonathan Cobb and David Cobb prior to October 20,

Detective Newell - Cross                    126

1   2009 for about a couple months, is that fair to say?

2   A    Yeah, a little over a month and a half maybe.

3   Q    Okay.  And the first time you ever made observation

4   of Darren Macklin was after he was in custody after the

5   vehicles were stopped, is that correct?

6   A    Me personally, yes.

7   Q    All right.  Thank you.

8        MS. GRASSO:  I have no more questions.

9        THE COURT:  Any redirect?

10       MR. LEVERETT:  No, Your Honor.

11       THE COURT:  Detective Newell, you may step

12  down.  Thank you.

13       THE WITNESS:  Thank you, Judge.

14       (Witness excused.)

15       THE COURT:  Anything further from the

16  government on the suppression?

17       MS. MARSTON:  No, Your Honor.

18       THE COURT:  Defendants?

19       MR. JARVIS:  Yeah, we call Detective Tyler.

20       THE COURT:  Okay.

21       (Pause in proceedings.)

22       DAVID TYLER, Defendants' Witness, Sworn.

23       THE COURT:  Please be seated and let's

24  proceed.

25                    DIRECT EXAMINATION

Officer Tyler - Direct                 127

BY MR. JARVIS:

Q    Thank you, Your Honor.  Is it Detective or Officer Tyler?

A    Officer Tyler.

Q    Okay.  Please state your full name for the record.

A    David Tyler, T-Y-L-E-R.

Q    And how are you employed, sir?

A    I am employed as a police officer with the City of Chester in Delaware County, Pennsylvania, assigned to a narcotics unit, assigned as a task force officer with the FBI.

Q    And before you were assigned with FBI as a task force officer, how long were you employed there in CHester?

A    I am in my twenty-first year.

Q    Okay.  And how long have you been with the FBI task force?

A    Six years.

Q    And I would draw your attention to October 20th of 2009.  You were employed in that capacity, weren't you?

A    Yes.

Q    And in that capacity did you have occasion to be positioned with Special Agent Luke Church in the wire room as a part of the investigation of the individuals here in court today?

Officer Tyler - Direct                128

1    A    Yes, I was.

2    Q    And do you recognize the individuals here in court

3    today?

4    A    Yes.

5    Q    Do you recognize Mr. David Cobb?

6    A    Yes, to the far left.

7    Q    Mr. Darren Macklin?

8    A    In the center, and then Jon Cobb to the right.

9    Q    Okay.  And with respect to those individuals, you

10   were in position to monitor either yourself or to be a

11   part of information from those agents monitoring

12   recorded conversations or Title 3 conversations between

13   the suspected individuals that were involved in

14   activity that day, correct?

15   A    That's correct.

16   Q    And there came a time, sir, when surveillance was

17   set up in Chester from Bethel Street?

18   A    People Street.

19   Q    And do you remember what time that surveillance

20   began?

21   A    I am going to say some time after 6:30 p.m.

22   Q    Okay.  After 6:30, before 7:00?

23   A    I believe so.

24   Q    Okay.  And at some point after it was set up,

25   surveillance was lost on the two vehicles?

Officer Tyler - Direct                    129

1    A    Yes.

2    Q    Do you remember what time that occurred?

3    A    I don't.  Somewhere around 7:00, somewhere around

4    there.

5    Q    And at some point later on that same evening, you

6    received information that surveillance had been

7    regained of the two vehicles?

8    A    Yes, Detective Sponagle radioed to me by phone that

9    he just observed the vehicles traveling southbound on

10   95 past the construction area.

11   Q    Near the Linc, the sports area?

12   A    I believe so, that area.

13   Q    And about what time was that?

14   A    I don't know the exact time.  It was around 8:30 or

15   so, maybe before 8:30.

16   Q    Before 9:00?

17   A    I believe so.

18   Q    Before 9:00 after 8:00?

19   A    I believe so.

20   Q    Okay.  And at some point you received information

21   from that same officer or one of the other ones that

22   they had actually observed the vehicles traveling and

23   about to exit the Widener exit off of 95, correct?

24   A    Yes, exit six I believe it is.

25   Q    About what time was that?

Officer Tyler - Direct                    130

1   A    Before 9:00.  I am not sure exactly what time.

2   Q    Okay.

3   A    I will have to check the notes.

4   Q    Okay.  All right.  And I believe someone made the

5   decision to actually stop those vehicles and conduct a

6   search of those vehicles, correct?

7   A    Yes.

8   Q    Who was it that made that decision?

9   A    Well, it was myself and Agent Church that made that

10  decision and we relayed our request to the county

11  Detectives.

12  Q    So, it was a collaborative decision between you and

13  Special Agent Church?

14  A    Yes.  I believe it was pretty much if they got

15  off -- there is several exits they could have gotten

16  off.  The best case scenario would have been the

17  Widener College exit.

18  Q    Which happened?

19  A    Which happened.  If they would have gotten off

20  Highland Avenue, or they would have split up we already

21  made the decision not to stop them.  But, since they

22  got off at the best scenario, it was decided to have

23  them stopped.

24  Q    Okay.  And did you have direct contact with

25  Detective Newell regarding what he should do after the

Officer Tyler - Direct                    131

1   vehicles were stopped?

2   A    Yes, I did have direct contact with him.  I don't

3   know exactly what I told him, but to secure the

4   individuals and to search the vehicles.

5   Q    Okay.  And about what time was that?

6   A    Again, some time around 9:00, maybe before.

7   Q    So, we are getting closer to 9:00 at that point?

8   A    It was later than the other incidents, yes.

9   Q    It was closer to 9:00?

10  A    I would have to check the 302.

11  Q    That's fine.  Now, there came a time when my client

12  and the others were actually arrested, handcuffed,

13  detained and removed from that area of the ramp, do you

14  recall?

15  A    That's what happened, yes.

16  Q    All right.  And you were the one or Agent Luke

17  Church that directed that activity?

18  A    Yes.

19  Q    Which one was it?

20  A    Which one was what?

21  A    Who told them to remove them from that location?

22  A    I don't recall.

23  Q    So, it may have been you, it may have been Agent

24  Church?

25  A    Correct.  It was one of us.

Officer Tyler - Direct                    132

1    Q    Right.  Now, before the decision was made to have

2    them removed from that location, I believe you

3    testified that it was already determined that a search

4    was going to occur, correct?

5    A    Yes.

6    Q    Of both vehicles, right?

7    A    Yes.

8    Q    And at the time that decision was made, before they

9    were removed from that ramp neither you nor Agent

10   Church, nor any of the other people that were part of

11   the surveillance had any information from an informant

12   or by surveillance that drugs were in either of those

13   vehicles, did you?

14   A    From the phone calls we believed that the drugs

15   were purchased and they were on their way back from

16   Philadelphia to Chester.

17   Q    Correct.  But, you had no independent way of

18   verifying that belief, did you?

19   A    I don't recall, no.

20   Q    You did not.

21   A    Just from the phone calls.

22   Q    I understand the phone calls, sir, that gave you

23   the belief.  But, independent of the phone calls, you

24   had no independent source or a way of corroborating

25   that drugs were in either of those vehicles, correct?

Officer Tyler - Direct                    133

1    A    That's correct.

2    Q    Then the vehicles were removed to another location?

3    A    That was Lieutenant Boudwin and the other county

4    guys to make that decision.

5    Q    Okay.

6    A    Apparently that was done because the traffic was

7    going to get bad.

8    Q    That's right.  And then when they were moved to the

9    parking lot --

10   A    Widener College parking lot.

11   Q    You directed Detective Newell to search the vehicle

12   he was responsible for securing, correct?

13   A    Yes.

14   Q    All right.  Now, was there any discussion between

15   you and Agent Church about the need or the use of a

16   drug sniffing or K-9 unit to come and corroborate what

17   you believe to have been a major drug transaction?

18   A    No.

19   Q    Was there any discussion between you and Agent

20   Church about checking with a magistrate or a judge

21   there in Chester County, or even a federal judge here

22   in this courthouse for a warrant to search either of

23   those vehicles?

24   A    No.

25              (Pause in proceedings.)

Officer Tyler - Direct                    134

1   Q    Do you recall the approximate time when Detective

2   Newell conducted the search and the seizure of the

3   cocaine?

4   A    I was not there, no.

5   Q    Do you remember receiving the call that he had

6   found it?

7   A    It was some time before 9:00 I believe.

8   Q    Okay.  And did you receive a call over the radio

9   from Detective Newell or anyone that a bag was observed

10  in my client's vehicle?

11  A    I just remember being told that they recovered a

12  kilogram out of one of the vehicles.

13  Q    Okay.  So, there was no description of the

14  container that the kilogram of cocaine was in?

15  A    I don't recall that.

16          MR. JARVIS:  One moment, Your Honor.

17          (Pause in proceedings.)

18          MR. JARVIS:  Those are my questions, Your

19  Honor.

20              CROSS-EXAMINATION

21  BY MR. CANNON:

22  Q    Officer Tyler, good afternoon.

23  A    Good afternoon.

24  Q    Apparently there was at no time a discussion

25  between yourself and Agent Church in the wire room

Officer Tyler - Cross                    135

1   about seeking out any legal authorization to conduct a

2   search?  There was never such a discussion?

3   A   We spoke about getting a possible search warrant

4   for a residence, but not of the vehicle.

5   Q   At the point that you ordered the officers on the

6   surveillance team to stop the cars, did you intend that

7   after that stop was made that a search would be carried

8   out?

9   A   Yes.

10  Q   Okay.  I guess you were first advised that the stop

11  had taken place, is that right?

12  A   Excuse me?

13  A   I said the first thing I guess you learned from the

14  surveillance team after the stop was made that it, in

15  fact, had taken place?

16  A   Yes.

17  Q   Were you then in continuous radio contact with the

18  surveillance team?

19  A   Yes.

20  Q   And were you advised anything about drugs being

21  observed in and about any of the automobiles?

22  A   At some point I was advised that there was a

23  kilogram recovered.

24  Q   Well, did you have a discussion first with the

25  surveillance officer where he asked you what he should

Officer Tyler - Cross                    136

1   do with regard to what he believed to be a suspicious

2   package, if I could use that expression, in one of the

3   cars.

4   Q    I believe I told him to recover it.

5   Q    Just recover?

6   A    Retrieve and recover and secure it.

7   Q    Okay.  And you gave no thought or concern to

8   obtaining a warrant at that time?

9   A    Correct.

10  Q    Okay.  Did you suggest to the officer that he seek

11  consent of David Cobb who was operating the car to

12  search the car?

13  A    No.

14          MR. CANNON:   Thank you, that's all I have.

15          MS. GRASSO:  I have nothing, Your Honor,

16  thank you.

17          THE COURT:  Any questions from the

18  government?

19          MS. MARSTON:  No, Your Honor.

20          THE COURT:  Okay.  Officer Tyler, you may

21  step down, thank you.

22          THE WITNESS:   Thank you, Your Honor.

23          (Witness excused.)

24          THE COURT:  Any other witnesses for the

25  defendant?

137

1    MR. JARVIS:  One moment, Your Honor.

2    THE COURT:  Yes.

3    (Pause in proceedings.)

4    MR. JARVIS:  Nothing further, Your Honor.

5    THE COURT:  Thank you.  Very well.  So, the

6 government rests, the defendant rests.  So, let me hear

7 argument.

8    MR. LEVERETT:  Thank you, Your Honor.  May it

9 please the Court, there was ample probable cause

10 possessed by the law enforcement officers on October

11 20th, 2009 when they retrieved the kilogram of cocaine

12 from the car the day that Cobb was driving.

13    The Third Circuit teaches that probable cause

14 turns on the totality of the circumstances and the

15 direct definition is that there is a fair probability

16 that contraband or evidence of crime will be found in a

17 particular place.

18    Looking at the totality of the circumstances

19 here, Your Honor, takes us all of the way back until

20 2008 when this investigation into Jonathan Cobb's drug

21 trafficking began.  There were a series of controlled

22 purchases of cocaine.

23    All of that information gleaned during the

24 course of the historical investigation which was used,

25 encapsulated and captured in Government Exhibit 1 which

is the affidavit, that information was used to obtain a wiretap.

Then once the wiretap began on September 29th, 2009 all of that information has to be incorporated into the Court's analysis of the totality of the circumstances here.

Your Honor heard testimony from Special Agent Luke Church today, Your Honor, that starting from the beginning of the wiretap until the end of the wiretap they were able to identify two independent sources of cocaine for Jonathan Cobb's drug trafficking business. There were telephone calls between these individuals that directed surveillance.

There were calls that suggested to the law enforcement officers that Jonathan Cobb and others, including the other defendants were traveling to West Philadelphia to North Philadelphia to obtain cocaine.

Specifically the Court was played calls on October 16th, 2009 to the North Philadelphia supplier which is where Jonathan Cobb, David Cobb and Darren Macklin traveled on the evening of October 20th, 2009 to purchase cocaine.

You heard during the course of those calls on October 16th that there were references to historical transactions.  There were questions about numbers,

139

1    there were questions about pricing, there were

2    questions about quality, and all of these conversations

3    happened between Jonathan Cobb and an individual in

4    North Philadelphia.

5    Then on October 20th there were calls between

6    and among the three defendants, Jonathan Cobb, David

7    Cobb and Darren Macklin coordinating a trip.  In

8    advance of those coordinating calls, there were calls

9    between Jonathan Cobb and the North Philadelphia

10   supplier, the same individual who he had talked about

11   pricing, quality and availability.  After those

12   coordinating calls, the agents knew that these three

13   individuals were going to the area on People Street.

14   They directed law enforcement officers surveillance

15   units to that area.

16   So, at this point in time, Your Honor, based

17   on all of that historical information and the

18   contemporaneous information being provided over the

19   wiretap, we have three individuals observed by Sergeant

20   Mike Boudwin arriving at 2611 People Street, arriving

21   in a Ford Explorer, arriving in a white Impala yet they

22   leave in a white Kia and the white Impala.

23   Surveillance units are directed based on

24   contemporaneous information that they are receiving

25   over the wiretap directing their movements, directing

140

their surveillance to follow those two cars, those

three defendants, because they were believed to be

traveling to North Philadelphia.

The reason that they believe they were

traveling to North Philadelphia is because Jonathan

Cobb had a telephone call earlier that day saying he

was coming up there.

They lose them, the testimony is clear, but

they pick them back up.  Just because they lost

physical observation of the defendants they were not

lost.  Those law enforcement officers knew where these

three individuals were based on their telephones.

Jonathan Cobb's call was pinging, the term

that was used today during the testimony.  You heard

testimony, Your Honor, that the pinging had them

traveling north on 95 from Chester headed to North

Philadelphia, the same location where Jonathan Cobb's

phone had him going on October 16th.

In response to the calls, in response to the

direction that these cars were traveling, and also keep

in mind, Your Honor, that there are direct telephone

calls that we played in Court today where Jonathan Cobb

informs the North Philadelphia supplier that he is "out

front."

The North Philadelphia supplier says "I'm in

1   the crib."  They identify one another during the course

2   of the calls and Jonathan Cobb says "Yeah, that's me,

3   back to back, both of these," talking about two cars,

4   talking about a Chevy Impala and a white Kia.

5         Those cars are seen traveling back down 95

6   because law enforcement officers anticipated that after

7   this transaction they would be going back in that

8   direction, traveling from the North Philadelphia

9   supplier back to Chester to distribute the cocaine.

10   That is exactly what happened, Your Honor.

11         In response to their movements you heard

12   testimony from two of the surveillance officers,

13   including the lead surveillance officer that day.

14   They tracked them, an individual surveillance unit saw

15   the two cars traveling south on 95.

16         Detective Newell saw those cars traveling in

17   tandem, pulled in front of them, saw they were getting

18   off at the same exit and the decision was made to stop

19   the cars, search the cars and take the cocaine out of

20   the cars.

21         THE COURT:  Now, is it of any moment that as

22   Sergeant Boudwin testified they didn't know which car.

23   In other words, does the probable cause have to attach

24   to a particular -- because this is a warrantless search

25   pursuant to an automobile exception.

1          MR. LEVERETT:  Correct.

2          THE COURT:  So, if you have a caravan, can

3    you stop all of the cars in the caravan?  Can you stop

4    two cars?  Did you need probable cause for a particular

5    vehicle, is that the limits and the contours of this

6    exception limited to one car?

7          MR. LEVERETT:  Well, I think the Court's

8    analysis in this context, Your Honor, has to turn on

9    the bedrock of the 4th Amendment which is

10   reasonableness.

11         And it is reasonable under these

12   circumstances, given that there were two cars, that

13   Jonathan Cobb himself identified them collectively,

14   we're here, back to back.

15         THE COURT:  But, always by definition one of

16   the two didn't have the drugs, right?

17         MR. LEVERETT:  Correct.

18         THE COURT:  So, it wasn't like half the drugs

19   were in one car and half in the other car?

20         MR. LEVERETT:  Correct.

21         THE COURT:  So, you are viewing them as a

22   unit, it is a vehicle made up of actually two different

23   vehicles?

24         MR. LEVERETT:  They were traveling in tandem,

25   they were driving together, they were referred to by

1  the defendants --

2        THE COURT:  Do you have any cases at all on

3  this issue?

4        MR. LEVERETT:  Not right here, Your Honor.

5  But, I am happy to brief the issue.

6        THE COURT:  Okay.  And I will close, Your

7  Honor, very quickly in saying that at the point in time

8  when the cocaine was seized from the car, the Court's

9  analysis should focus on as the Third Circuit

10  instructed, totality of the circumstances in

11  incorporating all of the information known at the time

12  of the seizure by all of the officers.

13        THE COURT:  Okay.  Very good, thank you.

14        MR. LEVERETT:  Thank you, Your Honor.

15        THE COURT:  Mr. Jarvis, why don't you go

16  first, your motion.

17        MR. JARVIS:  Yes, Your Honor.  Your Honor, I

18  submitted a motion -- I have a case here that I would

19  like to supplement that motion with.

20        THE COURT:  Okay.

21        MR. JARVIS:  And also request an opportunity

22  to brief the matter further.  I think it would be

23  helpful if we had the record, if we can get an

24  expedited copy of the record of the hearing because

25  this case will turn on the facts, Your Honor.  You are

144

1    absolutely right.

2         THE COURT:  Well, the facts aren't too

3    terribly disputed, are they?

4         MR. JARVIS:  Well, not too terribly.

5         THE COURT:  The thing is the interpretation

6    of whether they add up to probable cause and whether or

7    not under the totality of the circumstances, but I

8    don't know if they say there was no cocaine in the car

9    or it was the wrong car.  What facts do you think are

10   in dispute?

11        MR. JARVIS:  Well, you know, typically, Your

12   Honor. when you are talking about an automobile

13   exception to the 4th Amendment Privacy Acy --

14        THE COURT:  You couldn't get any smaller

15   font.

16        MR. JARVIS:  I apologize, Your Honor.

17        THE COURT:  Give me the magnifying glass that

18   goes with this.

19        MR. JARVIS:  I know.  I figured it would be

20   helpful just to have that -- give it to your clerk, he

21   can get the cite and, you know, they can get the book.

22        MS. MARSTON:  Do you have another copy of

23   that?

24        MR. JARVIS:  Oh, I do.

25        THE COURT:  Yes, the case is <u>United States v.</u>

145

1  <u>Brown</u> which is a decision by the Court of Appeals 448

2  F.3d 239.

3        MR. JARVIS:  Yeah, reversing the District

4  Court's denial of a motion to suppress, Your Honor.

5        THE COURT:  In a car situation, right?

6        MR. JARVIS:  Well, it wasn't a car situation,

7  but it was a Terry Stop situation, which is analogous

8  to the exception to the warrant requirements, Your

9  Honor, I would suggest.

10        THE COURT:  Okay.  Well, let's move on with

11  what we have today and let's see if we need more.  But,

12  go ahead.

13        MR. JARVIS:  Your Honor, you know, in

14  <u>Delaware v. Krauss</u> there was some discussion about the

15  propriety of vehicle stops when there was no traffic

16  infractions or violations.

17        THE COURT:  This is not that case.  I mean,

18  they are not claiming that they were stopped because of

19  a broken taillight, et cetera, and then they discovered

20  drugs.

21        MR. JARVIS:  Right.

22        THE COURT:  The question is when the decision

23  was made to stop the car was there probable cause.

24        MR. JARVIS:  Was there probable cause to not

25  only stop him -- and that stop was a seizure by the

146

1    way.

2              THE COURT:  Yes.

3              MR. JARVIS:  But, to conduct the warrantless

4    search.

5              THE COURT:  Right.

6              MR. JARVIS:  They had no articulable facts to

7    corroborate their belief that this kilogram of cocaine

8    deal had taken place, none.  That is problematic, Your

9    Honor, on the facts.  We are not even talking about the

10   law.  And then they searched not only one car, they

11   searched both vehicles.

12             And to add insult to injury, they don't even

13   arrest him and keep him in detention.  They arrest him

14   and then unarrest him.

15             THE COURT:  But, what is the import of that?

16             MR. JARVIS:  The import, Your Honor, is that

17   the Supreme Court has made it clear, if there is a

18   probable cause for an arrest then there is probable

19   cause for a search.

20             THE COURT:  Right.

21             MR. JARVIS:  Here they are saying that there

22   is probable cause for a search, but essentially there

23   is not probable cause for an arrest immediately.  They

24   delayed the arrest, fine.  That is their prerogative.

25   He tried to say under PA law that is permissible,  but

147

1    I have never heard of it.

2              But, you know, it is kind of putting the cart

3    before the horse.  My position, Your Honor, is that

4    there wasn't probable cause for the stop, and there

5    certainly wasn't --

6              THE COURT:  Right.  Well, that is the issue.

7              MR. JARVIS:  -- on the facts and the case law

8    will bear that out, Your Honor, nor was there probable

9    cause for the search.

10             Now, in the case that I gave Your Honor is

11   significant because it talks about some of the other

12   cases that the Supreme Court has dealt with such as I

13   believe it was the Place decision where -- let me find

14   it, Your Honor.

15             (Pause in proceedings.)

16             MR. JARVIS:  One moment, Your Honor.  No,

17   Your Honor.  As a matter of fact, let me back up a

18   minute, because what I did initially, Your Honor, is

19   distinguish the case that the government was relying on

20   in their brief.

21             THE COURT:  Okay.  Well, let me ask you this.

22   This is the -- well, I said that the facts don't appear

23   to be in sharp contrast.  As I understand it, the

24   wiretap was approved on September 29th, and from

25   September 29th to October 20th the wiretap suggested

that there was criminal activity afoot.  Historical

transactions, discussions of prices, quality, et

cetera, and the appearances of two sources of cocaine

who would provide the cocaine here.

Then on October 20th there were telephone

conversations among the three individuals coordinating

a trip to North Philadelphia, and indeed that trip did

take place, and the two cars were involved and that

it's.

MR. JARVIS:  Then the stops.

THE COURT:  Yes.

MR. JARVIS:  That's correct, Your Honor.

Now, the case law here, it is United States v. Place

and that cite is 462 US at 703 where the Supreme Court

held that the police may temporarily seize an item

based on specific articulable facts warranting a

reasonable belief that it contains contraband, that's

fine.

In Place, the police seized luggage for a

period of time, ninety minutes based upon officers

suspicions, like the officers in this case had, they

had suspicions.

THE COURT:  Well, they had to have more

suspicion, they have to have probable cause.

MR. JARVIS:  Well, our position, Your Honor,

149

is that not arising to probable cause.  They didn't

have facts to confirm that there was a location in

North Philadelphia that these vehicles went to, that

they had an informant or some other surveillance of

activity going into a particular location, or my client

or any of these individuals coming out of a particular

location in possession of anything, putting anything

(inaudible) under the car seat, in the trunk of a car.

They have none of that here, Your Honor.

THE COURT:  Well, your point is that they had

to -- they didn't even know -- this could all -- they

were suppliers, et cetera.  They didn't have any

confirmation as a matter of fact.  But, if two

individuals are talking on the phone -- let me give you

this hypothetical.

Two individuals are talking on the phone

about a drug transaction?

MR. JARVIS:  Yes.

THE COURT:  Is that probable cause then to

arrest the individual --

MR. JARVIS:  To arrest or --

THE COURT:  -- or do you have to then

factually confirm the existence of this transaction?

MR. JARVIS:  Our position, Your Honor, is

that that information has to be corroborated somehow.

THE COURT:  So, they have to get the
information.  You see, if it was a tip that would be
something else.  If you hear two people talk about some
other transaction, then that is a corroboration.  But,
if you hear the individuals themselves discussing the
transaction isn't that a different scenario?

MR. JARVIS:  It is slightly different, Your
Honor, but the danger is that --

THE COURT:  But, it wasn't some other people
talking about these three.  They, themselves, are
talking about some event that is going to take place.

THE COURT:  Correct, Your Honor.  But, the
Fourth Amendment adds layers of protection to
individuals, you know, in terms of their right to
privacy.  Just because individuals are talking about
drug transactions doesn't mean --

THE COURT:  The wiretap was authorized, I
mean, there is a question about --

MR. JARVIS:  That's true.

THE COURT:  -- that authorization, but
assuming that it was Judge Sanchez's decision that is
was appropriate, it seems to me that it is almost an
admission on the part of the defendants.  Now, the jury
may think otherwise.  They may think that the
conclusion that the officer drew was not correct.

151

He took for example certain phrases to mean certain drug codes, that may or may not be the case. But, if that's the case, you have an admission by three people that were engaged in a drug transaction.

MR. JARVIS:  Yeah, okay.  Let's treat the Title 3 wire tap as admissions that they were about to engaged in a drug transaction.  The police are required, Your Honor, to do more than what they did in this case.

THE COURT:  Okay.

MR. JARVIS:  And even when you look at the wiretaps, Your Honor, there is no confirming conversations, there is no surveillance of conversations hey, we did it, we got it, we are on our way back home, there was nothing of that.  Nothing, in terms of the wiretap or from the testimony of the agents that came in here today.

THE COURT:  Okay.  Why don't we do this.  Why don't we give you the opportunity to give it one last shot overnight, and if you find some case that you would like me to take a look at, send it to me tomorrow and just send, you know, a letter with the attachment. You don't have to have anything fancy, I just want the substance of it.

MR. JARVIS:  Very well, Your Honor.

1    THE COURT:  Do that, and it may be that you

2 have a point here.

3    MR. JARVIS:  Shall I e-mail it to you, fax it

4 to Your Honor?

5    THE COURT:  You can e-mail it to us.  Just

6 call the chambers and we will get the e-mail, so you

7 can send it to us as quickly as we can.

8    MR. JARVIS:  Very well, Your Honor.  I

9 appreciate that.

10    THE COURT:  Anybody that would like to add to

11 it?  I know you are not in here, but just briefly?.

12    MR. CANNON:   Very briefly.

13    THE COURT:  Yes.

14    MR. CANNON:   I would just contend, Your

15 Honor, that what we have heard here today, the stop was

16 based solely upon what they heard on the wiretap that

17 day.

18    THE COURT:  Right.

19    MR. CANNON:   I think that that gave them a

20 reasonable suspicion of criminal activity.

21    THE COURT:  I am going to go and rob a bank,

22 okay.  Can I be arrested as a result of that, or do I

23 have to confirm that I am actually going to rob the

24 bank?

25    MR. CANNON:   Oh, I don't think talking about

153

1  robbing a bank is a crime.

2          THE COURT:  Okay.  I am on my way to the

3  bank.

4          MR. CANNON:  Well, you may be there to make

5  a deposit.

6          THE COURT:  So, I have to wait until the bank

7  is robbed or what?  I mean, that is my distinction

8  here, is that what you have is basically admissions.

9          If we were talking about a tip I think that

10  is a significantly different matter.  If they said that

11  someone else was going to be engaged in a drug

12  transaction.

13          MR. CANNON:  Do you recall the officer

14  testifying, Your Honor, that the only reason that they

15  stopped them was because they used that particular exit

16  which made it a convenient place to stop them, and if

17  they had chosen to exit 95 anywhere else they weren't

18  even going to stop them.

19          THE COURT:  Right.

20          MR. CANNON:  Now, what does that say --

21          THE COURT:  Now, that was a tactical

22  decision.

23          MR. CANNON:  What does that say, though,

24  about their belief that that car had a kilo of cocaine.

25  Now, you know if they really believed --

154

1        THE COURT:  Well, that I don't know.  But, I

2   mean, I think that the point there, for example, it was

3   going to endanger the public, you may not want to stop

4   them.  You have to balance certain factors.

5        MR. CANNON:   Of course.  Public safety

6   versus law enforcement's interest.  I understand.

7   Thank you.

8        THE COURT:  Okay.  Very good.  Ms. Grasso, do

9   you want to add anything to this?

10       MS. GRASSO:  Just briefly, Your Honor.  I

11  would just add that obviously it appears that the

12  probable cause is based upon everything that is

13  obtained on the wiretaps.

14       And again, everything on the wiretap is

15  something that was interpreted by the agents and the

16  officers to mean that there was a drug transaction

17  going down.

18       THE COURT:  Yes.

19       MS. GRASSO:  So, I would keep that in mind as

20  we are -- as the Court is reviewing evidence.

21       But, also I think it is quite clear that they

22  jumped the gun here in terms of they had every

23  intention, I think, based upon the way they had things

24  set up in the wire room, with the surveillance team,

25  with the back up team, they had every intention of

1  making a vehicle stop on that day no matter what, and

2  what happened was they lost their surveillance.  And

3  when they lost their surveillance they lost their

4  probable cause because all they had --

5         THE COURT:  Okay.  Well, that's a different

6  point.

7         MS. GRASSO:  Yes.

8         THE COURT:  Whether or not there was a break

9  here that may have affected the chain of events.

10         MS. GRASSO:  And I think that the reason they

11  never discussed getting a warrant was because they had

12  every intention of stopping those cars and searching

13  both of those cars, and when the day set out I think

14  they had suspected or had hoped that not only they

15  would have had the conversations of the gentlemen

16  leaving the house on People Street or getting into the

17  vehicles on People Street and driving to the location

18  in North Philadelphia, they would have actually had a

19  surveillance team then watching them either go into the

20  house or meet with this supplier on the street

21  somewhere, whatever the case may be.

22         That never happened.  That was their probable

23  cause.  They don't have the probable cause and they

24  still went ahead and stopped them and searched the

25  vehicle anyway.

1        THE COURT:  In other words there are two --

2  there is no -- the chain is broke, there is a link

3  missing here?

4        MS. GRASSO:  Absolutely.

5        THE COURT:  And the link missing is the drug

6  transaction itself?

7        MS. GRASSO:  Or some indicia thereof of it.

8  Of somebody carrying a package.  You know, nobody had a

9  package originally.  There is no indication that

10  anybody had any buy money.  There is no indication

11  anybody came out of the house after meeting up with the

12  supplier with a bag.

13        That was the things that they sought to get

14  that day, but when the surveillance was broken, they

15  lost the surveillance, they didn't get that, but their

16  intentions never changed and they did exactly what they

17  set out to do, but they no longer had probable cause to

18  do it, Your Honor.

19        THE COURT:  Okay.  Good point.  Okay.  The

20  government has one final rebuttal toMs. Grasso's point.

21  What about that?  I mean, you've got some phone calls

22  of people talking and then they get arrested, but there

23  is no confirmation that any criminal activity had taken

24  place.

25        MR. LEVERETT:  Well, Your Honor, the

157

1   confirmation --

2       THE COURT:  In fact, they would have been

3   coming back of the criminal activity and it already

4   would have taken place.

5       MR. LEVERETT:  Correct.  But, looking at it

6   in the totality of the circumstances, the calls that

7   predated, the calls that preceded traveling north on 95

8   to buy the cocaine, discussing price, the historical

9   relationship with Jonathan Cobb, the conversation --

10      THE COURT:  But, you don't know where they

11  went?

12      MR. LEVERETT:  I'm sorry?

13      THE COURT:  That is the problem here.  If you

14  went up north on 95 --, let's assume they went up and

15  they turned around, they changed their mind or couldn't

16  find the house or whatever it was, in other words don't

17  you need some evidence of actual criminal activity

18  taking place other than some general intent which I

19  guess is what is involved here?  You have heard that

20  they intended to commit a crime?

21      MR. LEVERETT:  Yes.

22      THE COURT:  Well, they were already coming

23  back, so you weren't stopping them from committing a

24  crime, I suppose, maybe distribution at that point.

25      MR. LEVERETT:  Correct.  But, there was

158

1  probable cause to believe that there was cocaine in

2  that car or one of those cars based on the fact that he

3  was talking to a supplier of cocaine, someone he talked

4  about pricing with, someone he talked about quality

5  with.

6          THE COURT:  Well, why were the officers then

7  attempting to follow the car to North Philadelphia?

8  Why didn't they just wait in Chester until they came

9  back and simply effectuate the arrest at that point?

10         MR. LEVERETT:  Well, for the fillness of the

11  investigation, Your Honor, obviously they attempted to

12  travel up 95 to follow them.  All of the officers

13  talked about attempting to follow these cars.

14         THE COURT:  The theory, I suppose, as Ms.

15  Grasso was indicating you would have followed the car,

16  they would have stopped at some house somewhere,

17  they would have gone in and out and you would have

18  followed them back and now would have had cocaine in

19  the car.

20         The point is does the absence of that link in

21  this chain of events, does that impact the probable

22  cause analysis?

23         MR. LEVERETT:  It does not establish a lack

24  of probable cause, Your Honor.  Probable cause, the

25  standard simply is a fair probability that contraband

1    will be found.

2           There was a fair probability here.  Perhaps,

3    Your Honor, if surveillance units had been outside the

4    house, seeing them go in, waited, saw them come out to

5    a mathematical certainty --

6           THE COURT:  Right.

7           MR. LEVERETT:  -- but that is not the

8    standard.

9           THE COURT:  Okay.  Well, let me ask you

10   something.  Other than general principles of the

11   totality of the circumstances, what is your best case

12   factually analogous to this?  Is there anything that we

13   can rely on and say that this is like this case

14   factually?

15          MR. LEVERETT:  Again, when I respond to the

16   previous hypothetical, Your Honor --

17          THE COURT:  Okay.  Why don't we do this.  We

18   are going to give you twenty-four hours to come up with

19   something and then we are going to give you twenty-four

20   hours.

21          MR. LEVERETT:  Thank you, Your Honor.

22          THE COURT:  We are going to move fast because

23   want to get this done.  You know, we are going to try

24   the case on Tuesday.

25          MR. LEVERETT:  Right.

1    THE COURT:  Now, as far as the other matters
2  are concerned, the papers seem to be clear unless
3  somebody wants to add anything to what has been argued,
4  otherwise we will just decide it on the papers.

5    The government motions, I am not going to
6  address.  We are going to address those if we do get to
7  trial on Tuesday.  But, we will focus on the
8  defendant's arguments now.

9    MR. JARVIS:  Housekeeping, Your Honor.

10    THE COURT:  Yes.

11    MR. JARVIS:  Over the last week I have
12  received I believe three parcels from Fedex from the
13  government of discovery materials, statements from
14  other witnesses that we didn't previously know about.

15    THE COURT:  Right.

16    MR. JARVIS:  We still haven't received an
17  unredacted copy of the Title 3 application.  We still
18  are dealing with separation issues.  We can't even meet
19  with our clients at the Federal Detention Center.

20    THE COURT:  Okay.

21    MR. JARVIS:  So, we would ask that that
22  separation order be lifted so that we can meet and
23  corroborate and try to prepare some type of defense
24  strategy, because not only does the delay of this
25  information hamper us, the fact that we have to request

161

1   permission to meet jointly at the FDC hampers us.

2           THE COURT:  So, what is the bottom line?

3           MR. JARVIS:  The bottom line, Your Honor, is

4   that I am concerned as to whether I am going to be

5   prepared to go to trial on Tuesday.

6           THE COURT:  Okay.  Have you provided

7   everything?

8           MS. MARSTON:  Your Honor, in trial prep we

9   continue to conduct trial prep interviews.  Every time

10  that we conduct an interview, if there is any new

11  information that we obtain we are writing that up in a

12  report and I am immediately sending it to defense

13  counsel.

14          Any additional information that we are

15  gathering I am sending to defense counsel.  I already

16  told defense counsel that we are seeking a protective

17  order that we are going to file with you, Your Honor,

18  that we are going to send.  We have been sending

19  redacted copies of 302s for --

20          THE COURT:  These are recently conducted

21  interviews?

22          MS. MARSTON:  Right.  And even before I was

23  in the case, the 302s, the FBI records were redacted as

24  to witness names for safety reasons.  I think I

25  mentioned that in the trial memo.

1    I plan on Thursday night sending unredacted

2    copies pursuant to a protective order so they have time

3    to review those unredacted.  Obviously (inaudible), the

4    content and they may actually be able to determine who

5    those witnesses are, but we will now be providing those

6    names.

7         THE COURT:  Okay.  Well, let me do this.

8    Let's operate under that schedule.  If on Tuesday you

9    persuade me that you have not been able to prepare

10   despite your due diligence and that, therefore, you

11   would not be able to provide an effective assistance

12   then we will consider at that time. But, let's not

13   project that your diligence will not get you there.

14        MR. JARVIS:  Very well.

15        THE COURT:  So, we will just go with that.

16   Yes?

17        MS. GRASSO:  Your Honor, in the government's

18   pretrial memorandum they have indicated a number of

19   experts that they anticipate testifying and pursuant to

20   the Rules Of Procedure, I have provided a discovery

21   letter way back when requesting that sort of

22   information.  I would reiterate that request today.

23        THE COURT:  You want a report?

24        MS. GRASSO:  I want a report on the basis of

25   any opinions.  And particularly, Your Honor, we have

1  heard all of this testimony about the officers hear

2  this, you know, thirty-three thousand dollars worth a

3  kilo --

4           THE COURT:  Excuse me a minute.  We are

5  having a private conference.  I don't think is

6  appropriate.

7           MR. JARVIS:  I apologize, Your Honor.

8           THE COURT:  Well, I think my order indicates

9  that you are to supply a report or a letter report.

10           MS. MARSTON:  We will supply a letter report.

11           THE COURT:  I think it says ten days probably

12  before trial.

13           MS. MARSTON:  It does, Your Honor.  I had

14  thought that in the trial memo -- we provided the

15  reports related to the drug testing.  We provided draft

16  copies of the cell site information already and as to

17  the witness testifying as to the language, I put in

18  that they are going to testify as to the code language

19  as to the manner of packaging.  I mean I guess we can

20  get more specific as to, you know --

21           THE COURT:  Well, who is going to testify to

22  what?  I mean a report indicates, in fact, you know, it

23  may conceal -- we have to meet a Daubert standard.  It

24  should indicate who the witness is, what the

25  qualifications of that witness are to provide an

164

1    opinion --

2           MS. MARSTON:  We have turned over that.

3           THE COURT:  -- what opinion is that witness

4    going to provide and what is the basis for that

5    opinion, I think without that.

6           MS. GRASSO:  And that is my concern, Your

7    Honor.  I mean obviously I know what they are going to

8    say.  They are going to say --

9           MS. MARSTON:  We will do that by tomorrow.

10          THE COURT:  Let's get that done by Thursday

11   evening.

12          MS. MARSTON:  Yes, Your Honor.

13          MS. GRASSO:  The basis of their opinion is

14   (inaudible).

15          THE COURT:  Four things, credentials --

16          MS. MARSTON:  Credentials have all been

17   turned over.

18          THE COURT:  -- who the witness is,

19   qualifications, opinion and basis.

20          MS. GRASSO:  Right.

21          THE COURT:  Okay.  So, that takes care of

22   you.  Mr. Cannon, do you have any issues?

23          MR. CANNON:  Just to assist us in getting

24   ready, Judge, I would like to see the separation order

25   between Jonathan Cobb and David Cobb dissolved.

1    THE COURT:  Yes.  I think that is a matter

2  that you will have to sort of work out with the

3  government and the Bureau of Prisons.  What is your

4  view of that?

5    MS. MARSTON:  I think the separation request

6  put in back in the day, as to the conspiracy case the

7  separation request was put into effect.  We can say we

8  no longer need it, but that is up to the FDC what they

9  determine they want.

10    THE COURT:  Well, but I think they will

11  look -- if there is an order in place, I suppose what

12  you are saying now -- a separation order, who ordered

13  it?  Did I order it?

14    MR. CANNON:  It's a letter, Your Honor.

15    MS. MARSTON:  No, it is a letter that we

16  sent.  In conspiracy cases --

17    THE COURT:  Okay.  Then that's why I said an

18  order is maybe a request by the government that the

19  defendants be kept separate from each other.

20    MR. CANNON:  We are asking the government to

21  now submit a letter to the FDC dissolving it.

22    THE COURT:  Right.

23    MS. MARSTON:  We will do that tonight.  That

24  is not a problem, Your Honor.

25    THE COURT:  So, why don't you do that and

166

then it is up to counsel to deal with the FDC in
effectuating that order.  You do your thing and they
will do theirs.

MS. MARSTON:  Yes, Your Honor.

THE COURT:  Okay.  That takes care of all of
the issues over here.  How about the government issues?

MS. MARSTON:  We don't have any issues, Your
Honor.

THE COURT:  Anything at all?  Okay.  So, your
response is tomorrow, your response is twenty-four
hours later.  We will try to get to these matters as
soon as possible.  In any event we will see you here on
Tuesday at 9:30.  Have a good night.

ALL:  Thank you, Your Honor.

(Proceedings adjourned, 5:23 p.m.)

* * *

167

I N D E X

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Luke Church | | | | |
| By Ms. Marston | 7 | | 59 | |
| By Mr. Jarvis | | 45 | | 62 |
| By Mr. Cannon | | 48 | | |
| By Ms. Grasso | | 57 | | |
| | | | | |
| Michael Boudwin | | | | |
| By Mr. Leverett | 66 | | | |
| By Mr. Jarvis | | 79, 94 | | |
| By Mr. Cannon | | 87 | | |
| By Ms. Grasso | | 92 | | |
| | | | | |
| John Newell | | | | |
| By Mr. Leverett | 97 | | | |
| By Mr. Jarvis | | 108 | | |
| By Mr. Cannon | | 122 | | |
| By Ms. Grasso | | 125 | | |
| | | | | |
| David Tyler | | | | |
| By Mr. Jarvis | 126 | | | |
| By Mr. Cannon | | 134 | | |

168

<u>I N D E X</u>

<u>GOVERNMENT'S EXHIBITS</u>                    <u>ADMITTED INTO EVIDENCE</u>

1                       Affidavit              1

2                       CD                     31

3A through 3I           Transcripts            31


* * *

## CERTIFICATION

I, Donna M. Anders, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

6-14-10
Date

Donna M. Anders