IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

UNITED STATES OF AMERICA      : CRIMINAL NO. 09-733-ALL
                              :
                              :
                              :
                              :
                              :
                              :
          v                   :
                              :
                              :
                              :
                              :
                              :
                              :
                              :
JONATHAN COBB, DAVID COBB,    :
and DARREN MACKLIN,           : Philadelphia, Pennsylvania
                              : June 25, 2010
          Defendants          : 9:23 a.m.

- - -

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE EDUARDO C. ROBRENO
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Government:      NEUMAN LEVERETT, III, ESQUIRE
                        KAREN S. MARSTON, ESQUIRE
                        Assistant United States Attorneys
                        United States Attorney's Office
                        615 Chestnut Street
                        Suite 1250
                        Philadelphia, PA  19106


For Defendant           WILLIAM R. CANNON, ESQUIRE
Jonathan Cobb:          William T. Cannon, P.C.
                        100 South Broad Street
                        Suite 1910
                        Philadelphia, PA  19110


*Transcribers Limited*
*17 Rickland Drive*
*Sewell, NJ 08080*
*856-589-6100 • 856-589-9005*

2

```
 1   APPEARANCES:            (Continued)

 2   For Defendant          ROLAND B. JARVIS, ESQUIRE
     David Cobb:            RONALD BLAIR JARVIS PC
 3                          230 South Broad Street
                           Suite 700
 4                          Philadelphia, PA  19102

 5

 6   For Defendant          MARGARET M. GRASSO, ESQUIRE
     Darren Macklin:        Law Office of
                           Margaret M. Grasso
 7                          230 South Broad Street
                           Suite 503
 8                          Philadelphia, PA  19102

 9                               -  -  -

10   Audio Operator:        Joseph Matkowski

11   Transcribed By:        Jeff Nathanson

12                               -  -  -

13           Proceedings recorded by electronic sound
     recording, transcript produced by computer-aided
14   transcription service.

15                               -  -  -

16

17

18

19

20

21

22

23

24

25
```

3

1          (The following was heard in open court at
2     9:23 a.m.)
3          THE COURT:  Okay.  Please be seated.  Let's
4     bring the jury in.
5          (Pause in proceedings.)
6          MS. MARSTON:  Good morning, Your Honor.
7          (Jury in, 9:24 a.m.)
8          THE COURT:  Good morning.  Please be seated.
9     We're ready to complete the closing statements at this
10    time.  Ms. Grasso, please.
11         MS. GRASSO:  Thank you, Your Honor.
12         (Pause in proceedings.)
13         MS. GRASSO:  Good morning, ladies and
14    gentlemen.  This is the last time I get to speak to
15    you.  I think you know that from His Honor explaining
16    to you the order of the closing arguments.
17         On behalf of myself and on behalf of Darren
18    Macklin we would like to thank you for your service,
19    for being here, taking the time out from your busy
20    schedules to not only be here, as you're required to be
21    here, but to pay attention, which I know all of you
22    have been doing throughout the course of this trial.
23         When you go back to deliberate I'm confident
24    that you're going to uphold your oath as jurors and
25    keep an open mind, listen to what your fellow jurors

Defendant D. Macklin's Closing Argument          4

1   have to say, and decide the facts amongst yourselves,

2   and then apply the law as His Honor gives it to you

3   shortly in his instruction.

4          I want to remind you a little bit about some

5   of the law that you're going to hear from His Honor,

6   and what His Honor tells you on the law is what

7   controls.

8          But I want to remind you of a few things on

9   the law that I pointed out to you in the beginning of

10  this case, and that is that all of the defendants,

11  including Darren Macklin, are presumed innocent.

12         The fact that they have been indicted and the

13  fact that Darren Macklin has been charged with a crime

14  is absolutely evidence of nothing.  He stands in front

15  of you cloaked, as we say, with the presumption of

16  innocence.

17         I like to think of that presumption of

18  innocence as a wall that surrounds him and protects

19  him, as it would protect each and every one of you or

20  someone you know if they were charged with a crime.

21         That wall, that presumption of innocence

22  remains unless and until the government proves each and

23  every element of the crimes charged beyond a reasonable

24  doubt.

25         The burden of proof to prove the charges

Defendant D. Macklin's Closing Argument          5

1  beyond a reasonable doubt, as I told you before, rests

2  solely with this table, the government team.  There is

3  absolutely no burden over here.

4          You heard a lot of witnesses from the

5  government.  You didn't hear any witnesses from the

6  defense side.  The fact that you heard a large amount

7  of witnesses from the government and none from the

8  defense is not something that you can hold against any

9  of the defendants, and His Honor will instruct you that

10  the number of witnesses doesn't matter and, again, you

11  don't have to hear one single word from the defense

12  side.  The presumption of innocence, as I explained, is

13  like a wall, and that wall remains until they prove

14  those charges beyond a reasonable doubt.

15          His Honor will instruct you on reasonable

16  doubt, but I would suggest to you and he's going to

17  explain to you that it's the type of doubt that would

18  make you pause or hesitate in a matter of importance in

19  your life.

20          Common examples are getting married, deciding

21  to buy a house, those sorts of things.  If it's

22  something that says hey, I'm not sure I want to do this

23  or did it really happen this way, those I would suggest

24  to you are things that are reasonable doubt, and there

25  is a ton of reasonable doubt in this case with regard

Defendant D. Macklin's Closing Argument          6

1   to Darren Macklin, a ton.

2        The charges that the government needs to

3   prove, and they went over them a little bit and His

4   Honor will go over them with you in great detail,

5   essentially boil down to conspiracy, which is an

6   agreement.  There has to be some sort of agreement.

7        His Honor will tell you that it doesn't have

8   to be a spoken agreement, doesn't say hey, we agree to

9   go out and sell drugs together.  There's no evidence of

10  that and they don't need that.

11       But they need something that proves that

12  there was an agreement to go out and do something

13  collectively together.  There is no evidence of that in

14  this case with regard to Darren Macklin.

15       With regard to possession to distribute

16  cocaine, that's what the object of the conspiracy was.

17  They have to agree to have gone out to possess the

18  cocaine with the intent to distribute and,

19  specifically, you are being asked to determine that

20  there was five hundred more grams of cocaine that was

21  the object of that conspiracy.  There's absolutely no

22  evidence as to Darren Macklin regarding five hundred

23  grams of cocaine, no evidence.

24       There's been lots of names used in this case

25  by the government, particularly in argument.  And,

Defendant D. Macklin's Closing Argument          7

1    again, argument is not evidence.  The Judge will remind

2    you of that.

3          Darren Macklin has been called lots of things

4    during the course of this trial.  He's been called

5    "Jonathan Cobb's partner in crime."  He's been called

6    his "right-hand man," he's been called his "point

7    person," and he's been called "Sporty."  And the only

8    thing that the government has proven to you that he's

9    Sporty.  That's it.  None of those other names apply to

10   him.  This is Sporty.

11         If you met him at the corner store in Chester

12   and somebody said hey, who's that, they'd say that's

13   Sporty.  That's his name.  That's his nickname.  That's

14   been his name.  That's the only evidence of the names

15   that you have heard that the government has proven.

16         They haven't proven that he's a right-hand

17   man, they haven't proven that he's a partner or he's a

18   point person.  None of that has been proven in this

19   case.

20         If you think back about the evidence, and I'm

21   going to go over it and, unfortunately, I am going to

22   have to do it in some detail.  I'm sure you are

23   probably kind of tired of it, but I do need to do that

24   obviously.

25         Think about the evidence and the way things

Defendant D. Macklin's Closing Argument          8

1   came in and what the officers learned and when they

2   learned it and who were the targets of their

3   investigation.  I submit to you that if Darren Macklin

4   was not in an Impala on October 20th, 2009.  He

5   wouldn't be in this courtroom.

6        It wasn't until that point in time that they

7   knew who he was, and then they started to look back and

8   say oh, well, maybe this fits, maybe he's been involved

9   all along, we just didn't know it.

10       He's not been a target of ours, nobody's ever

11  talked to us about him, we don't have any surveillance

12  on him, but he was there so we better go back and check

13  and see what's going on, and they can do that.  I mean

14  law enforcement can do that.  There's nothing wrong

15  with that.

16       Take, for example, if there's a homicide, the

17  government's not there watching on a wiretap or they

18  don't have video of it usually, and they can go back

19  and reconstruct evidence.  That's perfectly legitimate.

20       But I ask you why did they have to do it in

21  this case because they didn't have anything on him.

22  And they have gone back and tried to submit to you

23  evidence that they believe shows a conspiracy to

24  possess and distribute cocaine, and there is no

25  evidence of that, ladies and gentlemen.

Defendant D. Macklin's Closing Argument          9

1    They want you to think that there is and they
2    have put on evidence of that and I'm going to go
3    through all that evidence.  But it's not there, ladies
4    and gentlemen.
5        What do we know about the investigation?  We
6    know that the investigation started approximately ten
7    months before September 29, 2009 when -- well, actually
8    September 12th they get the pen register.  And we know
9    at about ten months before that, which is all the way
10   back in December of '08, they're doing ordinary type of
11   law enforcement work out in Chester looking for drug
12   activity.
13       The targets of that investigation back in
14   December of '08 everyone agrees, every one of the
15   officers that I asked, every officer who testified, had
16   nothing to do with Darren Macklin.  There's no doubt
17   about that.  Nothing.
18       That initial investigation leads up to them
19   getting the pen register for the target phone, which,
20   of course, has nothing to do with Darren Macklin.  It's
21   not his phone.  We know that.
22       They get the pen register and then based upon
23   the pen register, they get the Title III.  Title III,
24   and I asked Agent Church about this, I asked Agent
25   Morrow about this, I'm pretty sure that Officer Tyler

Defendant D. Macklin's Closing Argument        10

was asked about it.  And Title III, you have seen it
waived around.  I'm not sure if it's an actual exhibit
or not, bBut it's sixty pages, and it has a fair amount
of names in it that were targets of the investigation.

And it also identifies individuals that they
have learned information from.  And I asked Agent
Church about it.  Of those twenty or so names, give or
take, obviously it's not an exact number, but give or
take, there is no mention of Darren Macklin, none,
nTiltone whatsoever.

What do they do with the Title III?  Well,
they have the Title III now and we know that they're
sitting in a room and they're listening to
conversations, and they can only listened to
conversations that are deemed pertinent because that's
all the law allows them to do.

Based upon that, they have surveillance setup
on the street and they have -- we heard from I believe
it was Sergeant Boudwin that they had four or five
officers out there surveilling from approximately 10:00
a.m. to 12:00 p.m. not every day, but on most days when
they had the wire setup.

What do they learn from the wire?  And what
do they learn from the pen register?  Well, they
learned the phone numbers of other people, and they

Defendant D. Macklin's Closing Argument      11

suspect, based upon what they listen to that other

people are involved in the drug sales or the drug

purchases or whatever the case may be, and so they go

out and they get the pen registers, the information

regarding those cellular telephones, and they do that

for a number of people.

They didn't do it for Darren Macklin.  They

had the wire setup.  They're listening to telephone

calls.  They know that that number is calling Jonathan

Cobb's phone.

We know from one of the final exhibits that

the government displayed that there was forty-six calls

going in and forty-six outgoing calls from that phone.

They don't get that pen register.  Why?  Because

they're not concerned.

They don't believe that there's any unlawful

activity with regard to the number that belongs to

Darren Macklin.  That's why they didn't do it, and if

they thought there was, they would have.

The North Philadelphia supplier, the West

Philadelphia supplier, they believed that there was

drug activity going on in those conversations between

those two phones.  They went out and they got those pen

registers as the investigation was going on.  They

didn't do that for Darren Macklin.  They weren't

Defendant D. Macklin's Closing Argument      12

concerned.

Surveillance is up, I think we went over this point a lot during the course of the trial, and you're probably sick, of it, they had the pole camera up. They had officers sitting in vehicles who had the ability to take photographs.

Do we expect them to take photographs the entire time they're sitting there?  No.  Do they have an obligation?  Are they concerned about protecting, you know, they're location and remaining unsuspected by whoever is out there?  Yes.  But it is one hundred percent clear there is no photographs or surveillance of Darren Macklin.

Forget the photographs.  All the officers who testified said Detective Newell -- Detective Newell didn't know until the day of the stop.  He says after the stop I think I may have seen him out there before when I was surveilling, but he didn't put two and two together until he saw him when he was in custody in a police car on October 20th.

The same thing with Sergeant Boudwin.  He didn't see him.  He didn't know him.  We had one -- testimony from I think it was Detective Newell who said at some point that he had seen Darren -- or I'm sorry, Jonathan Cobb during the course of his surveillance

Defendant D. Macklin's Closing Argument        13

over one hundred times or around one hundred times, and
this was brought out on redirect by the government.

Well, if Darren Macklin is his right-hand man
and he's seen him about one hundred times during the
course of his surveillance, he would have told you that
in the one hundred times he saw him his right-hand man
was with him. He didn't tell you that. There's no
evidence of that. He wasn't there. He's not his
right-hand man.

All of a sudden on the 20th he becomes the
right-hand man, the point person. Nothing before that.
On the 20th they say that he's the point person to go
out and help facilitate what they believe to be the
purchase of the kilo from the North Philadelphia
supplier.

But, they tell you there's been trips before
that where they believe that Jonathan Cobb has gone and
met with either the West Philadelphia supplier or the
North Philadelphia supplier. And they tried to surveil
him on those occasions, but surveillance wasn't
successful.

There's no testimony that Darren Macklin was
with him on any of the occasions. In fact, the
evidence shows that he wasn't. They don't have any
proof of that. There's no suggestion that he was. But

Defendant D. Macklin's Closing Argument        14

1  all of a sudden on the 20th he's got to be the point

2  person, he's got to be there.  Some point person.

3        What do we know that he did on the 20th?  He

4  picked up the phone when David Cobb called and said,

5  "We're at the Mrs.' crib."  I think there were two

6  calls.  Both times he says, "We're at the Mrs.' crib."

7  That's it.  That's the evidence against him for the

8  20th.  "We're at the Mrs.' crib."

9        And then, of course, he's picked up going

10  into those vehicles, and I'm going to get into that

11  later.  But does that makes him the point person.

12  There's absolutely one hundred percent reasonable doubt

13  when you look at those pieces of evidence, ladies and

14  gentlemen.

15        Officer Tyler.  Most of Officer Tyler's

16  testimony was to interpret the tapes for you of the or

17  the audio.  Again, the transcripts that you see on the

18  screen, they're not evidence, they're just an aid.  We

19  know that they were prepared by Agent Church.  And if

20  what you hear is different than what you see on the

21  screen, then it's what you hear that controls.

22        Officer Tyler tried to interpret for you some

23  of the things that he believed the government heard

24  that relates to drug activity.  He said that the

25  nicknames, they used nicknames because they don't want

1   to be detected.

2          Well, everybody in this case has a nickname.

3   Everybody.  And they didn't make any qualms about using

4   it on the telephone, even though, according to Officer

5   Tyler, if they're drug dealers, they suspect that

6   people are listening to their phones so they don't want

7   to tip them off.  So they wouldn't be using their

8   nicknames.  We hear Sporty's name all the time.  That's

9   his name.  No crime in that.  It's not indicative of

10  anything.

11         Officer Tyler tells you -- interprets things

12  for you, it's a Chess game, it's a drug deal.  If it's

13  first shift, they're referring to the fact that they

14  know that the cops are out there on their first shift.

15  If it said bowling, well, they must be bowling because

16  he didn't tell us that bowling is equivalent of

17  anything that has anything to do with a drug deal.

18         Quizzy.  Officer Tyler tells us Quizzy,

19  that's a quarter ounce of cocaine.  The officers are

20  setup listening to these tapes believing that is --

21  there is drug-related conversations.  They are hearing

22  what they want to hear.

23         I'm not suggesting to you that they're coming

24  in here and lying to you, but there's a context.  And

25  when you -- you know when you are expecting something

Defendant D. Macklin's Closing Argument        16

that sometimes it happens differently than you expect

it to.  I think the officers at some point were

listening to things expecting them to mean things that

they just simply did not in reality mean.

We don't have anyone in this case -- there's

no evidence in this case to tell you that a quizzy

means a quarter ounce, other than Officer Tyler.

There's no evidence been presented of that.

There's plenty of things regarding -- that

are either on the tapes or that we have heard testimony

about that is completely innocent behavior.  Bowling,

for example, we haven't heard anything that bowling is

anything other than bowling.

We know that Jonathan Cobb rehabs houses on

Jeffrey Street, on Norris Street, and we know that he

uses drywall and spackle and tape and he gives tenants

keys and he collects rent and he's fixing up the house

on Jeffrey Street and he's fixing up the house on

Norris Street and there are lots of people around on

the occasions that he is fixing up the houses with him.

Completely innocent behavior.

We know all that about the fixing up of the

houses from the government's witnesses.  We know that

from Officer Tyler, we know that from Donna Hill, we

know that from Angela Strand, and we know that from

Defendant D. Macklin's Closing Argument        17

1    Dawn Germany.  They all told us that.

2         Officer Tyler was qualified as an expert, and

3    clearly he has extensive experience in law enforcement.

4    And we know that he's never been qualified on drug

5    lingo before.  This was the first time.  And that

6    doesn't mean that he shouldn't have been qualified

7    because he was.

8         But the fact that he's been qualified as an

9    expert doesn't mean that you have to accept his

10   testimony as true.  You have to listen to what he told

11   you in light of the fact that he has this extensive

12   experience, but you have to weigh that testimony in

13   light of what you've heard from the other witnesses,

14   from the other evidence, from what you actually heard

15   on the transcript and what you think the transcript

16   means or could mean, and clearly there are millions of

17   things that some of the words that have been said on

18   the transcripts could mean.  You don't have to accept

19   what Officer Tyler has told you that they mean.

20        I would submit to you that there is at least

21   two occasions that Officer Tyler's interpretation of

22   what was said on the transcripts was wrong.  And I'm

23   going to give you two examples.

24        The -- both of them have to pertain --

25   there's a difference between what Officer Tyler told us

Defendant D. Macklin's Closing Argument       18

1  and what Anthony Minor told us.  And, again, this is

2  coming from my recollection as I listened to the trial.

3  The Judge will instruct you that your recollection

4  controls, so if you remember something differently,

5  then your recollection controls.

6         If I'm not mistaken, Officer Tyler told us

7  that a dollar means one hundred dollars.  Anthony Minor

8  told us a dollar means an ounce.  More importantly, and

9  this is the one I believe I have one hundred percent

10  certain in terms of my recollection, Officer Tyler said

11  -- remember that conversation between Jonathan Cobb and

12  Anthony Minor where Jonathan Cobb wasn't around and

13  he's telling Anthony Minor that you could hit my

14  brother up or whatever he says.

15         Officer Tyler says that when Jonathan Cobb

16  says, "He ain't gonna do it for what I do it for,"

17  Officer Tyler says that Jonathan cobb is referring to

18  the price.  He's not going to do it for the same price.

19         Well, Anthony Minor tells us when he says

20  that "He ain't gonna do it the way I do it for you" he

21  means he ain't gonna front it to you.  And I would

22  suggest to you that what Anthony Minor said probably

23  makes more sense, at least in light of what Anthony

24  Minor told us, which is that he always got his drugs

25  when they were fronted to him.

Defendant D. Macklin's Closing Argument        19

So there's an example of Officer Tyler thinking he knows what it means basing it upon his experience, but he got it wrong.  I would suggest to you that there's other times when he's gotten it wrong or possibly has gotten it wrong.  Is that doubt?  Is that reasonable doubt?  Yes, it is, ladies and gentlemen.

The North Philadelphia supplier and the West Philadelphia supplier.  We know that the government made up those terms based upon the calls that were going back and forth between the target phone and these telephone numbers and the cell sites that they would hit.

We never pinpointed or the government never presented any evidence that they pinpointed where the North Philadelphia supplier or the West Philadelphia supplier was stationed at, where their house was, et cetera.  We don't know anything about that.  There's been no evidence of that.

There's absolutely no evidence of any conversations between Sporty, Darren Macklin, and the Wester Philadelphia supplier and the North Philadelphia supplier, and if there was, you would have heard it.  There's nothing in the pen registers.

They have his cell phone that they presented

Defendant D. Macklin's Closing Argument      20

to you, and we all are familiar with cell phones.  You

can go into contacts.  You can look up a lot of

information when you have somebody's cell phone.  They

had the physical cell phone.  They had the pen

register.  Absolutely no contact between the cell phone

of Darren Macklin and the would be Philadelphia

supplier and the West Philadelphia supplier.

And, again, there's no evidence that he ever

went along for any of these purchases to the suppliers

except for the fact that he happens to be in the car on

the 20th, and, again, I would submit to you that's why

he's sitting here today.

There is no evidence, absolutely no evidence,

that any buyer who allegedly purchased drugs from

someone purchased them from Darren Macklin.  No one has

ever put drugs in Darren Macklin's hand.  I think

that's one hundred percent clear.

I kept going over it and over it every time

there was a witness on the stand.  No one bought drugs

from Darren Macklin in this case.  No one.  No one even

saw him holding drugs.  No one even saw him going to a

car where they believe drugs were stashed.  Nobody even

saw him going to a location in an alleyway where they

believe drugs were stashed.  There's no evidence of

that, absolutely none.

Defendant D. Macklin's Closing Argument        21

Kim Voyer, her name was mentioned, Joseph Curry, Angela Strand, Donna Hill, Shaky Bakey, Anthony Minor, none of them said that Darren Macklin had drugs. None of them.

Any time someone wants to get drugs from Jonathan Cobb and he's not around they don't get sent to Darren Macklin, the right-hand man, the partner in crime, not one. Not one of those persons when they wanted to get in touch with Jonathan Cobb did they ever get directed to Darren Macklin, not once.

I'm going to hit them all head on. Unfortunately, I'm going to go through them. I'm not going to play them for you, but I'm going to go through all of them because there's not that many.

We know that there's forty-six ingoing and forty-six outgoing between the two phone calls. We don't know the time frame. All we know is that it's from some point that the pen register is setup on September the 12th, and at some point when it's shut down, I think it was October 28th they said, some time after the 20th. And I have a total of one, two, three, four, five, six dates that they played pertinent calls, calls that they believe to be drug-related that are evidence against Darren Macklin to convict him for what he's been charged. Six days.

Defendant D. Macklin's Closing Argument       22

1          I think on the 16th there's somewhere around

2    five or seven calls altogether.  I'm going to go

3    through them.  Unfortunately, you're probably sick of

4    them, but I'm going to go through them, all of them.

5          So we have October 1st, October 2nd, October

6    5th, the 16th, the 19th, and the 20th.  October 1st.

7    Well, that's the quizzy.  That's the day he says --

8    Darren Macklin says and I don't have it with me, I'm

9    sorry, get him a quizzy, or something like that.

10         Well, what do we know?  We know that the only

11   person who ever testified that a quizzy is cocaine is

12   Officer Tyler, and we know that he's made mistakes

13   before.  I would suggest to you that he's made mistakes

14   before interpreting language, and I have just given you

15   the example of that.

16         We don't know where Jonathan Cobb is.  We

17   don't know where Darren Macklin is when he says get him

18   a quizzy.  We don't know if somebody ever met up with

19   Jonathan Cobb to get a quizzy.

20         We certainly don't have any evidence that

21   Darren Macklin met up with somebody to give him a

22   quizzy, to give him a quarter ounce.  There's

23   absolutely no evidence of that.

24         They are arguing to you that that means that

25   that was setting up a drug transaction.  Are you saying

Defendant D. Macklin's Closing Argument        23

1    to yourself based upon what you've heard, based upon

2    what you know, I'm not convinced.  Could be, might not

3    be.  It's reasonable doubt.

4         October 2nd.  And I don't think the

5    government even argued this in their closing because I

6    guess they don't think it's important, but I'm going to

7    hit on it.

8         That's the conversation where Darren Macklin

9    says to Jonathan Cobb, "Shaky Bakey is here."  Well,

10   that's a drug deal right there.  He's telling him Shaky

11   Bakey is here.  Well, we don't know who Shaky Bakey is

12   from the evidence that's been presented.

13        Shaky Bakey could be there for a lot of

14   things from what we know from the evidence.  All we

15   know is that Darren Macklin says, "Shaky Bakey is

16   here."  Not evidence of a drug deal as far as I'm

17   concerned.

18        October 5th.  This is the conversations

19   between Jonathan Cobb and Darren Macklin where Jonathan

20   Cobb uses words that Officer Tyler says are related to

21   covering up their drug activity.  Jonathan Cobb says

22   first shift -- hold on one second.

23        (Pause in proceedings.)

24        MS. GRASSO:  Jonathan Cobb says, "Yeah, you

25   know they're on first shift."  Darren Macklin says,

Defendant D. Macklin's Closing Argument        24

1  "Huh?" with a question mark, and there is a question

2  mark in the transcript actually.   Jonathan Cobb says,

3  "Yeah, they're on first shift.   I'm when you get there

4  free, hold on.   Yo is the bull."  Darren Macklin, can't

5  understand what he says.

6           Jonathan Cobb, "Down here in the purple car

7  waiting, that purple and blue car.   Darren Macklin,

8  "Nah, nah."  And we don't have any evidence that any of

9  the surveillance officers were in a blue and purple

10 car.  So we don't know what the conversation is about,

11 ladies and gentlemen.

12          They can suggest to you what they think it's

13 about, but, again, we don't know what it's about, and,

14 again, the words related to what they believe to be

15 discussing the fact that watch out, law enforcement is

16 out there, those are words that are spoken by Jonathan

17 Cobb, not by Darren Macklin.   In fact, he says, "Huh"

18 with a question mark.

19          Now, in the government's closing, and correct

20 me if I'm wrong, you'll do that when you go back to

21 deliberate, I believe the government referred to calls

22 on October 5th, Government's Exhibits 97 and 98, and I

23 just read to you 98, which is the one about the purple

24 car.

25          97 I'm going to read to you in a second.   But

Defendant D. Macklin's Closing Argument       25

I think the government when they closed, and I would
imagine that they made a mistake, said something about
that that conversation said "bring two," that Darren
Macklin said "bring two."  Well, when he said that in
his closing and I said to myself, "What?" because I
didn't remember that at all.  I had no recollection of
that.

I went back and I looked at the calls for
that day, and what the calls says on Government's
Exhibit 97, Jonathan Cobb answers the phone, "Yo."
Darren Macklin, "What's up, big dog?"  Jonathan Cobb,
"Man, I'll be right down in like two minutes.  I'll be
right there."  Darren Macklin, "Two, all right, yeah,
yo."  It doesn't say bring two, he says he'll be down
in two minutes.  And then he confirms "two, yeah, two."

Nobody ever said bring two to suggest that it
means bring two whatever of cocaine.  I don't know what
that could be, and we haven't heard any testimony about
that.

Quite frankly, I think he just made a
mistake, but in any event, there is absolutely no way
to argue that that says bring two.  I just read it to
you verbatim, so that's the call of October 5th, again,
nothing related to drug conversation in either of those
calls.

Defendant D. Macklin's Closing Argument      26

October 6th.  This is a call not between --
it doesn't involve Darren Macklin actually.  It's just
between Jonathan Cobb and David Cobb, and it's
Government's Exhibit 100.  This is the call where
they're talking about drywall.  And I'm just going to
read you some relevant portions.

Jonathan Cobb says, "I might need you to pick
him up so he can get a little piece of drywall from
around my crib, one of the cribs on Jeffrey Street.
I -- so he -- I got plenty of drywall laying right
outside, so if not, Sporty got a key to get inside to
get the other drywall."

Then later in that same conversation, it's a
pretty lengthy one, Jonathan Cobb says, "The drywall
laying right outside on the right side of the house,"
and then he talks about getting the spackle and the
tape.

Well, nobody's told you that has anything to
do with drugs because it doesn't.  But what do we know
from that?  We know that everything that we've already
been confirmed by the other witnesses, which is he's
fixing up houses, and Darren Macklin's got the key to
help them get in the houses to get the drywall, to get
them the supplies to fix up the houses because he's
helping them fix up the houses.  That's what we know

from that call.

October 16th.  That's the day where Jonathan Cobb uses, "You got to fall out."  Again, the words "fall out" and "it's real wet out here" they're not Darren Macklin's words.

That begins the whole series of conversations that go back between Jonathan Cobb and Darren Macklin with regard to Anthony Minor and getting the money, the money that was apparently short that Officer Tyler tells you that it was short for money for drugs that were fronted by Jonathan Cobb to Anthony Minor and then Darren Macklin is picking up the money.

Well, what do we know about that?  We know what Darren Macklin's words are.  We heard them.  "I didn't count it.  He didn't tell me nothing.  I never touched it.  What was supposed to be the total?  It had a rubberband on it and I left it like that."

Jonathan Cobb when he's having a conversation with Anthony Minor trying to figure out who was short, what it was short, he says, "Man, I trust him.  He's had thirty to forty stacks for me."  They tell you that thirty to forty stacks means thirty to forty thousand dollars.

Do we have any evidence that Darren Macklin has been holding thousands of dollars for anybody?  Any

Defendant D. Macklin's Closing Argument        28

1   evidence that anybody's ever seen him with thousands of

2   dollars?  There's no evidence of that in this case.

3         He collected the money.  Is there any

4   evidence in this case as to why he collected that

5   money?  I would suggest to you that the government has

6   not proven beyond a reasonable doubt regarding what

7   that was about.

8         October 19th.  And we're getting closer to

9   the day of the arrest.  Darren Macklin answers the

10  phone from Joseph Ward.  And you probably remember the

11  call.  Joseph Ward says, "Yo -- " he thinks it's Darren

12  -- Joseph Ward thinks it's Jonathan Cobb who answers

13  the phone, and Darren says, "No, it's not him.  He's

14  not here right now."

15        Joseph Ward says, "I'm trying to catch up

16  with him."  Well, if Darren Macklin is Jonathan Cobb's

17  right-hand man, if he's his partner in crime, if he's

18  the point person, and Joseph Ward is looking to buy

19  drugs, don't you think Darren Macklin would have said,

20  you know, I can take care of it, what do you need, how

21  much do you want, do you want this, you want that.  He

22  doesn't do that.

23        Obviously, Jonathan Cobb comes near where he

24  is on the phone at some point and he says, "Here he

25  is," and he hands him the phone.  Otherwise, I think it

Defendant D. Macklin's Closing Argument       29

1  was perfectly clear that that call was going to end,

2  that Joseph Ward and Darren Macklin were not going to

3  have a conversation because Joseph Ward didn't want to

4  talk to Darren Macklin.  He wanted to talk to Jonathan

5  Cobb.  He's no partner in crime.  He's no right-hand

6  man.

7          Same thing on October 19th.  Jonathan Cobb

8  and David Cobb have a conversation and this is after

9  the conversation with Joseph Ward where presumably

10 Jonathan Cobb, the government would have you believe,

11 is going to setup a drug transaction with Joseph Ward.

12 Well, what did Jonathan Cobb and David Cobb say?  Or

13 I'm sorry, Jonathan Cobb says to David Cobb, "I got

14 Sporty with me.  I got to drop him off."  He's going to

15 make a drug deal, but he's not going to take his

16 right-hand man with him?

17          All this evidence, ladies and gentlemen, is

18 indicative of Darren Macklin having nothing to do with

19 this alleged drug conspiracy.  He's no partner in

20 crime.  He's no right-hand man.

21          October 20th.  There's two calls, if I'm not

22 mistaken, where Darren Macklin is intercepted on

23 Jonathan Cobb's phone.  And there's lots of

24 conversation, and I think the government mentioned this

25 in their closing, between Jonathan Cobb and the North

Defendant D. Macklin's Closing Argument          30

1   Philadelphia supplier setting up the deal, setting up

2   the terms of the deal, setting up the location,

3   confirming it, reconfirming it.  None of those calls

4   are with the point person, Darren Macklin.  None.  No

5   evidence that he even heard any of those calls.

6   Nothing.

7           What does Darren Macklin do on October 20th?

8   He answers the phone of Jonathan Cobb and David Cobb is

9   calling and he says, "We're at the Mrs.' crib."  And he

10  calls back again and he says, "We're still at the Mrs.'

11  crib."

12          David says something about his cell phone is

13  running out of battery so I got to get there soon so he

14  just tells him yeah, we're here.  That's it.  And then

15  what does he do?  Well, we know what he -- we did based

16  upon a surveillance.

17          All we know that he did on October 20th is

18  answer the phone, say hey, "We're at the Mrs.' crib."

19  We know that he drives up, he's seen by Sergeant

20  Boudwin driving in the passenger's seat, seated in the

21  passenger seat of the Explorer that Jonathan Cobb was

22  driving.  That's what we know.

23          We know later that Detective Newell sees him

24  getting into the passenger's side of the Impala with

25  David Cobb.  That's what we know.  That's what they

Defendant D. Macklin's Closing Argument          31

1    want you to believe is evidence to show that he had

2    possession with intent to distribute a kilogram of

3    cocaine on October 20th.  That's what we have.

4         What else do we know about the 20th?  Well,

5    we know that the kilogram that they supposedly were

6    ordering which was supposed to be broken down, we know

7    that wasn't broken down, and that's been gone over.  We

8    know that the kilo is found in the Kia that's being

9    driven by David Cobb.  We know that Darren Macklin has

10   never set foot in that Kia.

11        (Pause in proceedings.)

12        MS. GRASSO:  And we know that the last time

13   the police saw Jonathan Cobb was he was in the Kia all

14   by himself.  And we know that there's a call where

15   Jonathan Cobb, who I don't know, maybe he was in the

16   Kia alone, maybe he wasn't in the Kia alone anymore,

17   but the last time they saw him he was in the Kia -- Kia

18   alone.  Jonathan Cobb is saying to the alleged North

19   Philadelphia supplier, "We're here.  We're back to

20   back."

21        What do we know about the time table?  Well,

22   we know from Detective Boudwin that the last call

23   regarding back to back with the North Philadelphia

24   supplier between Jonathan Cobb and the North

25   Philadelphia supplier occurs at 7:36.

Defendant D. Macklin's Closing Argument        32

1    We know that the take down of the two

2    vehicles doesn't happen until 8:45.  We have no idea,

3    based upon the evidence, of what happened in between.

4    We know that Darren Macklin is still in the same car he

5    was in when the police last saw him, which is the Chevy

6    Impala in which there is no drugs.  We don't know where

7    they went, what they did, we don't know.

8    The government is speculating what they did,

9    but I would suggest to you that the fact that

10   everything is setup on these calls and they believe

11   everything is going to happen exactly the way the calls

12   say they're going to happen, but it doesn't because

13   that broken down down kilo is a brick.  So it didn't

14   happen the way they suggested.  We don't know how long

15   that kilo was in that car based upon the evidence.  We

16   have no idea.

17   The government suggested in its closing that

18   they switched cars because they're working together.

19   Well, how does that make any sense?  I mean every time

20   we have evidence of them suppose -- of Jonathan Cobb

21   supposedly going to the supplier in North Philadelphia

22   or West Philadelphia or wherever, Darren Macklin is not

23   with them.

24   They never go back to back.  You don't hear

25   any evidence about hey, well, the cops are out.  We

1  better go in two cars because, you know, it just makes

2  more sense.  We can switch it up.  It doesn't make any

3  sense.  There's a million reasons they could be in two

4  cars.

5        I'm sure you've gone out with friends where

6  there's three of you and one person is driving alone

7  and then they -- you decide to switch up cars just

8  because hey, I'm going to drive with that person now.

9  I mean there's one million explanations for it.  One

10 million.  It doesn't show that they're working

11 together.  There's absolutely no evidence of that.

12       We have no evidence that these two cars

13 pulled up back to back anywhere other than they want

14 you to believe that because Jonathan Cobb says on the

15 phone, "Hey, we're back to back."

16       Well, probably they were back to back

17 somewhere.  But we don't know who's in the car at that

18 point.  We have no evidence of that.  We know who's in

19 the car the last time they saw -- they see him and we

20 know who's in the car when they stop them.  And that's

21 all we know based upon the evidence.

22       Does that give you pause?  Does that make you

23 think what could have happened?  There's one million

24 different things that could have happened here other

25 than what the government suggests to you happened.  I

Defendant D. Macklin's Closing Argument      34

1  suggest to you yes, that's reasonable doubt, ladies and
2  gentlemen.

3          The government said they're always together.
4  Jonathan Cobb and Darren Macklin are always together.
5  Detective Newell -- and this was on the government's
6  redirect when after cross-examination he had been asked
7  about whether or not they had seen Jonathan Cobb on
8  their surveillance and Detective Newell was part of
9  that surveillance team for that period in October
10  leading up to the arrest date.

11         He told us that he saw Jonathan Cobb hundreds
12  of times, or one hundred times, about one hundred
13  times, whatever it was.  He doesn't say he saw Darren
14  Macklin, doesn't see the right-hand man.  That's
15  important.

16         Where do we have evidence that Darren Macklin
17  is always with Jonathan Cobb?  And if we have evidence
18  that Darren Macklin is with Jonathan Cobb, where is the
19  evidence that there's any illegal activity going on?
20  There is none.

21         I just want to go through some of the
22  civilian witnesses and what did they add to this case
23  or not add to this case as the case may be.  Donna
24  Hill.

25         She testified that she is in a relationship

Defendant D. Macklin's Closing Argument       35

with Jonathan Cobb.  She known him for a year and a half.  Of course she couldn't tell you who Darren Macklin was by name.  She said she seen him on Jeffrey Street in a crowd of people.

She's been in a relationship with Jonathan Cobb for a year and a half, but she doesn't even know him by Sporty.  She just doesn't even know his name.  Does that suggest to you this is the right-hand man, the partner in crime?  The woman that he's having a sexual relationship with a year and a half.

Angela Strand.  What do we know about her.  We know that she's been using cocaine from 2001, 2003, that's she's purchased drugs and sold those drugs.  She didn't want to admit that she sold the drugs.

She wanted to just say well, I got gas money and all that stuff, but she sold drugs.  We know she lied to the government when she was asked about her prior theft conviction.

And not only did she lie, as Mr. Cannon pointed out, she lied and she made up a pretty detailed story about what happened.  But she is getting a pass entirely in terms of prosecution if she testifies in this case.  She told you that.

And she says well, she knew that Jonathan Cobb would be fixing up houses.  That she knew.  And

Defendant D. Macklin's Closing Argument        36

1    she knew that she's seen Darren Macklin around him on

2    Jeffrey Street when the houses were being fixed up.

3    What did she tell us?  Nothing.  Nothing about Darren

4    Macklin being involved in criminal activity.

5            She wants you to think that by saying oh,

6    well, there was a couple drug deals where he was there.

7    But what does she tell us?  She tells us she's never

8    gotten drugs from Darren Macklin, she's never given

9    money to Darren Macklin, she's never seen Darren

10   Macklin go to a stash location, she's never seen him on

11   Norris Street at 336 Norris Street, she's never seen

12   him in her house on Tilghman Street when she would

13   purchase drugs from Jonathan Cobb.

14           The only number she ever called to get drugs

15   was not Darren Macklin's number.  She didn't even know

16   who Darren Macklin was until the government told her

17   when she met them at Dick's the first time that they

18   informed her that she was a target of their

19   investigation.

20           Dawn Germany.  She's got three prior drug

21   convictions, she's a fugitive, a fugitive collecting

22   unemployment, she's got a parole violation, she's been

23   in federal custody, she sold drugs, she's purchased

24   drugs.

25           She's going to be charged with twenty-eight

Defendant D. Macklin's Closing Argument          37

1   grams.  She's signed a plea agreement regarding only

2   twenty-eight grams of drugs, and she believes that

3   she's going to get eighteen months, no more than

4   eighteen months.  What does she tell us?

5         She tells us that she knows Jonathan Cobb is

6   working on houses, that she's bought drugs from

7   Jonathan Cobb.  She can't tell us any of the dates that

8   she said she's seen Darren Macklin on.  She just

9   testifies, you know, oh, I've seen him with Jonathan.

10  But she can't tell us dates.

11        She doesn't give us any specifics as to when

12  she sees Darren Macklin with Jonathan Cobb, with the

13  exception of that one time when she says they're in the

14  black pickup truck and that she got drugs from Jonathan

15  Cobb on that day when they were in the black pickup

16  truck together.

17        What she tells us about that day is she rolls

18  up, or the car comes up and Jonathan is driving and

19  Darren is I think in the passenger's seat.  There's a

20  conversation.  The car leaves, the car comes back, and

21  she's supplied with drugs, not from Darren Macklin.

22        She didn't have a drug-related conversation

23  with Darren Macklin on that day.  She didn't give money

24  to Darren Macklin.  She didn't get drugs from Darren

25  Macklin.  The government wants you to believe that

Defendant D. Macklin's Closing Argument          38

because he's hanging around he must be involved.

He was arrested.  He's in one of those cars on October 20th.  He must know what's going on.  There's no evidence that he has any knowledge of that.  There's absolutely no evidence of that in this case.

I asked her about the specific dates and how many times she told the government in her proffer about seeing Darren Macklin because I can't remember how many times she said she saw him in court.  I think it was two or three times.

But I asked her did she ever tell the government before, and I think she said something like well, if I did, I don't remember.  If they didn't write it down, then I don't know.  Did you hear any rebuttal testimony from an agent to say yeah, she told me that before or yeah, it's in this report or it's not in my report, but she did tell me that?  There's no evidence of that.  I would suggest to you then you can't believe the testimony that she gave regarding that because it didn't happen.

Anthony Minor, Dink, Authentic, whatever you want to call him.  He's got nicknames too.  Everybody's got nicknames.  He goes through October 16th, which is the transcripts that you heard regarding collecting the money.

Defendant D. Macklin's Closing Argument      39

1    I asked him "He took the money from you,

2    Darren Macklin took the money from you," and there was

3    absolutely no conversation whatsoever, and he agreed

4    they didn't speak.  He didn't say this is what this is

5    for.  None of that.  There's no evidence of that.

6    He tells you, Anthony Minor tells you that

7    fifteen to twenty times he's made transactions where

8    Darren Macklin is present.  Again, he's not saying that

9    I got drugs from Darren Macklin, Darren Macklin took

10   money for drugs from me, none of that.  He's just

11   saying at fifteen -- all of a sudden fifteen, twenty

12   times he's been around Jonathan Cobb when he's gotten

13   drugs and Darren Macklin's been there.

14   Where's the evidence to back that up?

15   Anything to corroborate that?  Nothing.  And I would

16   suggest to you in order to believe Anthony Minor you

17   have to have some sort of corroboration of that.

18   Again, there's no report by the agent who

19   says when we interviewed him he told me that and I

20   wrote it down, or there's no re -- testimony by the

21   agent after Anthony Minor got on the stand and said

22   yeah, he told me that.  He told me that he saw him

23   fifteen to twenty times, because it didn't happen,

24   ladies and gentlemen.

25   Anthony Minor, I think you can evaluate him

Defendant D. Macklin's Closing Argument      40

pretty clearly.  He wouldn't even agree with me that he
hoped to get a lighter sentence for his testimony.  I
think that defies all credibility and I think that's
all you need to know about him.  I'm not suggesting
that the government is telling him to lie.  I'm not
suggesting that.

He's saying what he thinks the government
wants to hear because he's scared and he wants to get
out of jail.  He wouldn't even agree that he was scared
when he was picked up in Ohio or wherever it was
because he knows that the government knows that he's
dealt lots of cocaine before, up to a kilo from what we
can tell if we take that thirty to forty times times
twenty-eight grams an ounce on each occasion.

He's told the government that he's dealt a
kilo.  And the government would say to you well,
because of that proffer letter he's protected.
Whatever he said can't be used against him.

That's true under normal circumstances.  But
he's a fugitive.  He was supposed to cooperate with the
government and do what the government asked him to do.
He was supposed to show up for trial prep and he never
did.  He took off.

Anthony Minor, when he's sitting in jail in
Ohio and gets transported back here he's thinking I'm

Defendant D. Macklin's Closing Argument      41

in deep water.  For him to come in here for the first
time and say fifteen to twenty times he saw Darren
Macklin, it defies credibility.

Again, even if you want to believe that he
saw him fifteen to twenty times, Sporty didn't give him
drugs.  Sporty didn't take money from him except for on
the 16th when there was no conversation and Jonathan
Cobb wasn't present, and there was no exchange in drugs
on that day.  It's nothing.  It's not evidence against
him.

The government gets to speak last, as you
know, and obviously myself and the other attorneys
would ask you to say in your mind what would we have to
say about what they just said, and we would invite you
to do that.

But, again, I ask you to look at this case in
the way that the surveillance and this investigation
started.  Why is Darren Macklin here?  He's here
because on October 20th he picks up a phone and says,
"We're at the Mrs.' crib," twice.  A couple times he
says, "We're at the Mrs.' crib.  We're waiting for
you," or whatever the case may be.

I would remind you that on October 20th when
Jonathan Cobb has a conversation with the alleged North
Philadelphia supplier Jonathan Cobb says I'm waiting

Defendant D. Macklin's Closing Argument      42

for my brother.  He doesn't say we, he says I'm waiting

for my brother.  He doesn't say me and my partner are

waiting for my brother, he says I'm waiting for my

brother.  And when Jonathan Cobb says man, he keeps

bugging me or he keeps calling me, I forget what the

slang was that he used to say that, he's talking to

David.  He's not talking to Darren.

Darren Macklin is here because he says,

"We're at the Mrs.' crib," and he gets into a car

that's behind a car that has -- that's later stopped

that has a kilo in it.  That's why he's here.  He's not

a partner in crime, he's not a point person.  He's

Sporty, and I would ask you to find him not guilty.

THE COURT:  Government's rebuttal now.

MR. LEVERETT:  Thank you, Your Honor.  Good

morning.  Ms. Grasso was right about one thing.  I did

make a mistake yesterday about that call that she

talked about concerning two.  That's the only thing

that she was right about.  It wasn't concerning two of

some quantity of drugs, it was concerning two minutes.

That was a mistake.

But there was no mistake about that second

call, that call that you heard for yourself, that call

where Jonathan Cobb told Darren Macklin that they're on

first shift, referring to narcotics units, and there is

Government's Rebuttal Argument          43

1    no mistake about Darren Macklin's role in this

2    conspiracy.

3          Ms. Grasso said that the government has given

4    her client a lot of names.  Could we play call 3350,

5    please?

6          (Call 3350 is being played at this time.)

7          MR. LEVERETT:  That's Darren Macklin, ladies

8    and gentlemen, calling himself Jonathan Cobb's partner.

9    I didn't give him that name.  He did.

10          There's no mistake about the nature of the

11    relationship between Darren Macklin and Jonathan Cobb,

12    and what Ms. Grasso wants to do is segregate, isolate,

13    every single piece of their interaction.

14          But as I think His Honor will instruct you

15    and as defense counsel has already said, this case

16    comes down to common sense, what you know in real life,

17    what you know about relationships in real life.  Real

18    life interactions don't happen in isolation.  They

19    happen fluently and over time.

20          What you heard in these calls and what you

21    heard in this courtroom think about in connection with

22    what you know in real life.  Darren Macklin was always

23    around Jonathan Cobb.  The reason he was always around

24    was because they were working together.

25          Ms. Grasso said that, for example, on October

16th there was no conversation between Darren Macklin

and Anthony Minor during that drug dispute.  But she

overlooked the aspect of the call before that when

Jonathan Cobb said, "Hey, I'm going to send Dink around

to drop off a little change."

Darren Macklin didn't say what are you

talking about?  He said, "Oh, okay," because he knew.

Common sense, ladies and gentlemen.  That's just the

way things work.

Darren Macklin knew what Jonathan Cobb did

because he was right there with him.  One time is a

coincidence.  A few times, a pattern.  The evidence in

this case, ladies and gentlemen, shows that Darren

Macklin was just always around, and he was around

helping, he was around facilitating, and he was around

Jonathan Cobb as his partners.  His words, not mine.

Now, Ms. Grasso also said that she was going

to go through each and every call and take things heads

on -- take things head on as they came up.  She talked

about the quizzy call.

But she overlooked Jonathan Cobb's response

to Darren Macklin's use of the word "quizzy."  He said

no, no, no, no, no because he doesn't want Darren

Macklin talking loosely like that on the telephone.  He

doesn't want him using drug terms on the telephone

1   because they don't know who's going to be listening.

2          She says that the only reason that Darren

3   Macklin is here is because he answered the phone on

4   October 20th and he was in a car.  That's just not

5   true.  Darren Macklin is here for all the reasons that

6   you heard during this case, ladies and gentlemen.  It's

7   not just that call or those calls.

8          David Cobb calls Jonathan Cobb's phone and

9   who answers?  Darren Macklin answers.  He says I'm

10  going to meet you guys on the highway.  Darren Macklin

11  doesn't say huh, what are you talking about, where are

12  we going?  He says oh, okay.

13         She says that Donna Hill, Jonathan Cobb's

14  girlfriend, for lack of a better word, doesn't know

15  Darren Macklin.  Why doesn't she knew Darren Macklin?

16  Because he's never around Ms. Grasso would have you

17  believe.

18         Darren Macklin knows her.  He says, "We're at

19  the Mrs.' crib."  David Cobb knew exactly what he was

20  talking about.  "Why don't you just come meet us at the

21  Mrs.' crib?"  Meet us why?  Because he knows where

22  they're going, because he knows what they're doing.

23         Yesterday Mr. Cannon and Mr. Jarvis both

24  extended you an invitation to not accept the wiretap

25  evidence in this case.  And I submit to you that you

Government's Rebuttal Argument                  46

should reject that invitation and you should consider

all of the evidence in this case.

      They talked about a search warrant.  You

heard from the officers in this case, they didn't need

a search warrant to seize that kilogram of cocaine.

All defense counsel talked extensively about the

witnesses in this case.

      They talked about Anthony Minor, they talked

about Dawn Germany, they talked about Angela Strand.

The reason that Angela Strand, Anthony Minor, and Dawn

Germany were here as witnesses, ladies and gentlemen,

is because they were on the telephone ordering cocaine

from Jonathan Cobb.

      What they said to you in court is

corroborated with what you heard on the conversations

that they had with Jonathan Cobb while they were

ordering cocaine, and they explained those calls to

you, what was happening in real time in their own

words.

      Anthony Minor told you that several times,

fifteen to twenty times when he bought cocaine from

Jonathan Cobb, Darren Macklin was there.  Angela Strand

told you that on several occasions when Jonathan Cobb

was not around she was referred to David Cobb.  You

heard those tapes.  You heard them in real time.  You

1  know the nature of the relationships here, ladies and

2  gentlemen.

3          I agree with defense counsel in this regard.

4  Please use your common sense.  Now, concerning common

5  sense, there was a lot of talk yesterday from Mr.

6  Cannon about the drugs in this case.  Mr. Cannon said

7  he's a Missourian and drug talk is cheap.

8          Ladies and gentlemen, this kilogram of

9  cocaine can't talk, but it says an awful lot.  Now,

10  there was a discussion yesterday when defense counsel

11  suggested that Jonathan Cobb wanted something broken

12  down, but what we have here is a brick.

13          They suggested to you that you ask well,

14  where did the cocaine that was in the car, where did

15  that come from?  I think Mr. Cannon referred to it as

16  the mystery in this case.  There is no mystery in this

17  case, ladies and gentlemen.  That cocaine came from the

18  North Philadelphia supplier.

19          Now, how do we know that it came from the

20  North Philadelphia supplier?  Because you heard the

21  calls.  You heard the calls on October 16, 2009, the

22  calls where he said the reason I haven't been coming up

23  there is because the quality of your cocaine has been

24  poor.

25          You heard the North Philadelphia supplier say

1   that it would be better this time.  You heard the calls

2   on October 20th where Jonathan Cobb said okay, I'm

3   coming back, I'm going to have to go back to where I

4   was before, referring to October 16th.

5        You heard the calls between Darren Macklin

6   and David Cobb coordinating the trip to North

7   Philadelphia to buy that cocaine.  And you see the

8   cocaine there on the table.

9        Now, what the defendants would have you

10  believe is that because that's not broken down and

11  there was mention of the term "broken down" in the

12  coordinating calls that that cocaine was somehow

13  already in that car.  They didn't know that that

14  cocaine was there though.  It doesn't make sense,

15  ladies and gentlemen.

16       For example, if the defendants drove, as

17  their lawyers conceded, from Chester to North

18  Philadelphia to buy cocaine, didn't get it, and got

19  caught on the way back coincidentally with a kilogram

20  of cocaine in the car, where is the money?

21       Where is the money for that failed deal?

22  Ladies and gentlemen, the money is in North

23  Philadelphia because they rolled up to North

24  Philadelphia and bought a kilogram of cocaine.  They

25  would have you believe that they didn't know a kilogram

Government's Rebuttal Argument            49

of cocaine was in the car.

Jonathan Cobb would have you believe that he
didn't know a kilogram of cocaine was in the Kia.
Jonathan Cobb, who told the FBI shortly after he was
arrested that he could order up five or six kilograms
right then.  Jonathan Cobb, who as you heard years ago
was convicted after he threw cocaine out of a window.

David Cobb didn't know that cocaine was in
the car.  David Cobb, who has been arrested twice in
the past for possessing or distributing cocaine.  It
doesn't make sense, ladies and gentlemen.  There is no
mystery in this case.  You heard what happened.

THE COURT:  Two minutes.

MR. LEVERETT:  Thank you, Your Honor.  You
heard what happened on October 20, 2009.  And you see
the drugs there on the table.  Like I said, that
cocaine can't talk, but it says an awful lot.

Ladies and gentlemen, all of the evidence in
this case establishes beyond a reasonable doubt that
Jonathan Cobb, David Cobb, and Darren Macklin conspired
together to distribute cocaine.

The evidence in this case is their own
conversations.  The evidence in this case is their own
relationship.  The evidence in this case are the drug
customers from Chester, Pennsylvania who were caught on

Government's Rebuttal Argument          50

1   tape who you heard from both live and recorded.

2         The evidence in this case is that kilogram of

3   cocaine that was seized on October 20, 2009 after

4   Jonathan Cobb, David Cobb and Darren Macklin

5   coordinated a trip to the North Philadelphia supplier

6   to buy it.

7         Based on this evidence, ladies and gentlemen,

8   I ask that you return a verdict of guilty on both

9   counts.  Thank you.

10        THE COURT:  Thank you, counsel for closing

11  statements.  We are going to proceed now to charge you

12  on the law that you will apply in this case.  It should

13  take approximately forty minutes.

14        Members of the jury, I want to thank you for

15  the very careful attention you obviously have given to

16  these proceedings so far.  The right to trial by jury

17  is an essential element of our system of justice, and

18  without your participation the system could not

19  function.

20        We have now arrived at the point in the case

21  where I charge you before you go out to deliberate.

22  That is to say this is the point where I tell you what

23  the law is, and, as I told you at the beginning of the

24  case, you must apply the law to the facts that you find

25  from the evidence before you.

## CHARGE OF THE COURT

THE COURT:  You are not to single out any one instruction of mine in stating the law.  Rather, you should consider them all as a whole, all of the instructions that I give you.

Now, as jurors you have two duties.  Your first duty to decide the facts from the evidence that you have heard and seen in court during the trial. This is your job and your job alone.  I play no part in finding the facts.

You should not take anything that I may have said or done during the course of the trial or that I may say or do during the course of this instruction as indicating what I think the evidence is or what I think your verdict should be.

Your second duty is to apply the law that I give you to the facts that you find in the case.  My role is to explain to you the legal principles.  I must guide your deliberations, and you must apply my instructions carefully.

Each of the instructions is important and you must apply them all.  You must not substitute or follow your own notion or opinion on what the law is or ought to be.  You must apply the law that I give you whether you agree with the law or now.

1    Whatever your verdict it will have to be

2    unanimous.  All of you will have to agree on it or

3    there will be no verdict.  In the jury room you will

4    discuss the case among yourselves, but ultimately, each

5    of you will have to make up his or her own mind.

6    This is a responsibility each of you has and

7    you cannot avoid it.  Perform those duties fairly and

8    impartially.  Do not allow sympathy, prejudice, fear,

9    or public opinion to influence you and, of course, you

10   should not be influenced by any person's race, color,

11   religion, national ancestry, or gender.

12   You must make your decision in the case based

13   only on the evidence that you saw and heard in the

14   courtroom.  Do not let rumors, suspicions, anything

15   else that you may have seen or heard outside the

16   courtroom influence your decision in any way.

17   The evidence from which you will find the

18   facts consists of the following:  the testimony of

19   witnesses, document and other things that are received

20   into evidence, and any factor of testimony that was

21   stipulated, that is formally agreed to by the parties.

22   And there were, at least in my recollection, a couple

23   of occasions where the parties stipulated as to a

24   particular fact.

25   In the event that they stipulated as to a

Charge of the Court                    53

1   particular fact, that's fact for you to consider, but

2   ultimately, it is up to you to accept it, to turn it

3   down, or to give it whatever weight you think those

4   stipulations deserve.

5          The following, however, is not evidence in

6   the case.  The indictment is not evidence.  Statements

7   and arguments of the lawyers to you, that is not

8   evidence in the case.  Questions by the lawyers and

9   questions that I may have asked during the trial, and

10  objections by the lawyers, including objections in

11  which the lawyers stated fact, that's not evidence.

12  Any testimony that I struck or told you to disregard

13  and anything that you may have seen or heard outside

14  the courtroom is not evidence.

15         You should use your common sense in weighing

16  the evidence.  Consider in light of the your everyday

17  experiences with people and events and give it whatever

18  weight you believe it deserves.

19         If your experience and common sense tells you

20  that certain evidence is reasonably leads to a

21  conclusion, you may reach that conclusion.  As I told

22  you in my preliminary instructions, the rules of

23  evidence control what can be received into evidence.

24         During the trial the lawyers objected when

25  they thought the evidence was being offered that was

1   not permitted under the rules of evidence.  These

2   objections simply meant that the lawyers were asking me

3   to decide whether the evidence should be allowed under

4   the rules.

5         You should not be influenced by the fact that

6   an objection was made.  You should also not be

7   influenced by my ruling on the objection or a sidebar

8   conference you may have overheard.

9         When I overruled an objection the question

10  was answered and the exhibit was received as evidence

11  you should treat that testimony or exhibit like any

12  other evidence.

13        When I allowed the evidence or the testimony

14  or exhibits for limited purpose on, and you recall that

15  I did that on at least two occasions, I instructed you

16  to consider that evidence only for that limited

17  purpose.  You must do that.

18        When I sustain an objection the question was

19  not answered, the exhibit was not received as evidence.

20  You must disregard the question entirely and the

21  exhibit completely.

22        Do not think about it or guess what the

23  witness might have said in answer to the question.  Do

24  not think about or guess what the exhibit might have

25  shown.

Charge of the Court                    55

1    Sometimes the witness may have already
2 answered before a lawyer objected or before I rule on
3 the objection.  If that happened and I sustained the
4 objection, you must disregard the answer that was given
5 by the witness.

6    Also, if I ordered some testimony or evidence
7 be stricken from the record, you must disregard that
8 evidence.  When you are deciding the case you must not
9 consider or be influenced in any way by the testimony
10 or other evidence that I told you to disregard.

11    Although the lawyers may have called to your
12 attention certain facts or factual conclusions that
13 they thought were important, what the lawyers said is
14 not evidence and is not binding upon you.  It is your
15 own recollection and interpretation of the evidence
16 that controls your decision in the case.

17    Also, do not assume from anything that I may
18 have done or said during the trial that I have any
19 opinion or have any knowledge about the issues or the
20 facts of this case or about what your verdict should
21 be.

22    I'm not going to review the evidence that you
23 have heard during the trial.  It's been a relatively
24 short trial.  I may refer to some of it in order to put
25 the legal questions I'm going to talk to you about in

Charge of the Court                    56

1    context.

2         I probably will not, but if I do refer to any

3    evidence and your recollection of what the evidence was

4    and what it showed differs from mine, then it is your

5    recollection of the evidence that governs and not mine.

6         The same is true also what the lawyers said

7    to you during the closing statements about what the

8    evidence showed.  If your recollection differs from

9    theirs as to what the evidence show, it is your

10   recollection that governs and not theirs.

11        Now, at the conclusion of these instructions

12   I will talk to you about a verdict sheet.  And that

13   will be the sheet where you will record the verdict.

14   And I will discuss it more fully with you at the

15   conclusion of these instructions.

16        Now, there are two types of evidence that you

17   may consider in the case.  One is called direct

18   evidence and the other one is called circumstantial

19   evidence, and you may use both types of evidence in

20   reaching your verdict.

21        Direct evidence is simply evidence which you

22   believe directly proves a fact.  An example of direct

23   evidence, of course, when a witness testifies about

24   something that the witness knows from his or her own

25   senses, something the witness has seen, touched, heard,

Charge of the Court                57

or smelled.

Circumstantial evidence on the other hand you believe indirectly proves a point.  It is evidence that proves one or more facts in which you could reasonably find or infer the existence of some other fact or facts.

A reasonable inference is simply a deduction or conclusion that reason and experience and common sense leads you to make from the evidence.  A reasonable inference is not a suspicion or a guess.  It is reason, logical decision to find that a disputed fact exists on the basis of another fact.

For example, if someone walked into the courtroom wearing a wet raincoat and carrying a wet umbrella, that would be circumstantial or indirect evidence in which you could reasonably find or conclude that it was raining.  You would not have to find that it was raining, but you could.

Sometimes different inferences may be drawn from the same set of facts.  The government may ask you to draw one inference, the defendant may ask you to draw another.  You and you alone must decide what reasonable inference you will draw based on all the evidence and your reason, experience, and common sense.

You should consider all of the evidence that

Charge of the Court                    58

is presented in this trial, direct and circumstantial.
The law makes no distinction between the weight that
you should give to either direct or circumstantial
evidence.  It is up to you to decide how much weight to
give to the evidence, whether direct or circumstantial.

In reaching your verdict you are expected to
use again your good sense and consider the evidence in
the case for the purpose for which it has been
admitted.

Further, your expected to give the evidence
reasonable and fair construction in light of your
common knowledge of the natural tendencies and
inclinations of human beings.

In other words, you may make deductions and
reach conclusions that reason and common sense leads
you to draw from the facts which you conclude have been
established by the evidence.

In your consideration of the evidence you are
not limited to the statements of the witnesses.  You
are permitted to draw inferences, but only from facts
which you have been proven from the evidence and only
such an inference as seen justified in light of your
experience.

The only inferences that you can draw,
however, are inferences reasonably and fairly based

Charge of the Court                    59

1  upon the evidence and not inferences based on your

2  guesses or conjecture.

3        Now, during the trial you heard testimony of

4  witnesses and argument by counsel that the government

5  did not use specific investigative techniques, such as

6  drug-sniffing dogs or tracking devices.

7        You may consider these facts in deciding

8  whether the government has met its burden of proof

9  because, as I told you, you should look at all of the

10 evidence or lack of evidence in deciding whether the

11 defendant is guilty.

12       However, there is no legal requirement that

13 the government use any specific investigative

14 techniques or all possible techniques to prove its

15 case.

16       There is no requirement to use drug-sniffing

17 dogs or tracking devices.  Your concern, as I have

18 said, is to determine whether or not the evidence

19 admitted into trial proves each defendant's guilty

20 beyond a reasonable doubt.

21       Now, in deciding what the facts are you must

22 decide what testimony you believe and what testimony

23 you do not believe.  You are the sole judges of the

24 credibility of witnesses.

25       Credibility refers to whether a witness is

Charge of the Court                    60

worthy of belief.  Was a witness truthful?  Was a
witness' testimony accurate?  You may believe
everything a witness has said or only part of it or
none of it.

        You may decide whether to believe a witness
based on his or her behavior and manner of testifying,
the explanation the witness gave, and all the other
evidence in the case, just as you would in any
important matter when you are trying to decide if a
person is truthful, is straightforward, and (inaudible)
his or her recollection.

        In deciding the question of credibility
remember to use your common sense, your good judgment
and your experience.  In deciding what to believe you
may consider a number of these factors.

        One, the opportunity and ability of the
witness to see and hear and know the things about which
the witness testified.  Two, the quality of the
witness' knowledge, understanding, and memory.

        Three, the witness' appearance, behavior, and
manner while testifying.  Fourth, whether the witness
has an interest in the outcome of the case or a motive,
bias, or prejudice.

        Five, any relation the witness may have to a
party in the case and any effect that the verdict may

Charge of the Court                    61

have on the witness.  Six, whether a witness said or
wrote anything before trial that was different than
what the witness testified here in court.

Seven, whether the witness' testimony was
consistent or inconsistent with other evidence that you
believe.  And finally, any other factors that bear on
whether the witness should be believed or not believed.

If a witness is shown to have testified
falsely concerning any material matter, you have the
right to distrust such a witness' testimony in other
particulars and you may reject all the testimony of
that witness or give it such a credibility as you think
it deserves.

Inconsistencies or discrepancies in a
witness' testimony or between the testimony of
different witnesses may or may not cause you to
disbelieve a witness' testimony.

Two or more persons, as you know, witnessing
an event may simply see it or hear it differently.
Mistaken recollection, like a failure to recall, is a
common human experience.

So in weighing the effects of an
inconsistency you should consider whether it was about
a matter of importance or an insignificant detail.  You
should also consider whether the inconsistency was an

1   innocent inconsistency or whether it was intentional.

2           Now, the weight of the evidence to prove the

3   fact does not necessarily depend upon the number of

4   witnesses who testified or the quantity of evidence

5   that was presented.  What is more important than number

6   or quantity is how believable the witnesses were and

7   how much weight do you think their testimony deserves.

8           Now, during the trial you heard testimony

9   from witnesses who, because of their education,

10  experience, are permitted to state opinions and their

11  reasons for their opinions.

12          Opinion testimony should be judged like any

13  other testimony.  You may accept it, you may reject it,

14  or give it such a weight as you think it deserves

15  considering the witness' education and experiences and

16  the reasons given for the opinion as well as all other

17  evidence in the case.

18          Although the government is required to prove

19  that the defendant is guilty beyond a reasonable doubt,

20  the government is not required to present all possible

21  evidence related to the case or to produce all possible

22  witnesses that may have some knowledge about the facts

23  of the case.

24          In addition, as I have told you, a defendant

25  is not required to present any evidence or to produce

1  any witnesses.  You should always bear in mind that the

2  law never imposes upon a defendant in a criminal case

3  the burden or duty of calling any witnesses or

4  producing any evidence, and no adverse inference may be

5  drawn for any failure to do so.

6        Now, the defendants in this case, Jonathan

7  Cobb, David Cobb, and Darren Macklin, pleaded not

8  guilty to the offenses charged.  Therefore, the

9  defendants are presumed to be innocent.  The defendants

10  started the trial with a clean slate and no evidence

11  against them.

12        The presumption of innocence stays with them

13  unless and until the government has presented evidence

14  and overcomes that presumption by convincing you that

15  the defendants are guilty of the offenses charged

16  beyond a reasonable doubt.

17        A presumption of innocence requires that you

18  find the defendants not guilty unless you are satisfied

19  that the government has proved guilt beyond a

20  reasonable doubt.

21        The presumption of innocence means that the

22  defendant has no burden or obligation to present any

23  evidence at all or to prove that they are not guilty.

24  The burden or obligation of proof is on the government

25  to prove that the defendants are guilty and this burden

1  stay with the government throughout the trial.

2        In order for you to find the defendants

3  guilty of the offenses charged the government must

4  convince you that the defendants are guilty beyond a

5  reasonable doubt.

6        That means that the government must prove

7  each and every element of the offense charged, and I'll

8  speak to you about the elements in a moment, beyond a

9  reasonable doubt.  A defendant may not be convicted on

10  suspicion or conjecture, but only on evidence proving

11  guilt beyond a reasonable doubt.

12        Now, what is a reasonable doubt?  Proof

13  beyond a reasonable doubt does not mean proof beyond

14  all possible doubts or to a mathematical certainly.

15  Possible doubts are doubts based on conjecture,

16  speculation, or hunches are not reasonable doubt.

17        A reasonable doubt is a fair doubt based on

18  reason, logic, common sense, or experience.  It is a

19  doubt that an ordinary, reasonable person has after

20  carefully weigh all the evidence.

21        It's a doubt of the sort that would cause him

22  or her to hesitate to act in matters important in his

23  or her own life.  It may arise from the evidence or

24  from the lack of evidence or from the nature of the

25  evidence.

Charge of the Court                    65

1    If having now heard all of the evidence you
2  are convinced that the government proved each and every
3  element of the offense charged beyond a reasonable
4  doubt, you should return a verdict of guilty for that
5  offense.

6    However, if you have a reasonable doubt about
7  one or more of the elements of any of the offenses
8  charged, then you must return a verdict of not guilty
9  to that offense.

10   Now, the defendants have no duty to testify
11  or to put on any evidence.  And in this case the
12  defendants elected not to testify.  There is no
13  requirement that they testify in the trial.  In fact,
14  they have an absolute constitutional right not to do
15  so.

16   The fact that the defendants have not
17  testified must not enter into your deliberations
18  concerning guilty or innocence and must not enter into
19  your deliberations at all.

20   Now, you have heard the testimony of law
21  enforcement officers in this case.  The fact that a
22  witness is employed as a law enforcement officer does
23  not mean that his testimony necessarily deserves more
24  or less consideration or greater or lesser weight than
25  that of any other witness.

Charge of the Court                    66

1    You must decide after reviewing all of the

2 evidence whether you believe the testimony of each of

3 the law enforcement witnesses and how much weight, if

4 any, the testimony of each witness deserves.

5    Now, during the trial you heard recordings of

6 conversations with the defendants which were made

7 without the knowledge of the parties in the

8 conversation, but with the consent and authorization of

9 the court.

10    These recordings, sometimes referred to as

11 wiretaps, were lawfully obtained.  They use this

12 procedure to gather evidence, if lawful, and the

13 recording may be used by either party during the course

14 of the trial.

15    You also heard audio recordings that were

16 received into evidence and you were given written

17 transcripts of the recordings.  Actually, you saw the

18 transcripts of the recordings on the screen that have

19 been prepared by the government.

20    Keep in mind that the transcripts themselves

21 are not evidence in the case.  They were given to you

22 as a guide to help you follow what was being said.  The

23 recordings themselves are the evidence.

24    So if you notice any difference between what

25 you heard in the recordings and what you red in the

Charge of the Court                    67

1   transcript, you rely on what you heard, not what you

2   read.  And if you could not hear or understand certain

3   parts of the recording, you must ignore the transcript

4   as far as those parts are concerned.

5        You have heard that one of the witnesses,

6   Angela Strand-Mattis has an arrangement with the

7   government under which she has received a promise from

8   the government that her testimony will not be used

9   against her in a criminal trial for providing

10  information to the government.

11       Angela Mattis' testimony was received into

12  evidence and may be considered by you.  The government

13  is permitted to present the testimony of someone who

14  received a promise from the government that her

15  testimony will not be used against her in criminal case

16  for providing information to the government.

17       But you should consider the testimony of

18  Angela Mattis with great care and caution. In

19  evaluating Angela Mattis' testimony you should consider

20  this factor along with the other factors I have called

21  to your attention.

22       You may give the testimony such a weight as

23  you think it deserves. It is entirely up to you to

24  determine whether or not Angela Mattis' information or

25  testimony may have been influenced by her arrangement

Charge of the Court                    68

with the government.

You also heard evidence that Anthony Miner and Dawn Germany have made a plea agreement with the government. Their testimony was received into evidence and may be considered by you.

The government is permitted to present the testimony of someone who has reached a plea bargain with the government in exchange for his or her testimony.

Well, you should consider the testimony of Anthony Miner and Dawn Germany with great care and caution. In evaluating Anthony Miner and Dawn Germany's testimony you should consider this factor, along with others, that I have called to your attention.

Whether or not their testimony may have been influenced by a plea agreement is for you to determine. You may give their testimony such a weight as you think it deserves.

Now, evidence was also introduced during the trial that Angela Mattis, Anthony Miner, and Dawn Germany were using drugs when these events took place. There is nothing improper about calling such a witness to testify about events within his or her personal knowledge.

On the other hand, their testimony must be

Charge of the Court                    69

considered with care and caution. The testimony of a
witness who used drugs when the events took place may
be less believable because of the effects that drugs
may have on his or her ability to perceive, remember or
relay events in question.  After considering their
testimony in light of all of the evidence in the case
you may give it such a weight as you think it deserves,
if any.

You have heard testimony that in 2005
defendant Jonathan Cobb was arrested after he threw a
large plastic bag out of the window of a car while he
was being followed by a police officer.

The plastic bag was determined to contain
cocaine and he was later convicted of a felony
possession in 2006. You also heard testimony that in
2003 defendant David Cobb's home and vehicle were
searched and a number of items were seized including
bulk cocaine, a scale, and drug packaging material.
David Cobb was subsequently convicted of possession
with the intent to deliver cocaine in 2004.

This evidence of other acts was admitted only
for a limited purpose. You may consider the events only
for the purpose of deciding whether these two
defendants has the requisite knowledge or intent
necessary to commit the crime charged in the indictment

Charge of the Court                    70

or did not commit the acts for which the defendants are on trial by accident or mistake.

You may consider this evidence to help you decide if the two defendants, that Jonathan Cobb and David Cobb knowingly and intentionally possessed a controlled substance on October 20th, 2009 with the intent to distribute.

Do not consider this evidence for any other purpose. Of course it is up to you to determine whether you believe this evidence and if you do believe it, whether you accept it for the purpose of. You may give such a weight as you feel it deserves but only for the limited purpose that I have described for you.

The defendants are not on trial for committing these other acts and you may not consider the evidence of these other acts as a substitute for proof that the defendants committed the crimes charged in this case.

You may not consider the evidence as proof that the defendants have a bad character or any propensity to commit crimes. Specifically, you may not use this evidence to conclude that because a defendant may have committed the other acts, they must also have committed the acts charged in the superceding indictment.

Charge of the Court                71

Remember that the defendants are on trial here only for the conspiracy to distribute a controlled substance and possession of a controlled substance with the intent to deliver, not for these other acts. So do not return a guilty verdict unless the government proves the crimes charged in the superceding indictment in this case beyond a reasonable doubt.

As I have said, the law presumes the defendants are innocent and never imposes a defendant in a criminal case a burden or duty of calling any witnesses or calling any evidence, or producing any evidence in the case.

No presumption of guilt may be raised and no inference of any kind may be drawn from the failure of the defendant to call witnesses or to produce evidence. So, you must bear in mind always that the government has the burden of establishing all of the essential elements of the offense as defined in these instructions and that the government's burden is proved beyond a reasonable doubt.

Now, the conduct which with the defendants have been charged is set in the superceding indictment, which I remind you again is only an accusation, it is not evidence, it is not proof of anything.

The issue for you to decide is whether or not

Charge of the Court                    72

1    the defendants have violated the law. You are to

2    determine the defendants' guilt or innocence soley on

3    the basis of the evidence and the law as I charge you.

4    This is the oath that you took as jurors and the oath

5    that you are expected to follow.

6            The punishment or penalty provided by law for

7    the offenses charged in the superceding indictment is a

8    matter exclusively within the province of the Court,

9    should there be a verdict of guilty on any count.

10           Therefore, punishment should never be

11   considered by you, the jury in anyway during your

12   deliberation regarding the guilt or innocence of the

13   defendants.

14           Before the defendants may be found guilty of

15   any of the crimes charged in the superceding

16   indictment, the government must establish beyond a

17   reasonable doubt that the defendant acted in a manner

18   forbidden by law as charged in the superceding

19   indictment and that they acted with a requisite state

20   of mind when they committed those acts.

21           Now, you will note that the superceding

22   indictment charges that the offense was committed on or

23   about a certain date. The government does not have to

24   prove with certainty the exact date of the alleged

25   offense.

1    It is sufficient if the government proves

2  beyond a reasonable doubt that the offense was

3  committed on a day reasonably near the date alleged.

4  Now, the transcript named the speakers, but remember

5  you must decide who you actually heard speaking on the

6  recording, the names on the transcripts were used

7  simply for your convenience.

8    I'm now going to explain to you the offenses

9  for which the defendants are charged and the law that

10  you must apply in this case. You are to determine the

11  guilt or innocence of the defendants only as to the

12  specific charge brought against them by the government.

13    Such charges are the only charges before your

14  considerations and the defendants are not on trial for

15  any conduct not charged as a crime in the superceding

16  indictment.

17    The superceding indictment in the case

18  alleges that defendant Jonathan Cobb, David Cobb, and

19  Darren Macklin have been charged in two counts of the

20  superceding indictment. Count 1, charges each defendant

21  with conspiracy to possess with the intent to

22  distribute more than five hundred grams of cocaine.

23  Count 2 charges each defendant with possession with the

24  intent to distribute cocaine and aiding and abetting

25  the possession with the intent to distribute cocaine.

I will send you a copy of the superceding
indictment to the juryroom to aid in your deliberation.
Keep in mind again, that the indictment represents a
formal method of charging someone with a commission of
a crime, as such you may not consider as evidence of
the defendants' guilt or draw any inference of guilt
from them.

So, let's talk about Count 1, Count 1 is the
superceding indictment charges that from beginning in
or about August of 2009 through on or about October
20th, 2009 in Chester in the Eastern District of
Pennsylvania and elsewhere defendants Jonathan Cobb,
David Cobb, and Darren Macklin conspired and agreed
with others known and unknown to the grand jury to
knowing and intentionally distribute five hundred grams
or more of a mixture and substance containing a
detectable amount of cocaine, a Schedule II controlled
substance in violation of Title 21 United States Code
Section 841(a)1.

It is a federal crime for two or more persons
to agree or conspire to commit any offense against the
United States even if they were never actually achieved
their objective.

A conspiracy is a criminally kind of criminal
partnership.  In order for you to find the defendant

Charge of the Court                    75

1  guilty of conspiracy to distribute a controlled

2  substance you must find that the defendant (sic) proved

3  beyond a reasonable doubt each of the following three

4  elements.

5       First, two or more persons agreed to

6  distribute the controlled substance. Two, Jonathan

7  Cobb, David Cobb, and Darren Macklin were parties to or

8  members of that agreement.

9       Three, Jonathan Cobb, David Cobb, and Darren

10  Macklin joined the agreement or conspiracy knowing of

11  its objective to distribute a controlled substance and

12  intended to join together with at least one other

13  alleged conspirator to achieve that objective.

14       That is, each defendant and at least one

15  other alleged conspirator share a unity of purpose and

16  the intent to achieve the objective.  Let me explain

17  those elements to you in more detail.

18       The first element of the crime of conspiracy

19  is the existence of an agreement. The government must

20  prove beyond a reasonable doubt that two or more

21  persons knowingly and intentionally arrived at a mutual

22  understanding or agreement either spoken or unspoken to

23  work together to achieve the overall objective of the

24  conspiracy to commit the offense of distributing a

25  controlled substance.

Charge of the Court                76

1    The government does not have to prove the
2  existence of a formal or a written agreement, or an
3  expressed oral agreement spelling out the details of
4  the understanding.
5    The government does not have to prove at all
6  that all of the members of the conspiracy directly met
7  or discussed between themselves their unlawful
8  objectives or agreed to all the details or agreed to
9  what the means were by which the objectives would be
10  accomplished.
11    The government is only being required to
12  prove that all the people named in the superceding
13  indictment were in fact, parties to the agreement or
14  that all members of the alleged conspiracy were named
15  or that all members of the conspiracy are even known.
16    What the government must prove beyond a
17  reasonable doubt is that two or more persons in some
18  way or manner arrived at some type of agreement, mutual
19  understanding or meeting of the minds to try to
20  accomplish a common or unlawful objective.
21    You may consider both direct and
22  circumstantial evidence in deciding whether the
23  agreement has been proven beyond a reasonable doubt
24  that an agreement or mutual understanding existed.
25    You may find the existence of a conspiracy

Charge of the Court                    77

1   based on evidence of related facts or circumstances

2   which prove that the activities of the participants in

3   a criminal venture could not have been carried out

4   except as a result of a preconceived agreement, scheme,

5   or understanding.

6          The charged conspiracy has as its subjects

7   the offense of distributing controlled substance. The

8   elements of the offense of distributing a controlled

9   substance are, first, that the defendant distributed a

10  mixture of substance containing a controlled substance.

11         Two, that the defendant distributed the

12  controlled substance knowingly or intentionally. Third,

13  that the controlled substance was cocaine. Distribute

14  means deliver or transfer possession or control of a

15  controlled substance from one person to another.

16         Distributing includes the sale of a

17  controlled substance by one person to another, but does

18  not require a sale. Distributing also includes the

19  delivery or transfer without any financial

20  compensation, such as a gift or trade.

21         If you find that a criminal agreement or

22  conspiracy existed, then in order to find Jonathan

23  Cobb, David Cobb, and Darren Macklin guilty of

24  conspiracy you must also find that the government

25  proved beyond a reasonable doubt that the defendants

Charge of the Court                    78

1   knowingly and intentionally joined that agreement or

2   conspiracy during its existence.

3           The government must prove that Jonathan Cobb,

4   David Cobb, and Darren Macklin each knew the goal or

5   objective of the agreement or conspiracy and

6   voluntarily joined in it during its existence intending

7   to achieve the common goal or objective and to work

8   together with the other alleged conspirators towards

9   that goal or objective.

10          The government needs not proof that the

11  defendants knew everything about the conspiracy or that

12  the defendants knew everyone involved in it or that

13  each defendant was a member from the beginning.

14          The government also does not have to prove

15  that each defendant played a major or substantial role

16  in the conspiracy. You may consider both direct and

17  circumstantial evidence in deciding whether Jonathan

18  Cobb, David Cobb, and Darren Macklin joined the

19  conspiracy, knew of the criminal objective, and

20  intended to further the objective.

21          Evidence which shows that Jonathan Cobb,

22  David Cobb, and Darren Macklin only knew about the

23  conspiracy or only get bad company by associating with

24  members of the conspiracy or were only present when it

25  was discussed or when a crime was committed is not

Charge of the Court                    79

1   sufficient to proof that he was a member of the

2   conspiracy, even if he approved of what was happening

3   or did not object to it.

4        Likewise, evidence showing that the defendant

5   may have done something that happened to help the

6   conspiracy does not necessarily prove that he joined

7   the conspiracy.

8        You may, however, consider this evidence

9   along with all the other evidence in deciding whether

10  the government proved beyond a reasonable doubt that

11  the defendant joined the conspiracy.

12       So, in order to find Jonathan Cobb, David

13  Cobb, and Darren Macklin guilty of conspiracy, you must

14  find that the defendant proved beyond a reasonable

15  doubt that each defendant joined the conspiracy knowing

16  of its objectives, and intending to help further or

17  achieve that objective.

18       The government must prove that Jonathan Cobb,

19  David Cobb, and Darren Macklin knew of the objective or

20  goal of the conspiracy, that each defendant joined the

21  conspiracy intending to help, further, or achieve that

22  goal or objective and that each defendant and at least

23  one other alleged conspirator would share unity or

24  purpose towards that objective goal.

25       You may consider both direct and

Charge of the Court                    80

circumstantial evidence including Jonathan Cobb, David
Cobb, and Darren Macklin's word or conduct and other
facts and circumstances in deciding whether they had
the requisite knowledge and intent.

Now, with regard to the fourth element of the
conspiracy, that is the overt acts, the government must
prove beyond a reasonable doubt that during the
existence of the conspiracy at least one member of the
conspiracy performed at least one of the overt acts
described in the superceding indictment for purposes of
furthering or helping to achieve the object of the
conspiracy.

The superceding indictment alleges certain
overt acts, the government does not have to prove that
all of these acts were committed or that any of these
acts were themselves, illegal. Also, the government
does not have to prove that Jonathan Cobb, David Cobb,
and Darren Macklin personally committed any of the
overt acts.

The government must prove beyond a reasonable
doubt at least one member of the conspiracy committed
at least one of the overt acts alleged in the
superceding indictment and committed it during the time
that the conspiracy existed for purposes of furthering
or helping to achieve the objectives of the conspiracy.

Charge of the Court                    81

You must unanimously agree on the overt act that was
committed.

The government is not required to prove that
any of the members of the conspiracy were successful in
achieving any or all of the objectives of the
conspiracy.

You may find Jonathan Cobb, David Cobb, and
Darren Macklin guilty of conspiracy if you find that
the government proved beyond a reasonable doubt the
elements I have explained even if you find that the
government did not prove that any of the conspiracy
actually committed any other evidence against the
United States.

Conspiracy is a criminal offense separate
from the offense that was the objective of the
conspiracy. A conspiracy is complete without the
commission of the offense.

Now conspiracy ends when the objectives of
the conspiracy have been achieved or when all the
members of the conspiracy have withdrawn up front.
However, a conspiracy maybe a continuing conspiracy and
if it is, it lasts until at least there is some
affirmative showing that it has ended or that all of
these members have withdrawn.

A conspiracy may be a continuing one if the

Charge of the Court                    82

1   agreement includes that understanding that a conspiracy

2   will continue over time. Also, a conspiracy may have a

3   continuing purpose or objective and therefore maybe a

4   continuing conspiracy.

5          Evidence has been admitted in this case that

6   certain persons were alleged to be co-conspirators of

7   Jonathan Cobb, David Cobb, and Darren Macklin,

8   (inaudible).

9          The acts or statements of any member of the

10   conspiracy treated as the acts or statements of all

11   members of the conspiracy. If these acts or statements

12   were performed or spoken to during the existence of a

13   conspiracy and to further the objectives of the

14   conspiracy.

15          Therefore, you may consider as evidence

16   against Jonathan Cobb, David Cobb, and Darren Macklin

17   any acts done or statements made by any members of the

18   conspiracy during the existence of and to further the

19   objectives of the conspiracy.

20          You may consider these acts and statements

21   even if they were done or made in the defendant's

22   absence or without his knowledge.  After all the

23   evidence is presented in the case, it is up to you to

24   decide whether you believe the evidence and how much

25   weight to give to that evidence.

Charge of the Court                          83

1       So that is Count 1, now let me move on to

2   Count 2. Count 2 charges that on or about October 20th,

3   2009 in Chester in the Eastern District of Pennsylvania

4   and elsewhere defendants Jonathan Cobb, David Cobb, and

5   Darren Macklin and others known and unknown to the

6   grand jury, knowing and intentionally possessed with

7   the intent to distribute and aided and abetted the

8   possession with the intent to distribute five hundred

9   grams or more, that is approximately nine hundred and

10  ninety-seven grams of a mixture and substance

11  containing a detectable amount of cocaine, a Schedule

12  II controlled substance.

13      Section 841, Title 21 of the United States

14  Code provides in part and I quote, "It shall be

15  unlawful for any person knowing or intentionally to

16  possess with the intent to distribute a controlled

17  substance.

18      "Count 2 of the superceding indictment

19  charges the defendants with possessing five hundred

20  grams or more of a mixture or substance containing a

21  controlled substance, specifically cocaine with the

22  intent to distribute the controlled substance which is

23  a violation of the federal law.

24      "In order to find Jonathan Cobb, David Cobb,

25  and Darren Macklin guilty of the offenses charged in

Charge of the Court                    84

1   Count 2, you must find that the government proved each

2   of the following five elements beyond a reasonable

3   doubt.

4          "First, Jonathan Cobb, David Cobb, and Darren

5   Macklin possessed a mixture or substance containing a

6   detectable controlled substance. Number two, they

7   possessed a controlled substance knowingly or

8   intentionally.

9          "Three, they intended to distribute the

10  controlled substance.  Fourth, that the controlled

11  substance was cocaine as charged in Count 2.  Five,

12  that the weight of the mixture of substance containing

13  the controlled substance was approximately five hundred

14  grams or more."

15         Let me talk to you about some of these terms,

16  to possess a controlled substance means to have it

17  within a person's control.  The government does not

18  have to prove that a defendant physically held the

19  controlled substance, that is had actual possession.

20  As long as a controlled substance was within the

21  defendant's control, they possess it.

22         If you find that the defendants either had

23  actual possession of the controlled substance or had

24  the power and intention to exercise control over it,

25  even though it was not in their physical possession,

Charge of the Court                    85

that is that the defendants had the ability to take
actual possession of the controlled substance when they
wanted to do so, you may find that the government has
proved possession.

Possession, while it may be momentary or
fleeing proof of the ownership of the controlled
substance is not required.  The law also recognizes
that possession may be sole or joint. If one person
alone possesses a controlled substance, that is sole
possession.

However, more than one person may have the
power and intention to exercise control over a
controlled substance.  This is called joint possession.
If you find that a defendant has such a power and
intention, then he possessed a controlled substance
even if he possessed it jointly with another.

Being in proximity to the controlled
substance or mere presence on the property where it is
located or mere association with the person who does
control the controlled substance or the property is not
enough to support a finding of possession.

Now, in order to find Jonathan Cobb, David
Cobb, and Darren Macklin guilty of possession of a
controlled substance with the intent to distribute as
charged in Count 2 of the superceding indictment, you

must find that the government proved beyond a

reasonable doubt that the defendants intended to

distribute a mixture or substance containing a

controlled substance.

To find the defendant had the intent, you

must find that he had in mind or had planned in some

way to deliver or transfer the possession or control of

the controlled substance to someone else.

In determining whether a defendant had the

intent to distribute, you may consider all the facts

and circumstances shown by the evidence presented

including his word and actions.

In determining a defendant's intent to

distribute a controlled substance you may consider

among others the quantity and purity of the controlled

substance, the manner in which the controlled substance

was packaged and the presence or absence of weapons,

large amounts of cash, or equipment used in the

processing or sale of the controlled substance.

You are instructed as a matter of law that

cocaine in a controlled substance, that is some kind of

prohibited drugs.  It is soley up to you, however, to

decide whether the government has proved beyond a

reasonable doubt that Jonathan Cobb, David Cobb, and

Darren Macklin possessed with the intent to distribute

Charge of the Court                87

a mixture or substance containing cocaine as charged in

Count 2.

Now, let's talk about knowing and

intentionally.  To act knowingly as used in the offense

charged means that Jonathan Cobb, David Cobb, and

Darren Macklin were conscious and aware that they were

engaged in the acts charged and knew of the surrounding

facts and circumstances that make out the offense.

Knowingly does not require that they knew

that the acts charged and surrounding facts actually

amounted to a crime. To act intentionally as used in

the offense charged means to act deliberately and not

by accident.

Intentionally does not require that the

defendant intended to violate the law. The phrase

knowingly or intentionally as used in the offenses

charged require that the government prove beyond a

reasonable doubt that the defendants knew that they

possessed with the intent to distribute, what they

possessed with the intent to distribute was a

controlled substance.

In addition, the government must also prove

beyond a reasonable doubt that the controlled substance

was, in fact, cocaine.  However, as long as you find

that the government proved beyond a reasonable doubt

that the defendants knew that what they possessed was a

controlled substance, you need not find that they knew

that the controlled substance was cocaine as charged in

Count 2.

In deciding whether the defendants acted

knowingly or intentionally, you may consider evidence

about what they said, about what they did or failed to

do, how the acted and all the facts and circumstances

shown by the evidence that may prove what was in their

minds at the time.

Now, on Count 2, a person may guilty of an

offense because he personally committed the offense

himself or because he aided and abetted another person

in committing the offense.

A person who has aided and abetted another in

committing the offense is often called an accomplish.

The person whom the complice aids and abets is also

known as the principal.

In this case the government alleges that

Jonathan Cobb, David Cobb, and Darren Macklin aided and

abetted the possession of a controlled substance with

the intent to distribute as charged in Count 2.

In order to find each defendant guilty of

these offenses because he or they aided or abetted in

committing these offenses, you must find that the

Charge of the Court                    89

government proved beyond a reasonable doubt each of the following four requirements.

First, that the principal committed the offense charged by committing each of the elements of the offenses charged as I have explained to you. Two of the defendants knew that the offense charged was going to be committed, that was being committed by the principal.

Third, that the defendants did some act for the purpose of aiding, assisting, soliciting, facilitating or encouraging the principal in committing the offense and with the intent that the principal commit the offense.

Fourth the defendants acted in some way, aid, assist, facilitate or encouraged the principal to commit the offense. The defendants act need not themselves be against the law. Evidence that a defendant was merely present during the commission of the offense is not enough for you to find him guilty as an aider and abetter.

In addition, if the offense show the defendant knew of the offense being committed or was about to be committed but does not also prove beyond a reasonable doubt that it was the defendants' intent and purpose to aid, assist, encourage or facilitate or

Charge of the Court                    90

1    otherwise associate himself with the offense, you may

2    not find that defendant guilty of the offense as an

3    aider or abetter.

4           The government must prove beyond a reasonable

5    doubt that the defendant in some way participated in

6    the offense committed by the principal as something the

7    defendant wished to bring about and to make it

8    succeed.

9           If you find the defendant guilty of offenses

10   charged in Counts 1 and 2 you must answer some

11   questions called jury interrogatories to decide whether

12   the offenses involved certain weights or quantities of

13   controlled substance to decide, let me repeat that.

14          You must answer some questions called jury

15   interrogatories to decide whether the offenses involved

16   certain weights or quantities of controlled substances.

17          Do not answer these jury interrogatories

18   until after you have reached your verdict as to each of

19   the defendants.  If you find that the government has no

20   proof a defendant guilty of the offenses charged in

21   Counts 1 and 2, then you do not need to answer the

22   interrogatories.

23          If you find a defendant guilty then answering

24   these interrogatories as in deciding your verdict, you

25   must be unanimous, that is in order to find that the

Charge of the Court                    91

1   offenses involved a certain weight or quantity of

2   controlled substance you must all be satisfied that the

3   government proved the weight or quantity beyond a

4   reasonable doubt.

5          Weight or quantity means the total weight of

6   any mixture or substance which contains a detectable

7   amount of a controlled substance charged. Jury

8   interrogatory number one relates to Count 1 and asks

9   you to determine the weight of the cocaine involved in

10  the conspiracy.

11         The first question is whether you unanimously

12  find beyond a reasonable doubt that the weight or

13  quantity of cocaine which was involved in a conspiracy

14  was five hundred grams or more.

15         In making this decision you should consider

16  all controlled substance that the members of the

17  conspiracy actually distributed. If your answer to this

18  question yes, that completes your determination of the

19  amount of cocaine involved in the conspiracy.  If your

20  answer is no, that completes your determination of the

21  amount of the cocaine involved in the conspiracy as

22  well.

23         Jury interrogatory number two relates to

24  Count 2 and asks you whether you unanimously find

25  beyond a reasonable doubt that the weight or quantity

Charge of the Court                    92

1    of cocaine which was possessed with the intent to

2    distribute was five hundred grams or more.

3         If your answer to this question is yes, that

4    completes jury interrogatory number two, if your answer

5    is no, that completes jury interrogatory number two.

6         That concludes my instruction explaining the

7    law regarding the testimony and other evidence and the

8    offenses charged. Now, let's take a few moments to

9    discuss your deliberations in the juryroom and your

10   conduct during the course of your deliberation.

11        The first thing that you should do in the

12   juryroom is choose someone in the jury to be your

13   foreperson. This person will speak for you here in

14   court.

15        He or she will preside over your

16   deliberations, however the views and votes of the

17   foreperson are entitled to no greater weight than those

18   of any other jury.

19        Second, I want to remind you that your

20   verdict whether it is guilty or not guilty must be

21   unanimous to find Jonathan Cobb, David Cobb, and Darren

22   Macklin guilty of an offense, everyone of you must

23   agree that the government has overcome the presumption

24   of innocence with evidence that prove each element of

25   that offense beyond a reasonable doubt.

Charge of the Court                    93

To find Jonathan Cobb, David Cobb, and Darren Macklin not guilty every one of you must agree that the government has failed to convince you beyond a reasonable doubt.

Third, if you decide that the government has proved Jonathan Cobb, David Cobb, and Darren Macklin guilty, then it will be my responsibility at the appropriate time to decide what the appropriate punishment should be, therefore, you should not consider the possible punishment in reaching your verdict.

Fourth, the defendants are all charged with two offenses, each offense is charged in a separate count on the superceding indictment.  The number of offenses charged here is not evidence of guilt and should not influence your decision in any way.

Also in our system of justice guilt or innocence is personal and individual. You must separately consider the evidence against each defendant on each count and charge and you must return a separate verdict for each defendant on each offense.

For each offense you must decide whether the government has proven beyond a reasonable doubt that the particular defendant is guilty of the particular offense.

1    Your decision as to any one defendant or any

2  one offense whether guilty or not guilty should not

3  influence your decision as to any other defendant or

4  offenses.   Each offense and each defendant should be

5  considered separate.

6    Finally, as I have said before your verdict

7  must be based only on the evidence received in the case

8  and the law that I have given you. You should not take

9  anything I may have said or done during the trial or

10  anything that I have said or done during the course of

11  this charge as any evidence of what I think your

12  verdict should be. Your verdict is your exclusive

13  responsibility in this case.

14    Now, that all of the evidence is in, the

15  arguments are completed and once I have finished these

16  instruction, you will return to the juryroom and

17  commence your deliberation.

18    In fact, it is your duty to talk with each

19  other about the evidence and to make every reason

20  effort to reach a unanimous agreement. Talk with each

21  other, listen carefully and respectfully to each

22  other's views and keep an open mind as you listen to

23  what your fellow jurors have to say.

24    Do not hesitate to change your mind, however,

25  if you are convinced that other jurors are right and

1  what your position was wrong.  But do not ever change

2  your mind just because other jurors see things

3  differently or just to get the case over with.  In the

4  end, your vote must be exactly that, your own vote.

5       It is important for you to reach a unanimous

6  agreement but only if you can do so honestly and in

7  good conscious.  Listen carefully to what other jurors

8  have to say and then decide for yourself if the

9  government has proved each of the defendants guilty

10  beyond a reasonable doubt.

11       No one will be allowed to hear your

12  discussions in the juryroom and no record will be made

13  of what you have said.  As I have indicated once the

14  verdict is completed we will collect your notes and the

15  notes will be destroyed, so there will be no written

16  record of what was said or what you wrote down during

17  the course of the trial.  Therefore, you should all

18  feel free to speak your mind.

19       Remember if you elected to take notes during

20  the trial your notes should be only used as memory

21  aids, you should not give your notes greater weight

22  than your independent recollection.

23       You should rely on your own individual

24  recollection of the evidence or lack of evidence and

25  you should not undue the influence by the notes of any

Charge of the Court                    96

other juror.  Notes are not entitled to any more weight than the memory and impression of each of the jurors.

Finally, once you start deliberating do not talk about the case to any court officials or to me or to anyone else except to each other.  If you have any questions or messages your foreperson should write them down on a piece of paper, sign them and then give them to the court official who will be outside the jury room who will bring that note to me.

I will then talk to the lawyers about what you have asked and I will respond as soon as I can. This may take some time for me to the talk to the lawyers, so in the mean time, if possible, continue with your deliberation on some other subject.

If you want to see any of the exhibits that were admitted into evidence, you may send me a message and if appropriate, I will send the exhibits back out with you.

One more thing about messages. Do not write down or tell anyone how you or anyone else have voted or how you stand on any one issue.  That should stay a secret until you have finished your deliberations.

If you have occasion to communicate with the Court while you are deliberating, do not disclose the number of jurors that are voted to convict or to acquit

Charge of the Court                      97

1   on any one offense.

2            Now, we will have a verdict sheet prepared

3   for each of the defendants and that verdict sheet, the

4   verdict should be returned.  Each of you will have a

5   verdict sheet in the verdict room but when you have a

6   reached a unanimous verdict the foreperson should write

7   the verdict on the form, date and sign it and return to

8   the courtroom and give that form to my deputy clerk who

9   will then hand it up to me.  So only one verdict form

10   should be completed and dated and signed by the

11   foreperson.

12            If you decide that the government has proved

13   Jonathan Cobb, David Cobb, and Darren Macklin guilty of

14   any or all of the offenses charged beyond a reasonable

15   doubt, say so by having your foreperson mark the

16   appropriate place on the form.

17            If you decide that the government has not

18   proved Jonathan Cobb, David Cobb, and Darren Macklin

19   guilty of some or all of the offenses charged beyond a

20   reasonable doubt, say so by having your foreperson mark

21   the appropriate place on the form.

22            Okay. So this completes my instruction and

23   I'm going to now consult with the lawyers, if there is

24   anything else before you go out to deliberate. May I

25   see counsel at sidebar?

1        (Sidebar discussion begins.)

2        THE COURT:  Any objections or exceptions to

3   the charge?

4        MS. MARSTON:  I have no objections.  I did

5   note that you only listed one of David Cobb's prior

6   convictions and we actually --

7        THE COURT:  What is that? I'm sorry?

8        MS. MARSTON:  The instruction and I apologize

9   I didn't catch it earlier, only listed one of the two

10  prior convictions for David Cobb under 404(b), so I

11  don't know whether you wanted to go back and mention

12  the other one or if you are --

13       MR. JARVIS:  There is no need to do that,

14  Your Honor.

15       MS. MARSTON:  That is fine, I'm fine.  I just

16  wanted to point that out.

17       THE COURT:  Okay.  No objections from the

18  government.

19       MS. MARSTON:  No.

20       THE COURT:  For the defendant?  Mr. Cannon?

21       MR. CANNON:  No objection.

22       THE COURT:  Mr. Jarvis?

23       MR. JARVIS:  No objection, Your Honor.

24       THE COURT:  Ms. Grasso?

25       MS. GRASSO:  No, Your Honor.

1    THE COURT:  Okay.  So the case is ready to

2  proceed to deliberation.

3    MR. CANNON:  Yes.

4    MR. JARVIS:  My coffee stained verdict form.

5    THE COURT:  Okay.

6    MR. JARVIS:  The one this interrogatory reads

7  in my mind is not really an interrogatory the way I

8  would like to see it because the issue is a controlled

9  substance, fine, but in what amounts, and they are not

10  giving any options here.

11    THE COURT:  What?

12    MR. JARVIS:  Options, two terms of quantities

13  of the cocaine.  The only option is was it five hundred

14  grams or more.  I would like to see an interrogatory

15  include less than five hundred grams or if there is

16  more than five hundred grams, fine.  Have you

17  considered putting a cap --

18    THE COURT:  Well, if it is not more than five

19  hundred, it is less than five hundred, isn't it?

20    MS. MARSTON:  Right.

21    MR. JARVIS:  That is correct.  I understand

22  that, but even after that it says five hundred grams,

23  for sentencing purposes, you know, there is no cap on

24  it.

25    THE COURT:  Well, you want the jury to

1  determine the actual amount?

2  MR. JARVIS: Well, it is an idea. I'm

3  suggesting that we have no idea, lesser of an idea to

4  an amount would be like this. Now, I see Ms. Marston --

5  THE COURT: Well, you have an idea that it is

6  more than five hundred or less than five hundred, you

7  don't know exactly how much more than five hundred it

8  is.

9  MR. JARVIS: More than five hundred, that is

10  really my concern.

11  THE COURT: Okay.

12  MS. MARSTON: Well, Your Honor, that it

13  attracts the mandatory minimum language in the statute

14  and that is the appropriate jury interrogatory. If

15  they were to find him guilty of more than five hundred,

16  we can put on at sentencing additional evidence for

17  purposes of the sentencing guideline calculation, Your

18  Honor, and that is not something this jury is to

19  consider.

20  MR. JARVIS: Well, that is my point, if this

21  jury makes a finding of an amount then whether it

22  precludes the government or not the government might be

23  satisfied with the amount that they have said. At

24  sentencing they can just do whatever they want to do

25  but at least it gets their finding of the quantity --

THE COURT:  Well, it seems to me that your argument will be or is that it is the role of the jury to determine the amount of cocaine that is involved in the conspiracy.

Now, if you are correct in your position in the event that they are found guilty, the government will be stuck with five hundred grams. If you are incorrect they will then be able to put on the evidence.

So, the question is whether under Booker and decisions that have come down since then, this is a proper determination by the Court or by the jury.  I think it is, by accord, but in the event that you are correct, that will be the result. Is that right? Does everybody agree to that?

MS. MARSTON:  Correct, yes.

THE COURT:  So you will have in the event that there is a conviction, the opportunity to argue that you raised it at sidebar, the Court declined to do that and therefore that is the way it is.

MR. JARVIS:  Understood, Your Honor.

THE COURT:  Everybody joins in on that?

MR. JARVIS:  Yes, Your Honor.

MS. MARSTON:  Yes.

THE COURT:  Okay. Very well, so we can send

1  the case out now.

2          (Sidebar discussion concluded.)

3          THE COURT:  Okay. May we have the security

4  officer come forth and may the security officer be

5  sworn.

6          (The court security officer was sworn at this

7  time.)

8          THE COURT:  At this time jurors one to

9  twelve, please proceed to the juryroom, the two

10 alternates please remain seated and you should take

11 your notes with you and begin your deliberation and

12 lunch should be served around 12:00? 12:15. Okay,

13 please be proceed to the jury room.

14          (Jury out, 11:22 a.m.)

15          THE COURT:  Okay, please be seated. The two

16 alternates, let me just go over your role.  As I

17 indicated the role of the alternate is an important one

18 because in the event that there is a need to substitute

19 a juror we wouldn't have to start the trial over again

20 so that you stand ready to fill in if that is the case.

21          So, the case is not yet ended, so what I'm

22 going to ask you is to go with Mr. Vance, who is going

23 to take you somewhere here in the courthouse and you

24 will have lunch delivered to you and, you know, read a

25 book or do whatever you can do to when the time that

1    they are deliberating in the event that there is a need

2    to call upon your services.

3            It is, I understand somewhat frustrating to

4    hear all of the evidence and then don't take part in

5    the final deliberations.  But we really appreciate it

6    because it would be an enormous cost to the system if

7    we did not have alternate jurors who are ready,

8    willing, and able to fill in, in the event they were

9    called.

10           So, remember that you are still jurors, so

11   subject to the same instructions, do not discuss the

12   case among yourselves or with anyone or read anything

13   about it if there is anything to be read about it.

14   That is you are still jurors and subject to the same

15   instructions except that you are sort of on stand by

16   for the time being.

17           So, I'm going to ask Mr. Vance, please if you

18   would take the jurors to a safe place here in the

19   courthouse.  So Mr. Matkowski, do you want to take the

20   jurors back or Mr. Vance?

21           (Pause in proceedings.)

22           THE COURT:  Okay. Now, a couple things,

23   please be seated. There are some final instructions

24   here.

25           Number one, I like to have the exhibits

1  placed on the exhibit table and we will have a table
2  here set up and each side will place exhibits there and
3  each of you should be certain that each piece of paper
4  or each piece of exhibit except for the drugs, that is
5  on the exhibit table has been duly admitted.

6           So as a responsibility of counsel to ensure
7  that exhibit has been duly admitted. In the event that
8  there is a call for that exhibit we will rely upon
9  counsel's verification of the exhibit was admitted.

10          Number two, we will at 12:15 then adjourn for
11  lunch break so that you can leave the courtroom area,
12  but you should return around 1:00 and also leave your
13  cell numbers, et cetera in the event of some unforeseen
14  need for your participation.

15          Number three, other than during lunch, please
16  remain on the floor in contact with Mr. Makowski or Mr.
17  Vance in the event that there is a need to respond to
18  the jury or there is a verdict where they are able to
19  find you promptly and will not delay the proceedings.

20          So, any questions, any comments, anything
21  that we need to address before we adjourn? Yes, Ms.
22  Grasso?

23          MS. GRASSO: Your Honor, I am not familiar
24  with how the Court deals with the exhibits, are you
25  stating that by agreeing that the exhibits that are on

1    the exhibit table that if the jury were to ask for them

2    the Court would send them back no matter what?

3              THE COURT:  Ordinarily I would do it unless

4    there is an objection.

5              MS. GRASSO:  Okay.

6              THE COURT:  If there is an objection then we

7    will hear the objection.

8              MS. GRASSO:  So we would have an opportunity

9    to be called in to say that, you know, the jurors asked

10   to see exhibit --

11             THE COURT:  Yes, of course.

12             MS. GRASSO:  Okay. I wasn't sure, I thought

13   it would be automatic without our knowledge, I wasn't

14   sure.

15             THE COURT:  All we want to be sure is that

16   only evidence that has been admitted is on that table,

17   but if they ask for Exhibit 1 and you say I have no

18   objection, nobody has any objection, we will send

19   Exhibit number 1.

20             MS. GRASSO:  Understood.

21             THE COURT:  We don't all have to congregate

22   because Exhibit number 1 would already be on that

23   table. Now, if you say I object to Exhibit number 1,

24   then we congregate and decide whether or not to send it

25   back.

1      So it is a way of trying to facilitate the
2    production of the exhibits with the exception of the
3    drugs. I think every other exhibit can be placed. The
4    drugs should remain in the custody of government
5    counsel throughout the course of the proceedings.
6          Okay. Very well, we will stand adjourned at
7    this time.
8          (Recess, 11:28 a.m. to 1:20 p.m.)
9          THE COURT:  Okay. Please be seated.  We have
10   a note from the jury.  I have shared the note with
11   counsel and it reads for "Count 2,  is it aiding or
12   abetting or possession, or is it aiding and abetting
13   and possession, i.e. if someone possessed but did not
14   aid and abet or vice versa?  Do we need to consider
15   both, i.e. if innocent of one, innocent of both, guilty
16   of one, guilty of both." Signed foreman, 6-25-10.
17         This note came in at about 12:20 and we are
18   addressing it now at 1:20 due to a lunch recess. Okay.
19   So, Ms. Marston, what is the answer to this question?
20         MS. MARSTON:  Well, Your Honor, I think what
21   I would propose is that we reinstruct on Count 2. You
22   know, obviously the indictment reads it is aiding and
23   abetting the possession with the intent to distribute.
24         If they found somebody, they don't have to
25   aid and abet to possess with the intent to distribute

1   in order to be guilty of this count. I guess that is

2   not clear to them, but I think probably the best way of

3   going about this is reinstructing them on Count 2.

4          THE COURT:  Mr. Cannon?

5          MR. CANNON:  Well, just trying to interpret

6   the note for the benefit of the Court, it seems to me

7   that what the foreperson is asking is in order to find

8   the defendants guilty of Count 2, do they have to find

9   that not only did they possess but they also aided and

10  abetted.

11         In other words, they want to know do they

12  have to find both things in order to return a verdict

13  of guilty and if only one of those two things has

14  proven to them, that is that they either possessed or

15  aided and abetted, then that could be a basis for

16  acquittal according to the second part of their note.

17         THE COURT:  Okay. So what would you like to

18  do?

19         MR. CANNON:  I agree that we should just

20  reinstruct on Count 2.

21         THE COURT:  Okay. Ms. Grasso?

22         MS. GRASSO:  Your Honor, well I agree with

23  Mr. Cannon's interpretation of what the question is

24  trying to ask. I think Count 2 of the superceding

25  indictment which clearly says, "possess with the intent

1   to distribute and aided and abetted the possession with

2   intent to distribute" speaks for itself.

3        I would simply refer the jury at this time

4   back to the clear language of Count 2 of the

5   indictment.  They have not asked for the charge at this

6   point and I'm not sure without reviewing the specific

7   charge that the Court would read.

8        I'm not sure that it is instructive on the

9   question that they've asked. Because they may still

10  very well have the same question and I think it is the

11  language, it is that word, "and" after possessed with

12  intent to distribute comma "and" aided and abetted

13  which is the clear language of the indictment which

14  clearly means that they have to find that the way it is

15  charged, that they do have to find them guilty of both

16  in order to be able to convict them on Count 2. It is

17  the government's indictment.

18        MS. MARSTON:  Your Honor, I agree it is the

19  government's indictment, but however and I also agree

20  we didn't instruct on the use of the conjunctive "and".

21        So, I don't think we can go back reinstruct

22  them on that, but I would say that, you know, it is not

23  required, just because the indictment reads "and" that

24  does not mean they have to find aiding and abetting and

25  possession with the intent to distribute.  They can

1  find just possession with the intent to distribute

2  without finding somebody aiding and abetting.

3          MS. GRASSO:  I'm not sure why we have a

4  charging document then, Your Honor.

5          THE COURT:  Well, will recharging Count 2

6  answer the question?

7          MS. MARSTON:  I'm sorry?

8          THE COURT:  Will recharging them on Count 2

9  answer the question?

10          MS. MARSTON:  To answer the question, yes, I

11  agree.

12          THE COURT:  It will answer the question

13  according to you?

14          (Pause in proceedings.)

15          MS. MARSTON:  Let me look a minute here, Your

16  Honor. I mean I'm not sure if it is going to answer

17  their complete question, but it is obviously the law as

18  you have given it to them which is correct.

19          MS. GRASSO:  Your Honor, I am not conceding

20  that rereading the charge answers their question but if

21  the Court is inclined to reread the charge on Count 2,

22  I would first instruct the jury or I would ask that the

23  Court would first instruct the jury that they should

24  refer to the clear language of the indictment.

25          MS. MARSTON:  Well, I --

1         MS. GRASSO: Or the plain language of the

2 indictment, you don't have use the word clear, but to

3 the language of the superceding indictment itself to

4 look at that first.

5         MS. MARSTON: Well, I don't agree with that,

6 I mean the indictment is not evidence and the

7 indictment is not the law. They are supposed to follow

8 the law in this case that Your Honor has given.

9         THE COURT: Okay.

10         MR. JARVIS: Your Honor, respectfully, I'm

11 going back through your instructions now and I'm at

12 page forty-two, I'm not really sure if we can be on the

13 same page on this issue or not, but just looking back

14 beginning at paragraph ninety-three, that is the

15 section that begins with the possession with the intent

16 to distribute, accomplish liability, aiding and

17 abetting, is what they are actually asking about. I'm

18 not sure --

19         THE COURT: Page forty-three?

20         MR. JARVIS: Starting at forty-two, Your

21 Honor, I'm sorry I may have mispoke.

22         MS. MARSTON: Paragraph ninety-three.

23         MR. JARVIS: Paragraph ninety-three.

24         THE COURT: Yes?

25         MR. JARVIS: Ours is a draft.

1      THE COURT:  Do we have different versions?

2      MS. MARSTON:  Yes, it is this. You are right.

3      MR. JARVIS:  You not got the revised.

4      THE COURT:  I think we should all have the

5  same version.

6      MS. MARSTON:  It is the first paragraph under

7  Count 2, possession of controlled substance, Your

8  Honor.

9      THE COURT:  Okay. Ninety-three, you are

10  instructed that as a matter of law, is that what you

11  are saying?

12      MS. MARSTON:  No, a person may be guilty of

13  an offense because he personally the committed the

14  offense himself.

15      THE COURT:  Well, what paragraph is it?

16      MS. MARSTON:  It is our ninety-three, but you

17  have a revised set of instructions.

18      MR. JARVIS:  That we don't have a copy of,

19  Your Honor, we have the draft.

20      MS. MARSTON:  I can hand up if you want to

21  see the revised set, Your Honor.

22      MS. GRASSO:  Your Honor, if I may interject

23  while the Court is looking at that. We have two

24  subheadings that are, you know, headings that are

25  underlined that say Count 2.

One says Count 2 possession of a controlled substance with intent to distribute and then the other one says Count 2, possession of a controlled substance aiding and abetting.

So, clearly the jury wants to know, they don't need those individual sections reread, they need to know whether or not the conjunction "and" or the conjunction "or" has to be placed between the two of those and the only instruction we have for that, Your Honor, is the superceding indictment.

MS. MARSTON:  The superceding indictment is not an instruction, Your Honor. I mean, I am now looking at it and I do believe it is going to answer their question, Your Honor, because it does specifically say "or."

THE COURT:  Where is that?

(Pause in proceedings.)

MS. MARSTON:  It looks like it is page forty-three in the revised instructions, Your Honor. It looks like it is new paragraph ninety-seven.

MS. GRASSO:  Can you read the first couple lines of it because our numbers are off.

MS. MARSTON:  "The person may be guilty of the offense because he personally committed the offense himself or because he aided or abetted another person

in committing the offense.

"A person who has aided and abetted another person in committing an offense is often called an accomplish. A person whom an accomplish aids and abets is known as the principal."

MS. GRASSO:  Right, but that is a subset of the -- Count 2 basically has two subsets which I think is what they are trying to figure out, whether or not "and" goes between them or "or", and what she just read is underneath one of the subsets of Count 2, so I'm not sure how that is instructed.

THE COURT:  Okay. I think the instruction is correct, we will reread the entire instruction to them on Count 2. I think that answers the question and it will include both so-called "subsets". Okay, will you bring the jury in, please?

(Pause in proceedings.)

MS. GRASSO:  Your Honor, could I just inquire, again, I don't have the revised set in front of me but I'm assuming --

THE COURT:  Well, get the revised one because that is the one that we are talking about.

MS. GRASSO:  I just wanted to be clear on the paragraphs where the Court is going to start and where the Court is going to end.

1          THE COURT:  I'm going to start at eighty-
2     eight.
3          MS. GRASSO:  Eighty-eight?  Count 2 starts at
4     eighty-four.
5          THE COURT:  Eight-four, we will start at --
6          MS. GRASSO:  And would go all the way to
7     paragraph, through and including paragraph ninety-nine?
8          THE COURT:  Yes.
9          MS. GRASSO:  Okay. Very well, Your Honor.
10    Now, we're on the same page. Thank you.
11         THE COURT:  Okay.
12         (Pause in proceedings.)
13         (Jury in, 1:32 p.m.)
14         THE COURT:  Okay. Please be seated. Okay, we
15    have your question and I will just repeat it to be sure
16    that you remember it.
17         "For Count 2, is it aiding and abetting or
18    possession or is it aiding and abetting and possession,
19    i.e. if someone possessed but did not aid and abet or
20    vice versa, do we need to consider both, i.e. if
21    innocent of one, innocent of both, guilty of one,
22    guilty of both?"  The best way to answer that question
23    and to put it in context is to revisit my instructions
24    to you on Count 2 which I'm going to do.
25         Count 2 charges that on or about October

20th, 2009 in Chester in the Eastern District of
Pennsylvania and elsewhere defendants Jonathan Cobb,
David Cobb, and Darren Macklin and others known and
unknown to the grand jury, knowing and intentionally
possessed with the intent to distribute and aided and
abetted the possession with the intent to distribute
five hundred grams or more, that is approximately nine
hundred and ninety-seven grams of a mixture and
substance containing a detectable amount of cocaine, a
schedule two controlled substance.

Section 841 Title 21 of the United States
Code provides in part and I quote, "It shall be
unlawful for any person knowing or intentionally to
possess with the intent to distribute a controlled
substance.

"Count 2 of the superceding indictment
charges the defendants with possessing five hundred
grams or more of a mixture or substance containing a
controlled substance, specifically cocaine with the
intent to distribute the controlled substance which is
a violation of the federal law.

"In order to find Jonathan Cobb, David Cobb,
and Darren Macklin guilty of the offenses charged in
Count 2, you must find that the government proved each
of the following five elements beyond a reasonable

doubt.

"First, Jonathan Cobb, David Cobb, and Darren Macklin possessed a mixture or substance containing a detectable controlled substance. Number two, they possessed a controlled substance knowingly or intentionally.

"Three, they intended to distribute the controlled substance. Fourth, that the controlled substance was cocaine as charged in Count 2.  Five, that the weight of the mixture of substance containing the controlled substance was approximately five hundred grams or more.

"To possess a controlled substance means to have it within a person's control. The government does not have to prove that a defendant physically held the controlled substance, that is had actual possession. As long as a controlled substance within the defendant's control, they possess it.

"If you find that the defendants either had actual possession of the controlled substance or had the power and intention to exercise control over it, even though it was not in their physical possession, that is that the defendants had the ability to take actual possession of the controlled substance when they wanted to do so, you may find that the government has

1  proved possession.  Possession, while it may be

2  momentary or fleeing proof of the ownership of the

3  controlled substance is not required.

4         "The law also recognizes that possession may

5  be sole or joint. If one person alone possesses a

6  controlled substance, that is sole possession. However,

7  more than one person may have the power and intention

8  to exercise control over a controlled substance. This

9  is called joint possession.

10        "If you find that a defendant has such a

11 power and intention, then he possessed a controlled

12 substance even if he possessed it jointly with another.

13 Being in proximity to the controlled substance or mere

14 presence on the property where it is located or mere

15 association with the person who does control the

16 controlled substance or the property is not enough to

17 support a finding of possession.

18        "In order to find Jonathan Cobb, David Cobb,

19 and Darren Macklin guilty of possession of a controlled

20 substance with the intent to distribute as charged in

21 Count 2 of the superceding indictment, you must find

22 that the government proved beyond a reasonable doubt

23 that the defendants intended to distribute a mixture or

24 substance containing a controlled substance.

25        "To find the defendant had the intent, you

118

must find that he had in mind or had planned in some way to deliver or transfer the possession or control of the controlled substance to someone else.

"In determining whether a defendant had the intent to distribute, you may consider all the facts and circumstances shown by the evidence presented including his word and actions.

"In determining a defendant's intent to distribute a controlled substance you may consider among others the quantity and purity of the controlled substance, the manner in which the controlled substance was packaged and the presence or absence of weapons, large amounts of cash, or equipment used in the processing or sale of the controlled substance.

"You are instructed as a matter of law that cocaine in a controlled substance, that is some kind of prohibited drugs.  It is soley up to you, however, to decide whether the government has proved beyond a reasonable doubt that Jonathan Cobb, David Cobb, and Darren Macklin possessed with the intent to distribute a mixture or substance containing cocaine as charged in Count 2.

"To act knowingly as used in the offense charged means that Jonathan Cobb, David Cobb, and Darren Macklin were conscious and aware that they were

1    engaged in the acts charged and knew of the surrounding

2    facts and circumstances that make out the offense.

3           "Knowingly does not require that they knew

4    that the acts charged and surrounding facts actually

5    amounted to a crime. To act intentionally as used in

6    the offense charged means to act deliberately and not

7    by accident.

8           "Intentionally does not require that the

9    defendant intended to violate the law. The phrase

10   knowingly or intentionally as used in the offenses

11   charged require that the government prove beyond a

12   reasonable doubt that the defendants knew that they

13   possessed with the intent to distribute, what they

14   possessed with the intent to distribute was a

15   controlled substance.

16          "In addition, the government must also prove

17   beyond a reasonable doubt that the controlled substance

18   was, in fact, cocaine.  However, as long as you find

19   that the government proved beyond a reasonable doubt

20   that the defendants knew that what they possessed was a

21   controlled substance, you need not find that they knew

22   that the controlled substance was cocaine as charged in

23   Count 2.

24          "In deciding whether the defendants acted

25   knowingly or intentionally, you may consider evidence

about what they said, about what they did or failed to
do, how the acted and all the facts and circumstances
shown by the evidence that may prove what was in their
minds at the time.

"Now, on Count 2, a person may guilty of an
offense because he personally committed the offense
himself or because he aided and abetted another person
in committing the offense.

"A person who has aided and abetted another
in committing the offense is often called an
accomplish. The person whom the complice aids and abets
is also known as the principal.

"In this case the government alleges that
Jonathan Cobb, David Cobb, and Darren Macklin aided and
abetted the possession of a controlled substance with
the intent to distribute as charged in Count 2.

"In order to find each defendant guilty of
these offenses because he or they aided or abetted in
committing these offenses, you must find that the
government proved beyond a reasonable doubt each of the
following four requirements.

"First, that the principal committed the
offense charged by committing each of the elements of
the offenses charged as I have explained to you in
these instructions.

"Second, that the defendants knew that the offense charged was going to be committed or was being committed by the principal.  Three, that the defendants did some act for the purpose of aiding, assisting, soliciting, facilitating or encouraging the principal in committing the offense and with the intent that the principal commit the offense.

"Fourth, that the defendant acted in some way, aid, assist, facilitate, or encourage the principal to commit the offense.  The defendants' acts need not themselves be against the law.  Evidence that a defendant was merely present during the commission of the offense is not enough for you to find them guilty as an aider and abetter.

"In addition, if the evidence shows that the defendant knew that the offense was being committed or was about to be committed but does not also prove beyond a reasonable doubt that it was the defendant's intents and purpose to aid, assist, encourage or facilitate or otherwise associate himself with the offense, you may not find the defendant guilty of the offense as an aider and abetter.

"The government must prove beyond a reasonable doubt that the defendant in some way participated in the offense committed by the principal

1  as something the defendant wished to bring about and to

2  make successful."

3      That completes my instructions on Count 2. So

4  with that in mind, please return to the juryroom and

5  continue your deliberations.

6      (Jury out, 1:43 p.m.)

7      THE COURT:  Okay. We will stand in recess.

8      (Recess, 1:43 p.m. to 2:58 p.m.)

9      THE COURT:  Please be seated.  Okay.  The

10  jury indicated that they have reached a verdict.

11  Please bring the jury in.

12      (Jury in, 3:00 p.m.)

13      THE COURT:  Okay. Please be seated. Would the

14  foreperson, please stand.   Juror number two, has the

15  jury reached a unanimous verdict?

16      JURY FOREMAN:  Yes, they have, Your Honor.

17      THE COURT:  Okay.  Would you hand the verdict

18  sheet to Mr. Vance and please be seated for a moment

19  while I inspect it for regularity.

20      (Pause in proceedings.)

21      THE COURT:  Would you hand up the verdict

22  sheets to the foreperson, would you please stand, sir?

23  Members of the jury, Mr. Vance will ask the questions

24  and the foreperson will speak for you, please pay

25  attention to the verdict because I will then ask you

1  whether you agree with the verdict as read.  So, let's

2  begin.

3       COURTROOM DEPUTY:  In the United States of

4  America versus Jonathan Cobb, Criminal Action Number

5  09-733-01 as to Count 1 of the superceding indictment

6  charging conspiracy to distribute cocaine from

7  beginning in or about August 2009 and continuing

8  through on or about October 20th, 2009, how do you find

9  the defendant, Jonathan Cobb, guilty or not guilty?

10       JURY FOREMAN:  Guilty.

11       COURTROOM DEPUTY:  As to jury interrogatory

12  number one, do you unanimously agree by proof beyond

13  reasonable doubt that the quantity of the mixture or

14  substance containing a detectable amount of cocaine

15  which was involved in the conspiracy was five hundred

16  grams or more?

17       JURY FOREMAN:  Yes.

18       COURTROOM DEPUTY:  As to Count 2 of the

19  superceding indictment, possession of cocaine with

20  intent to distribute on or about October 20th, 2009,

21  how do you find defendant, Jonathan Cobb, guilty or not

22  guilty?

23       JURY FOREMAN:  Guilty.

24       THE COURT:  As to jury interrogatory number

25  two, do you unanimously agree by proof beyond a

1   reasonable doubt that the quantity of the mixture or

2   substance containing a detectable amount of cocaine

3   which was possessed with intent to distribute was five

4   hundred grams or more?

5           JURY FOREMAN:  Yes.

6           COURTROOM DEPUTY:  In the United States of

7   America versus David Cobb, Criminal Action Number

8   09-733-02, as to Count 1 of the superceding indictment

9   charging conspiracy to distribute cocaine from

10  beginning in or about August 2009 and continuing

11  through on or about October 20th, 2009, how do you find

12  defendant, David Cobb, guilty or not guilty?

13          JURY FOREMAN:  Guilty.

14          COURTROOM DEPUTY:  As to jury interrogatory

15  number one, do you unanimously agree by proof beyond a

16  reasonable doubt that the quantity of the mixture or

17  substance containing a detectable amount of cocaine

18  which was involved in the conspiracy was five hundred

19  grams or more?

20          JURY FOREMAN:  Yes.

21          COURTROOM DEPUTY:  As to Count 2 of the

22  superceding indictment, possessing cocaine with intent

23  to distribute on or about October 20th, 2009, how do

24  you find defendant, David Cobb, guilty or not guilty?

25          JURY FOREMAN:  Guilty.

COURTROOM DEPUTY:  As to jury interrogatory number one, do you unanimously agree by proof beyond a reasonable doubt that the quantity of the mixture or substance containing a detectable amount of cocaine was possessed with intent to distribute five hundred grams or more?

JURY FOREMAN:  Yes.

COURTROOM DEPUTY:  In the United States of America versus Darren Macklin, Criminal Action Number 09-733-02, as to Count 1 of the superceding indictment charging conspiracy to distribute cocaine from beginning in or about August 2009 and continuing through on or about October 20th, 2009, how do you find defendant, Darren Macklin, guilty or not guilty?

JURY FOREMAN:  Not guilty.

COURTROOM DEPUTY:  As to Count 2 of the superceding indictment, possessing cocaine with intent to distribute on or about October 20th, 2009, how do you find defendant, Darren Macklin, guilty or not guilty?

JURY FOREMAN:  Not guilty.

THE COURT:  Please hand the verdict sheet to the deputy.  Members of the jury, I am going to now verify anonymity.  I'm going to ask you whether you agree with the verdict that is read, your suggested

1    answer should be yes or no.  juror number one, do you

2    agree with the verdict as read?

3                JUROR 1:  Yes.

4                THE COURT:  Juror number two, do you agree

5    with the verdict as read?

6                JUROR 2:  Yes.

7                THE COURT:  Juror number three, do you agree

8    with the verdict as read?

9                JUROR 3:  Yes.

10               THE COURT:  Juror number four, do you agree

11   with the verdict as read?

12               JUROR 4:  Yes.

13               THE COURT:  Juror number five, do you agree

14   with the verdict as read?

15               JUROR 5:  Yes.

16               THE COURT:  Juror number six, do you agree

17   with the verdict as read?

18               JUROR 6:  Yes.

19               THE COURT:  Juror number seven, do you agree

20   with the verdict as read?

21               JUROR 7:  Yes.

22               THE COURT:  Juror number eight, do you agree

23   with the verdict as read?

24               JUROR 8: Yes.

25               THE COURT:  Juror number nine, do you agree

1    with the verdict as read?

2         JUROR 9: Yes.

3         THE COURT:  Juror number ten, do you agree

4    with the verdict as read?

5         JUROR 10:  Yes.

6         THE COURT:  Juror number eleven, do you agree

7    with the verdict as read?

8         JUROR 11:  Yes.

9         THE COURT:  Juror number twelve, do you agree

10   with the verdict as read?

11        JUROR 12:  Yes.

12        THE COURT:  Polling of the jury having

13   verified anonymity I direct the clerk to file and

14   record the verdict.

15        Members of the jury, we want to thank you

16   again for the hard work that you've done and your

17   cooperation throughout the trial, it has been

18   relatively short but I'm sure it has been a demanding

19   schedule, some of you come a long way.

20        I know you've had to travel to be here, you

21   were here on time, ready to go and accommodated us in

22   every way.  So, we want to thank you for that, hope

23   that you will walk away with an appreciation of the

24   criminal justice system and how it works in the federal

25   court.

1    If you have any questions or any logistics,

2  Mr. Vance will be able to assist you with that. Other

3  than that, your jury service has been completed, we

4  will collect your notes and those will be destroyed.

5    At this time I thank you again and have a

6  good afternoon and a good weekend. Thank you.

7    (Jury out, 3:07 p.m.)

8    THE COURT:  Okay. Please be seated.  First,

9  we will enter an order providing for the filing of

10  post-trial motions and according to the national rules,

11  you will have fourteen days to do that.  If you need

12  additional time, you may request that additional time

13  before the expiration of the fourteen days.

14    Number two, each of the parties in this case

15  are charged with retaining possession of any exhibits

16  that were entered into evidence in the case, as

17  officers of the Court.

18    In the event that those exhibits are needed

19  for post-trial motions and/or appeal. So, each of you

20  is personally charged with preserving and protecting

21  the integrity of the exhibits.

22    Number three, the Court has set September

23  23rd at 9:00 a.m. in courtroom 11A, or in such other

24  courtroom as may be designated on that day for the

25  sentencing of Jonathan Cobb.

129

1        The Court has set September 29th, 2010 at

2   9:00 a.m. in courtroom 11A, or in such other courtroom

3   as may be designated on that day for the sentencing of

4   David Cobb.

5        The Court will order a presentence

6   investigation report be conducted by the probation

7   office and the report be submitted to the Court in

8   accordance with the local rules and the deadlines

9   provided for in the local rules.

10        Anything else?  Is Mr. Macklin subject to a

11   detainer or may he be released at this time?

12        MS. GRASSO:  There is nothing else holding

13   him that I'm aware of.

14        MS. MARSTON:  Actually, I think there is

15   something holding him.  I was told he was a fugitive at

16   the time.

17        THE COURT:  Okay.

18        MS. MARSTON:  So we do believe there is a

19   detainer in place, a state detainer.

20        (Pause in proceedings.)

21        THE COURT:  Just a minute.  This is what we

22   are going to do.  The two of you will meet immediately

23   after trial is dismissed and I'll be in chambers and if

24   the appropriate order needs to be entered I will do so

25   immediately following the proceedings.

130

1       MS. GRASSO:  I appreciate that, Your Honor.

2       MS. MARSTON:  That is fine.

3       THE COURT:  So, at this time, is there

4  anything else? If not the trial is adjourned. Thank

5  you, counsel, defendants are remanded.

6       MS. MARSTON:  Your Honor, are we allowed to

7  talk to the jury if the jury wishes to talk to us?

8       THE COURT:  You may talk to the jury,

9  exactly, and I did not tell them that they are able to

10  do that, but you may communicate with the jury.

11       MS. MARSTON:  Thank you, Your Honor.

12       (Proceedings adjourned, 3:10 p.m.)

13                    *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

131

I N D E X

DEFENDANT D. MACKLIN'S CLOSING ARGUMENT     PAGE NUMBER

  By Ms. Grasso                                          3


GOVERNMENT'S REBUTTAL ARGUMENT              PAGE NUMBER

  By Mr. Leverett                                      42


CHARGE OF THE COURT                         PAGE NUMBER

  By Judge Robreno                                     51


JURY VERDICT                                PAGE NUMBER

  By the Jury                                         122

* * *

1
2
3
4
5
6                    CERTIFICATION
7
8        I, Jeff Nathanson, do hereby certify that the
9   foregoing is a true and correct transcript from the
10  electronic sound recordings of the proceedings in the
11  above-captioned matter.
12
13
14  _____          _____
15  Date                   Jeff Nathanson
16
17
18
19
20
21
22
23
24
25