IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

UNITED STATES OF AMERICA : CRIMINAL NO. 09-733-1
                                    :
                                    :
                                    :
                                    :

        v                            :

JONATHAN COBB,         : Philadelphia, Pennsylvania
                         : November 4, 2015
           Defendant  : 9:15 a.m.

- - -

TRANSCRIPT OF RELIEF HEARING
BEFORE THE HONORABLE EDUARDO C. ROBRENO
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Government:  KAREN S. MARSTON, ESQUIRE
                      Assistant United States Attorney
                      United States Attorney's Office
                      615 Chestnut Street
                      Suite 1250
                      Philadelphia, PA  19106

For the Defendant:  CAROLINE A. CINQUANTO, ESQUIRE
                      1500 Market Street
                      12th Floor
                      East Tower
                      Philadelphia, PA  19102

Transcribers Limited
17 Rickland Drive
Sewell, NJ 08080
856-589-6100 · 856-589-9005

2

1    Audio Operator:          N. Phillippi

2    Transcribed By:          Donna M. Anders

3                              - - -

4         Proceedings recorded by electronic sound
     recording; transcript produced by computer-aided
5    transcription service.

6                              - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          (The following was heard in open court at

2  9:15 a.m.)

3          THE COURT:  Good morning.  Please be seated.

4          ALL:  Good morning, Your Honor.

5          THE COURT:  We are here today to consider the

6  relief to be granted to the defendant, Mr. Cobb, after

7  the Court granted his 2255 petition.  Mr. Cobb was

8  initially sentenced to 288 months of incarceration, and

9  the question is what is the appropriate sentence at

10  this point.

11         So, why don't we start with you, Ms.

12  Cinquanto, what do you think?

13         MS. CINQUANTO:  Well, Your Honor, I believe

14  that we have to have a two-prong approach to this

15  situation.  First I believe that Your Honor must decide

16  whether or not -- the defense position is that Mr. Cobb

17  should be able to plead open in the -- the sentence and

18  the conviction should be vacated, and he should be able

19  to plead open in the same position that he would have

20  been in May of 2010, and that position, Your Honor,

21  would have been prior to the 851 being filed and prior

22  to trial.

23         So, I think the first step here is that Your

24  Honor must decide whether or not the defense argument

25  is valid, and whether or not the 851 should also be

4

1  vacated and also Mr. Cobb should be sentenced on one

2  kilo versus two kilos.

3         After that decision is made, which could be

4  made today, Your Honor, then I believe we should

5  adjourn and we should come back for sentencing in about

6  60 days because then a new PSR can be created, if that

7  is necessary, and also Mr. Cobb can then present his

8  post-sentencing rehabilitation arguments, which he is

9  allowed to present, under Pepper versus United States.

10 So, that is my request today.

11        THE COURT:  I guess in either event, maybe we

12 should do that.  In other words, even if I disagree

13 with you that 851 would not have been filed, maybe we

14 should have an update of the PSI to see whether there

15 has been any post-rehabilitation.

16        But, I don't know if that would require a

17 full sentence or simply to take -- as it was mentioned

18 in Lafler that we could just take into account any

19 other information, but I don't know.  You say he is

20 entitled to a full sentencing hearing?

21        MS. CINQUANTO:  Well, Your Honor, I believe

22 that at the very minimum we are entitled to present the

23 post-rehabilitation information --

24        THE COURT:  Right.

25        MS. CINQUANTO:  -- which in this situation is

1   substantial.

2          THE COURT:  Okay.

3          MS. CINQUANTO:  I was only able to get

4   approximately, you know, ten certificates of programs

5   that Mr. Cobb has either taught or Mr. Cobb has taken.

6   His counselor at the prison has said that she is happy

7   to release his disciplinary record and his other

8   certificates which, I believe, are very, very good.

9          THE COURT:  Well, why weren't you ready with

10  that today?  Today is the hearing.

11         MS. CINQUANTO:  Today is the day of the

12  hearing, Your Honor, however, she would only release

13  that to the government.  And my apologies, Your Honor,

14  I was not made aware of that in enough time for the

15  government to actually jump through those hoops.  That

16  is my responsibility.

17         THE COURT:  Okay.  So, you want to have some

18  more educational certificates that Mr. Cobb has earned,

19  is that it?

20         MS. CINQUANTO:  Yes, Your Honor.  And this

21  just isn't a defendant who I'll give you one or two

22  extra certificates.  This is significant and

23  substantial.

24         THE COURT:  Okay.  And what else?

25         MS. CINQUANTO:  That's it, Your Honor.  So, I

6

1   would like the opportunity to be able to argue because

2   I believe at sentencing -- see, I think at sentencing

3   we're going to have -- if this is not a situation where

4   Your Honor is going to be considering an upward

5   variance like the government has requested, and a

6   significant upward variance at that, perhaps we could

7   go forward on the paperwork.

8          But, I do believe that because the government

9   is going to be asking for an upward variance, I believe

10  they said something of 78 percent of his sentence --

11         THE COURT:  Right.

12         MS. CINQUANTO:  -- then I do think it is

13  important to Mr. Cobb --

14         THE COURT:  Well, I think we're talking about

15  the trees, maybe the forest here first.  What is the

16  Court charged with doing at this hearing?  What would

17  be just and fair?  What is the question that I have to

18  ask myself?

19         MS. CINQUANTO:  I think there is two

20  questions, Your Honor.  The first question is whether

21  or not Mr. Cobb should be sentenced based on a

22  guideline range of one kilo of cocaine that he

23  possessed, or two kilos of cocaine which is the

24  information that came out during the trial, which would

25  never have come out before Your Honor had he pled open

1    back in May of 2010.

2         Second, Your Honor, I believe, and more

3    importantly I believe that we do have to discuss the

4    851 enhancement --

5         THE COURT:  Right.

6         MS. CINQUANTO:  -- because the 851 is a

7    significant enhancement, and I am prepared to argue

8    that today.  The one kilo versus two kilos, my argument

9    will be brief, but I do believe the 851 must be decided

10   today.  Then, once we decide that, we can come up with

11   an appropriate guideline range and then we can go to

12   sentencing.

13        THE COURT:  Okay.  Now, what about 851?  How

14   does 851 work?

15        MS. CINQUANTO:  Okay.  Your Honor, this is

16   what happened in this case and the timing is very, very

17   important.  Mr. Cobb is indicted in November of 2009.

18   He is facing at that point a five-year mandatory

19   minimum.

20        On May 24th, 2010 the government files an

21   851, and what that means is that it went from a

22   five-year mandatory minimum to a ten-year mandatory

23   minimum.  Less than --

24        THE COURT:  Now, I was looking at 851.  How

25   do you get from five to ten?

8

1          MS. CINQUANTO:  I get from five to ten

2     because he has a prior conviction for a drug

3     distribution.

4          THE COURT:  But, is that under -- 851 itself

5     doesn't say anything about it, I guess.  Do you then go

6     to the drug -- 843 or 841?

7          MS. CINQUANTO:  841, Your Honor, and I have

8     that in front of me if Your Honor would like to see

9     that.

10          THE COURT:  Okay.  Give me a citation to

11     that.

12          MS. CINQUANTO:  Yes, Your Honor.  That would

13     be 840 -- bear with me here, sir, 841(b)(1)(B), Your

14     Honor.

15          THE COURT:  Okay.  So, you start with an 851

16     notice and then you go to the statute that governs that

17     crime, in this case it's 841(b),(1)(B), and that takes

18     you from five to ten years.  So, you would give him 120

19     months baseline.

20          MS. CINQUANTO:  That is correct.  And what is

21     very important here is that you have to think about the

22     timing.  As I said, he's indicted in November of 2009.

23     The 851 is dropped on May 24th, 2010 --

24          THE COURT:  Right.

25          MS. CINQUANTO:  -- and then on June 17th,

1    three weeks later this man goes to trial.  So, the

2    timing is important.

3              THE COURT:  Why is that?  What do you make

4    out of the timing, what does that tell you?

5              MS. CINQUANTO:  The timing, Your Honor, and,

6    number one, I am going to argue common sense.  I'm

7    going to argue your experience, I am going to argue my

8    experience, I'm going to argue the U.S. Attorney's

9    experience.

10             My experience is in practicing in Federal

11   Court for almost ten years, is that 851s are not filed

12   unless the defendant opts to go to trial.  And, for

13   example, I'm going to do a change of plea hearing this

14   afternoon and one of the things that the government had

15   talked about is if he decided to go to trial, then an

16   851 would be filed, and that is something that is part

17   of the plea negotiations.

18             Now, in this case, Your Honor, the government

19   claims that it would have filed the 851, it was going

20   to file it as early as the detention hearing.  Your

21   Honor, I just don't believe that's believable.  I take

22   your experience, my experience and the U.S. Attorney's

23   experience --

24             THE COURT:  Yes.  But, the judge, in my

25   experience and, again, this is one of the questions

1   here since we don't have much guidance, and it seems to

2   me that it may not be a good way to looking at it, but

3   in my experience I would look at the plea and would see

4   whether the plea reflected the reality of the crime,

5   and I have rejected a number of pleas that do not

6   reflect the reality of the crime.

7            If 851 was warranted in this case, why

8   wouldn't it have been filed?

9            MS. CINQUANTO:  Your Honor, first of all,

10  Your Honor, with all due respect, Your Honor has no

11  input whether or not an 851 is filed.

12           THE COURT:  Right, but I have an input

13  whether or not I accept a plea.

14           MS. CINQUANTO:  Well, if he pled open, Your

15  Honor, I believe that Your Honor would have no choice

16  but to accept the plea if he had pled open to all of

17  the charges.

18           Your Honor at that point would have the

19  opportunity to give him an upward variance, which is

20  what Your Honor decided to do, and that is within Your

21  Honor's discretion.

22           But, when he comes before you in May of 2010

23  with a five-year mandatory minimum, which is a 60-month

24  mandatory minimum and the guideline range, at that

25  point, Your Honor, if he pleads open to everything, I

11

1   believe that Your Honor at that point, if he gets to

2   the plea colloquy, must accept his plea.

3          At that point, Your Honor, the PSR will be

4   prepared, Your Honor would see what the guidelines are,

5   and Your Honor might say hey, you know what, this is

6   not satisfactory to me, I want to do an upward

7   variance.  That is how that process works.

8          The 851 process is something that is the sole

9   discretion of the U.S. Attorney's Office, and that in

10  my experience has been used as a plea tactic, as a

11  negotiation tactic.  And if you look at the timing

12  here, three weeks before trial, three weeks before

13  trial is when they opt to file the 851.

14         We know from the hearing that we had, that

15  that's when they were going through the negotiations as

16  to whether or not he was going to be pleading, and they

17  were trying to get the cooperation plea agreement and

18  that type of thing was working.

19         Now, Your Honor, the second thing is, besides

20  our common experience in this particular area, we also

21  have to think about the practice of the U.S. Attorney's

22  Office.

23         Since this case has happened, General Holder

24  has announced, and I've got his memorandum right here,

25  that 851s are not to be filed willy-nilly.  They are

12

1  not to be filed in a detention hearing unless there is

2  really a good reason.  They are not even supposed to be

3  used as a plea tactic or a negotiation tactic anymore.

4       General Holder has made it very clear in his

5  memo that that is not to happen.  So, Your Honor, not

6  only do we have our common experience, but we've also

7  got guidance now from General Holder as to whether or

8  not 851s should and could be filed.

9       Finally, Your Honor, and this is something

10 that we have to, you know, think about, there is a

11 thing called the Smarter Sentencing Act, that is before

12 Congress, has not passed, has not passed, but is before

13 Congress right now.  It's a bipartisan effort to reduce

14 the mandatory minimums.

15      So, now we're talking about something that

16 used to be a five-year mando is going to be, hopefully,

17 a two-year mando.  Something that was a ten-year mando

18 is going to be a five-year mando.

19      So, in this particular case, if the Smarter

20 Sentencing Act is in place at the time that he is

21 sentenced, which is unlikely, but I am using this as

22 guidance for the Court as to what the rest of the world

23 thinks is common sense, the sentence he would be

24 looking at for the amount of drugs that he possessed

25 would have been a two-year mando.  Even if the

13

1   government drops the 851, it would only go to a

2   five-year mando.

3          So, Your Honor, everything is pointing

4   towards the fact that this man should not have an 851

5   dropped on him because we've got Congress looking at

6   reducing it from a ten-year down to a five-year, we

7   have got General Holder saying don't drop these 851s

8   willy-nilly, and we've got the timing and the common

9   sense of the Court to show that this is not something

10  that would have been filed had Mr. Cobb not opted to go

11  to trial.

12         So, Your Honor, all things are pointing to --

13  the 851 should have never been filed, and it wouldn't

14  have been filed had he been given the proper advice at

15  the time that he wanted to plead open or could hare

16  pled open back in May of 2010.

17         Just to show Your Honor, if I could, I

18  prepared a little cheat sheet.  May I?

19         THE COURT:  Please.

20         MS. CINQUANTO:  May I approach?

21         (No response heard.)

22         MS. CINQUANTO:  Your Honor, this makes it

23  very clear as to what we're looking at here.  The top

24  chart shows that if you sentence Mr. Cobb, and let's

25  just say you sentence Mr. Cobb on the two kilos of

1  cocaine that the PSR allocated in the guidelines, his

2  guideline range would be 84 to 105 months, okay, and

3  that takes into account the amount of drugs which is

4  28, the guideline level 28, the now applicable of the

5  2014 Fair Sentencing Act, which is a two level

6  reduction which the government does not disagree should

7  be imposed in this case, and also three levels off for

8  a timely plea.

9           So, Mr. Cobb at this point would have been at

10  a level 23, and his guideline range would have been 84

11  to 105 months.  Now, if the government says that the

12  851 should be filed, if we look at the second chart, I

13  say pre-SSA, that's pre-Smarter Sentencing Act, that's

14  the sentencing act I just talked about, then his

15  minimum guideline range would go from 105, Your Honor,

16  to 120 months.  That is a 15-month increase over the

17  guideline limit.

18           So, when the government tries to say oh, the

19  851 doesn't really matter in this case, the 851 very

20  much matters in this case, because if the 851 is not

21  filed, Mr. Cobb is only looking at a guideline range of

22  84 to 105 months, and from there is where Your Honor

23  would do his departure.  So, whether the 851 is filed

24  in this case is very important.

25           If you look at the second line --

1          THE COURT:  Well, the difference is 105 as

2    opposed to 120, right?

3          MS. CINQUANTO:  That's correct, Your Honor --

4          THE COURT:  Okay.

5          MS. CINQUANTO:  -- but that is a significant

6    difference.  Now, if Your Honor takes a look at the

7    second line there where I say post-SSA and, again, I am

8    not trying to insinuate that this actually has been

9    passed, it has not.  It's a resolution that's before

10   Congress, I believe it's a bipartisan effort and I

11   believe because it's bipartisan it will be passed, that

12   he would only be looking at a 60-month mandatory

13   minimum even if they dropped the 851.

14         So, basically what we are looking at here

15   is -- he would be looking at -- once the post-Smarter

16   Sentencing Act, he wouldn't even be looking at 120

17   months, Your Honor, he would only be looking at 60

18   months mandatory minimum.

19         Your Honor, all --

20         THE COURT:  But, the sentencing guideline

21   would still be 105 months, right?

22         MS. CINQUANTO:  That is absolutely correct,

23   Your Honor.

24         THE COURT:  Yes.

25         MS. CINQUANTO:  And Your Honor would have

1    discretion.  Well, what they ask is that -- okay, I am

2    going to disregard that.

3         Yes, Your Honor, and in 105 months, Your

4    Honor, then we would be able to come back before Your

5    Honor at sentencing, and I would be able to argue for a

6    downward variance based upon post-rehabilitation under

7    Pepper, and the government would be able to argue for

8    an upward variance and then Your Honor would have

9    discretion on whatever Your Honor wants to do.

10        THE COURT:  Well, then it would seem to me

11   that what you're suggesting -- and you would have one,

12   two, three various steps, so let me try to collapse

13   them into perhaps two.

14        Number one is what is the baseline?  And the

15   baseline depends upon whether 851 is applicable.  Once

16   that is determined, then we would see whether the 78

17   percent increase from the baseline should be done in

18   this case, whether it's consistent with the sentence.

19   That would be step number one.

20        And then once we get that figure, we will go

21   to step number two, and step number two would be

22   whether or not that figure should be modified upward or

23   downward by the conduct of the defendant since he was

24   sentenced or any other factor that may be -- may be

25   applicable.

1       MS. CINQUANTO:  Well, may I?

2       THE COURT:  Yes.

3       MS. CINQUANTO:  Okay.  I do believe that

4  the first issue before Your Honor is the 851, whether

5  or not Your Honor believes that in May of 2010, would

6  that really have been filed?

7       THE COURT:  Right.

8       MS. CINQUANTO:  Okay.  Now, my argument is

9  we're at 184 to --

10      THE COURT:  No, I heard your arguments.  Yes.

11      MS. CINQUANTO:  Fair enough, sir.

12      THE COURT:  Okay.

13      MS. CINQUANTO:  I didn't --

14      THE COURT:  So that would be step number one.

15  And then number two would be what is the extent of the

16  variance.  If you take the same percentage variance or

17  the number of months, that would give you the tentative

18  sentence in this case to which you then have an

19  opportunity to argue that it should be modified by

20  events that have occurred since he was sentenced.

21      MS. CINQUANTO:  Well, may I, Your Honor?

22      THE COURT:  Yes.

23      MS. CINQUANTO:  I think the --

24      THE COURT:  What's missing there?

25      MS. CINQUANTO:  I think the 78 percent, Your

18

1   Honor, is the -- you are automatically assuming that

2   you would be imposing a 78 percent increase I believe

3   is something that should be reconsidered.

4           THE COURT:  Okay.

5           MS. CINQUANTO:  And let me tell you why.

6   Because, Your Honor, in your wisdom, in your wisdom, in

7   your own brief, your opinion, you said that there's

8   a -- you increased -- it was an upward variance of 78

9   percent based upon a lot of things, one of them being

10  that you had -- this gentleman had gone to trial.

11          THE COURT:  Right.

12          MS. CINQUANTO:  One of them all the

13  information that you heard during trial.  I mean there

14  was -- there was an opinion that you got of this

15  particular gentleman because of all the things that

16  happened post-May 2010, things that you would not have

17  known necessarily or thought about him had he pled

18  guilty back in May of 2010.

19          Now, I know I can't un-ring a bell for you,

20  sir, but I --

21          THE COURT:  So but you think that as a legal

22  principle, all that disappears?

23          MS. CINQUANTO:  No, Your Honor, I don't.  And

24  I'm not -- and I'm not -- if I didn't think that Your

25  Honor could --

19

1          THE COURT:  Well, let's assume we had a

2  motion to suppress and we have learned certain

3  information and he had pled guilty at that point --

4          MS. CINQUANTO:  Sure.

5          THE COURT:  -- would the information that I

6  learned from the motion to suppress would not be

7  relevant at sentencing?

8          MS. CINQUANTO:  No, Your Honor, I believe it

9  would be relevant at sentencing.  And the reason why

10  I've -- but I don't think that automatically Your Honor

11  should say okay, I'm going to go with the 78 percent

12  because I think --

13          THE COURT:  Well, so let me give you this

14  hypothetical.  I think one of the reasons why I granted

15  the variance was that in my view Mr. Cobbs culpability

16  was close to that of his brother or equal to that of

17  his brother, and his brother had been sentenced to 288

18  months.  Now, would it be possible to say that since

19  the baseline is lower now, the variance should be

20  greater?

21          MS. CINQUANTO:  Your Honor, I actually -- I

22  disagree wholeheartedly, respectfully, Your Honor.

23  First of all, Your Honor, you have to think about where

24  you would have been, sir, prior to trial, prior to the

25  ineffective assistance of counsel.

20

1    There wasn't a suppression hearing, you know,

2 in May of 2010.  Where would your mind Set have been,

3 Your Honor?  Your mind set would have been that we have

4 a gentleman coming in pleading open before Your Honor,

5 okay, who's not known as -- you know, you're a pretty

6 conservative sentencer, all right, coming in doing the

7 right thing, coming in before Your Honor.  You would

8 not have heard all of the things that you had heard at

9 trial.

10    Now, I can't help that his brother had a --

11 he was a career offender and his record is what his

12 record is.  We can't -- in every case, sir, common

13 sense, you can't -- you can't -- just because someone

14 is a career offender and someone is not a career

15 offender, these career offender guidelines are

16 hellacious.  You can't bring up every single defendant

17 to equal that person simply because someone is a career

18 offender and someone is not.

19    But, Your Honor, I think it's just really

20 important, and I trust Your Honor and I trust Your

21 Honor's wisdom to be able to put yourself back in May

22 of 2010 and to do the best to put aside --

23    THE COURT:  Is that what I need to do is put

24 myself in 2010 and see what the sentence would have

25 been had he pled open?  Is that the bottom line?

21

1        MS. CINQUANTO:  Absolutely.  Absolutely.

2  Absolutely, because that's where -- Your Honor has

3  found that the 2255 was granted because there was

4  ineffective assistance of counsel based upon the fact

5  that he was not given the correct guideline range.

6        Had he been given the correct guideline

7  range, Mr. Cobb would have pled open, and he would have

8  pled open, you know, way back in the beginning of this

9  case had he gotten the correct advice.

10       And back then he would have a received a sent

11  -- it would have been a five-year mandatory minimum and

12  he would have been looking at approximately, let's just

13  go with the two kilos, sir, 84 to 105 months.

14       THE COURT:  Okay.

15       MS. CINQUANTO:  And at that point, Your Honor

16  would not have all of the slop of everything that

17  happened post that.  And I think that that's a very

18  important place for Your Honor to be.

19       And for Your Honor just to say well, I'm

20  going to raise it up 78 percent just, you know, because

21  that's what I did before, I think Your Honor can -- I

22  think Your Honor, upon reflection, can realize that

23  that's not the reaction or the automatic reaction that

24  maybe Your Honor should have.

25       Maybe Your Honor should think a little bit

1   about where he would have been prior to the trial and

2   prior to everything that Your Honor had heard.  And

3   with a man, frankly, who -- frankly, who would have

4   been pled guilty.

5          At the time of sentencing when you gave him

6   78 percent, Your Honor, you had a man who decided that

7   he was going to go to trial, you had the -- you know,

8   this -- you know, he was somebody who was not taking

9   acceptance for his responsibility -- for what he had

10  done.  You have a man that, you know, you think, for

11  all intents and purposes, is a drug dealer who's not --

12  who's not sorry.  And that would have been a completely

13  different situation had --

14          THE COURT:  Okay.  So we have -- and this is,

15  as far as I know, maybe the first case that has

16  considered this issue.  So it seems to me that there

17  are three steps now.  Number one, what is the baseline,

18  and the baseline depends upon whether 851 would have

19  been filed.

20          MS. CINQUANTO:  Yes, Your Honor.

21          THE COURT:  Once that's established, the

22  second point is what, if any, extent of the variance

23  would have been granted at that time?  And then once

24  you get that figure, then number three is what

25  additional information should bear upon this case, such

23

1     as post-sentence conduct.

2          MS. CINQUANTO:  That is correct, Your Honor.

3          THE COURT:  Okay.  Let me hear from Ms.

4     Marston, please.

5          MS. MARSTON:  Your Honor, I disagree with a

6     couple of points that defense counsel has made.  I

7     don't necessarily disagree with the three points though

8     that Your Honor has just established there.

9          But, I do think that the idea of that you

10    have to go back and put yourself in 2010 and that you

11    can't take into consideration what happened after that

12    time frame, the case law specifically says, "Second, it

13    is not necessary here to decide as a constitutional

14    rule that the judge is required to pre-sent, that is to

15    say disregard, any information concerning the crime

16    that was discovered after the plea offer was made."

17         So, we don't have a plea offer in this case,

18    but to take defense counsel's timing after the May 2010

19    time frame, you certainly don't have to disregard.

20    That's exactly what Lafler versus Cooper was talking

21    about.

22         The time continuum makes it difficult to

23    restore the defendant and the prosecution to the

24    precise positions that they occupied prior to that

25    rejection of a plea offer is what they're talking about

24

1   there.  But the baseline can be consulted in finding a

2   remedy that does not require the prosecution to incur

3   the expense of conducting a new trial.

4          So, I think obviously to the extent that the

5   Court is going to take into account that he, but for

6   this ineffective assistance of counsel, he would have

7   entered an open plea, he would have come in and I

8   suppose be remorseful for his crimes, get the three

9   level reduction, the Court definitely should consider

10  all of that and be put back in that position, but at

11  the same time, the Court does not have to disregard

12  what the Court learned after that point.

13         That brings me to this 851.  My experience is

14  very different than defense counsel's experience.  I

15  can speak from my own cases, and I primarily do drug

16  cases.  I do not use the 851 as a plea negotiation

17  tactic.

18         If at this point the Holder analysis is

19  correct, we must follow that.  If somebody qualifies

20  under the Holder analysis, and I would argue that --

21  and I talked to a supervisor.  We've discussed Mr. Cobb

22  under that, he does qualify under the Holder analysis,

23  we would file the 851.

24         Now, in this particular case, I was not the

25  assistant that had the case from the very beginning,

1    but I have reviewed what occurred, and I know that Mr.

2    Leverett said in open court during the hearing what the

3    mandatory minimums would be for Mr. Cobb, and that took

4    into account filing the 851.

5          Now, Mr. Leverett didn't get around to filing

6    that 851 until May, but if defense counsel is arguing

7    that we would have gotten a telephone call and said Mr.

8    Cobb is ready, he's going to plead open, he doesn't

9    want a plea agreement, Mr. Leverett would have known to

10   file the 851 before that hearing took place.  That's

11   the argument I made in prior paperwork.

12         If the Court needs to hear from Mr. Leverett

13   or from a supervisor in my office, we can certainly do

14   that.  But, this is not a case where the 851 would not

15   have been filed, and it's a case in which from the very

16   beginning, Mr. Cobb was informed of the enhanced

17   penalty that he would be facing when that 851 was

18   filed.

19         Your Honor, obviously this Smart Sentencing

20   Act is something that has not been passed by law.  We

21   don't know once it passes whether it be retroactive or

22   not.  I think that's something that we really can't

23   take into consideration now.

24         If Mr. Cobb gets resentenced, the Smart

25   Sentencing Act takes into effect, and it is

1   retroactive, well, then we're going to have to deal

2   with it at that point in time.

3          But that's really looking into the future,

4   and we can't necessarily determine what Congress is

5   going to do with that Smart Sentencing Act.  So I'm not

6   really going to address that aspect of it.

7          THE COURT:  Now, let's go back here for a

8   moment to Mr. Leverett.  Is this a question of trying

9   to determine what was inside Mr. Leverett's head, or is

10  it some objective, as opposed to subjective, analysis

11  of those circumstances at the time by looking at the

12  policies and the eligibility of the -- of the defendant

13  for 851 treatment, or do we need to try to sort of

14  penetrate his thought process at the time, and would

15  this depend upon the personality and idiosyncracy of

16  each prosecutor?  I mean --

17         MS. MARSTON:  Well, it shouldn't, Your Honor.

18  I can't necessarily say -- obviously, defense counsel

19  has had some very different experiences.

20         THE COURT:  Well, that's what I wonder

21  whether ultimate and fair justice can depend upon

22  idiosyncracies and personalities, as opposed to

23  policies and whether the policies were appropriately

24  applied.

25         Obviously, there's discretion.  There could

1   be -- some fall on one side and some fall on the other,

2   but whether they were done consistent with policy, as

3   opposed -- I don't know the answer.

4          I'm just -- I'm just throwing this out there

5   because, as I said, we don't have much guidance in this

6   area.  At first, I said I would be reluctant to turn it

7   into the idiosyncracies of the judge.

8          In other words, which hopefully, although we

9   all have, you know, tendencies, et cetera, but I don't

10  think it would be sound to say well, we got this judge

11  and, you know, he wouldn't accept this or he would

12  accept that, or we got this prosecutor and, you know,

13  Marston would do it but, you know, Leverett would not

14  do it.  How do we sort this out?

15         MS. MARSTON:  Well, that's what I'm saying,

16  Your Honor.  The policy of the office, especially at

17  that time, was to file 851s.  If somebody ---

18         THE COURT:  Now, how do we know that?  Where

19  is that?  Is that in -- is that -- what, written out

20  somewhere or is that --

21         MS. MARSTON:  I don't --

22         THE COURT:  Custom and practice, is that it?

23         MS. MARSTON:  Yes, it's the custom and

24  practice of our office.  And at that point in time, it

25  was before the Holder memo came out, so we weren't

1   necessarily doing the analysis now that we have to do

2   we -- the guidance of the Holder --

3            THE COURT:  So in a sense, the Holder memo --

4            MS. MARSTON:  Gives a different --

5            THE COURT:  -- changed --

6            MS. MARSTON:  -- set of guidance.

7            THE COURT:  There would be no need for the

8   Holder memo if that was already in place.  So,

9   obviously, it changed something that was going on

10  before, at least in this office.

11           MS. MARSTON:  Well, in all offices.

12           THE COURT:  Yes.

13           MS. MARSTON:  The Holder memo put it -- I

14  mean there's still an analysis that goes into place for

15  an 851.  It goes up to a supervisor, it gets approved.

16  So, now, the Holder analysis is a more detailed

17  analysis that has to go through, given the whole Holder

18  memo.

19           So what I'm trying to say here is at the time

20  that Mr. Leverett had this case, he had made the

21  determination that the 851 was going to be filed and he

22  made that determination from the front end.

23           We know that because we can see the

24  transcript from the detention hearing, or his

25  arraignment.  I can't honestly remember exactly which

1  hearing it is, but it's an early hearing in magistrate

2  court where he stated the mandatory minimums that this

3  defendant was going to be facing, and he stated them in

4  terms of the filing of the 851.

5      So that's the government's position, that

6  that 851 was intended to be filed from the very

7  beginning of his case.

8      THE COURT:  Okay.  Now, what about the upward

9  variance?  Let's assume they we get a baseline, whether

10  it is 851 or it's the guideline range, how do we

11  determine what, if any, upward variance should be

12  warranted in this case?

13      MS. MARSTON:  Well, I think the Judge -- Your

14  Honor is going to have to take a position that what I

15  just quoted from the case law here, obviously we don't

16  disregard everything we learned after the fact.

17      The fact of the matter is at any sentencing

18  hearing, everybody, at the time of Mr. Cobb's trial and

19  even until the presentence report came out, was under

20  the impression that he also, like his brother, was

21  going to be a career offender.

22      Whether or not he had pled open or whether or

23  not he had gone to trial and then was going to have a

24  sentencing date, that would have been a matter that the

25  government would have addressed with the Court.

30

1    The argument that the government says is that

2    the government would have filed -- would have made a

3    motion to the Court.  We expected him to be a career

4    offender.  We have learned that he is not going to be a

5    career offender and this is why, but the Court should

6    take into consideration exactly what the government did

7    present at his sentencing hearing.  That would have

8    happened whether or not he went to trial or whether it

9    was an open plea.

10           THE COURT:  It would have been relevant

11   conduct, is that it?

12           MS. MARSTON:  It would have been relevant.

13   Oh, definitely, Your Honor.  Now, I also want to point

14   out that part of the Court's reasoning for the upward

15   variance, granting the upward variance and then doing

16   the 78 percent that the Court did was because the Court

17   determined that Jonathan Cobb was more culpable than

18   his brother, David Cobb.  So taking away the --

19           THE COURT:  Well, now, counsel says that had

20   he pled guilty, that might not have been -- come out,

21   but what you're saying is it would have come out at the

22   sentencing hearing?

23           MS. MARSTON:  Oh, definitely it would come

24   out at his sentencing hearing because obviously the

25   government is going to present the facts related to

31

1   this particular case, and when you have co-defendants

2   the government is definitely going to address to the

3   Court who is more culpable, who is less culpable, who

4   did what.  So that definitely would be presented.

5          That's also my argument, we haven't focused

6   too much on this, between the one kilogram and the two

7   kilogram, but that evidence would have also been

8   presented.

9          It's not like the government is going to

10   forget about a kilogram of cocaine just because

11   somebody enters an open plea.  That's relevant conduct

12   that we must present to the Court for the Court's

13   consideration.  So, I have no problem with this three

14   step method.  The baseline --

15          THE COURT:  Now, is this going to be a full

16   sentencing or just simply --

17          MS. MARSTON:  I don't --

18          THE COURT:  -- grant the motion or deny the

19   motion?  What do I -- do I grant the motion to reduce

20   the sentence, is that going to take care of it or do I

21   have to have a full sentencing?

22          MS. MARSTON:  I don't believe you have to

23   have a full sentencing, but obviously I don't oppose

24   defense counsel presenting you, and I will make -- I

25   just learned this morning that she wants me to make a

32

1   telephone call to --

2          THE COURT:  Right.

3          MS. MARSTON:  -- counselor, which I am happy

4   to do.  If I'm provided the information, I'll do it

5   today.  But, obviously, the government doesn't

6   oppose the Court taking into consideration any

7   post-rehabilitation.  I don't think this has to be a

8   full sentencing hearing but, you know, I leave that up

9   to the Court's discretion.

10         THE COURT:  I think I had one case where the

11  sentence was reduced, and I think we did it right from

12  the sentence.  Before the _Lafler_ case came out, and

13  perhaps to the surprise of many of us, actually, the

14  Third Circuit had a case, and the name escapes me, but

15  Judge Fisher had authored a case which pretty much

16  required what _Lafler_ does today.

17             And pursuant to that, we had a -- we had a

18  hearing, the sentence was reduced, but I don't believe

19  we had a full sentencing, which doesn't mean that might

20  have been correct.  What's your view of that?  Do you

21  want a full sentencing from beginning to end or do we

22  just focus on the issues that we have raised here

23  today?

24         MS. CINQUANTO:  Your Honor, may I -- may I

25  just --

33

1          THE COURT:  Yes.

2          MS. CINQUANTO:  -- respond to a couple of

3    things --

4          THE COURT:  Right.

5          MS. CINQUANTO:  -- before I answer that

6    question?  Okay, because there's a couple of

7    inaccuracies here.

8          Number one, okay, absolutely, the government

9    is asking you to presume what Neuman Leverett would

10   have done.  And they're pointing to a detention hearing

11   where they said oh, you know, the 851 could be filed

12   because -- they actually don't mention the 851 in the

13   detention hearing.  They only mention the mandatory

14   minimums.

15         At a detention hearing, of which I have done

16   many --

17         THE COURT:  But wasn't that the same -- isn't

18   that the same thing?

19         MS. CINQUANTO:  Well --

20         THE COURT:  In other words, the mandatory

21   minimum could only have gone up if 851 was filed?

22         MS. CINQUANTO:  Yes, Your Honor.  However, in

23   the detention hearing, they also said he's a career

24   offender.

25         THE COURT:  Okay.

34

1        MS. CINQUANTO:  Okay.  So Neuman Leverett, at

2   the time of the detention hearing, thought this man was

3   a career offender, and the representations he made to

4   the detention hearing was inaccurate, and what he put

5   in that motion may have been inaccurate based upon his

6   misbelief or his misunderstanding he was a career

7   offender.

8        So yes, of course, they're asking you to get

9   into Neuman Leverett's head and decide whether or not

10  the mane would have filed an 851 --

11       THE COURT:  We should or we shouldn't?

12       MS. CINQUANTO:  Excuse me?

13       THE COURT:  We should or shouldn't?

14       MS. CINQUANTO:  We should not --

15       THE COURT:  Okay.

16       MS. CINQUANTO:  -- but they're asking you to.

17  But now what do you have to do, Your Honor?  You have

18  to do what every good lawyer does in a situation like

19  this.  Look at the circumstantial evidence, okay, the

20  circumstantial evidence about whether this man would

21  have filed an 851.

22       We talk about Attorney General Holder's memo,

23  and it's my mistake because I should have put this on

24  my timeline.  Attorney General Holder's memo came out

25  on May 19th, 2010.  The 851 was filed on May 24th,

35

1   2010.

2          So Attorney General Holder's memo was in

3   place at the time Neuman Leverett filed that 851.  So

4   Neuman Leverett filed that 851 because this man had

5   opted to go to trial and it was part of a negotiation

6   tactic, and that's what happened.

7          The U.S. Attorney's Office was under clear

8   direction at the time that Neuman Leverett filed that

9   on May 24th, 2010, that these 851s should not be

10  filed without an individualized analysis of every

11  defendant.

12         The government said in their own brief, and

13  even here in its argument today, that it is a matter of

14  course that they file an 851.  They violated their own

15  Department of Justice regulations.  And if that's

16  really what was happening with the U.S. Attorney's

17  Office and they are really going on record under oath

18  and say -- not under oath, but as an officer of the

19  court in saying these things, we have a lot bigger

20  problem than just Mr. Cobb, because what they're saying

21  on the record is that, as a matter of course, on May

22  24th, 2010, they are filing 851s when they were under

23  clear direction on May 19th that they can't do that.

24         So we have a lot more problems, Your Honor,

25  than Mr. Cobb.  I'm not finished yet, okay?  That's the

36

1   first thing.  So, circumstantially, Your Honor, I'm

2   asking you -- I'm asking you --

3          THE COURT:  Ms. Marston.

4          MS. CINQUANTO:  I'm asking you to look at the

5   circumstantial evidence.  We have an attorney general

6   file that says you cannot do this on May 19th, we have

7   filed on May 24th when this man at that point has opted

8   to go to trial.  That's why the 851 was filed.

9          The detention hearing, we can't even rely on

10  that as circumstantial evidence because Neuman Leverett

11  was wrong at the detention hearing about him being a

12  career offender.  So if he was wrong about that, he was

13  wrong about the mandatory minimums.  Who knows?  But

14  the point is, Your Honor, is that we're -- I'm just

15  asking for what's fair.  And I know in my experience

16  that 851s are not filed --

17         THE COURT:  Okay, fine, you said that before.

18         MS. CINQUANTO:  All right.

19         THE COURT:  Maybe we --

20         MS. CINQUANTO:  The second --

21         THE COURT:  Maybe we --

22         MS. CINQUANTO:  May I?

23         THE COURT:  -- ought to have him come in and

24  testify, and then depending upon how that turns out, I

25  will decide whether or not that subjective analysis was

37

1   proper.

2           But maybe that should be on the record for

3   review purposes to have Mr. Leverett come in and

4   testify as to what the sequence of events and be

5   cross-examined at that point.  What do you think?  You

6   said you had no problem with that.

7           MS. MARSTON:  Well, let me just respond.

8           THE COURT:  Is he still in the office?

9           MS. MARSTON:  He's not still in the office.

10          THE COURT:  Where is he?

11          MS. MARSTON:  Private practice in New Jersey

12  I believe.

13          THE COURT:  Okay.

14          MS. CINQUANTO:  I'm sure they can subpoena

15  him.

16          THE COURT:  What, I'm sorry?

17          MS. CINQUANTO:  I'm sure they can subpoena

18  him, Your Honor.

19          MS. MARSTON:  He can certainly --

20          THE COURT:  Oh, I'm sure he'll --

21          MS. MARSTON:  -- be here if he is needed to

22  be here.

23          THE COURT:  Yes, I'm sure he'll show up.

24  Yes.

25          MS. MARSTON:  I really do take offense though

1  that -- what I am saying, a matter of course, means you

2  take into account whatever policy is in place at that

3  time.

4          THE COURT:  Now, do you -- you may not know

5  the answer to this question, but do you know, first of

6  all, the timeline that counsel has now laid out?  Do

7  you know whether Mr. Leverett went through or the

8  office went through the Holder memo analysis?

9          MS. MARSTON:  I will have --

10          THE COURT:  Yes.

11          MS. MARSTON:  -- to check with a supervisor,

12  but my knowing Mr. --

13          THE COURT:  Who is the supervisor?  Who was

14  the --

15          MS. MARSTON:  I believe it would have been

16  Faith Taylor --

17          THE COURT:  At the time?

18          MS. MARSTON:  -- at the time of this

19  particular case.

20          THE COURT:  Okay.

21          MS. MARSTON:  It's either Tom Perricone or

22  it's Faith Taylor, and I will check on that.  But I

23  know -- I mean knowing Mr. Leverett and that memo

24  coming down, and as soon as that memo came down, it was

25  sent to us.  And if you're filing an 851 within days of

39

1   that memo --

2           THE COURT:  Okay, well, we'll see.

3           MS. MARSTON:  -- you would go through that

4   policy.

5           THE COURT:  Okay.  Well --

6           MS. MARSTON:  And so I just want it to be on

7   the record though because I feel like I'm getting

8   accused here of --

9           THE COURT:  Yes.

10          MS. MARSTON:  -- doing some things that --

11  when I say as a matter of course I mean whatever policy

12  is in effect at that time.  If somebody fits under that

13  analysis, the 851 is filed.  Just like today, we go

14  through the Holder analysis, if the Holder analysis

15  says an 851 gets filed --

16          THE COURT:  Is this done in writing or is it

17  done orally with a supervisor?

18          MS. MARSTON:  It can be done either way

19  depending on --

20          THE COURT:  Okay.

21          MS. MARSTON:  I mean if you're sitting down

22  talking to a supervisor, you go through the analysis

23  and you get their approval.  I mean it just depends on

24  the case and the situation.

25          THE COURT:  And what is the timing for

1   deciding whether or not to file an 851?  Is there some

2   office procedure that we should be -- file out front or

3   later or it depends or how does that work?

4          MS. MARSTON:  Your Honor, that does depend a

5   little bit on the A.U.S.A.  I personally tend to file

6   them on the front end of the case and I do my analysis

7   on the front end of the case with the supervisors.

8          But I do know, and I know that in my previous

9   motions that I filed with you, there was a

10  circumstance, and I think I quoted to that case that

11  actually Tom Perricone was on the stand in a case with

12  a former A.U.S.A Kenya Mann where she hadn't filed the

13  851 until right before trial.

14         And it was a similar circumstance where Mr.

15  Perricone took the stand to say that it would have been

16  filed.  This wasn't something -- and I forget all of

17  the circumstances of that particular case, but I do

18  know that it was something that he had to testify that

19  as a supervisor, that was something that was going to

20  be filed.

21         THE COURT:  Okay.

22         MS. CINQUANTO:  Your Honor, what I would

23  request, Your Honor, if Your Honor is going to have a

24  hearing with Mr. Leverett, I would request the file.  I

25  would request all written procedures, memorandum, and

41

1    any type of advice that is given to the U.S. Attorneys

2    regarding filing an 851, all written procedures and any

3    type of memos or e-mails that are sent regarding that.

4              I would like all correspondence from Mr.

5    Leverett to his supervisor regarding this particular

6    case.  I would also like Mr. Leverett's supervisor

7    present to discuss what type of conversations that they

8    had.  So we're not going to sit --

9              MS. MARSTON:  That's work product.

10             THE COURT:  Okay.  Hold on a minute.

11             MS. CINQUANTO:  It is not work product --

12             THE COURT:  Hold it.

13             MS. CINQUANTO:  -- because at this point,

14   Your Honor, at this point, Your Honor, they are opening

15   the door to say well, Mr. Leverett is going to come in

16   and take the stand.

17             I'm entitled to any type of paperwork or

18   anything having to have to do with his decision if he

19   testifies that he would have filed the 851.  And I

20   would like that information because it is --

21             THE COURT:  Well, why don't you --

22             MS. CINQUANTO:  -- important.

23             THE COURT:  Why don't you make a request?

24             MS. CINQUANTO:  I will, Your Honor.

25             THE COURT:  And then we'll see what the

42

1    government's response is and we will do that.  I think

2    what we're going to do is the following.  We'll adjourn

3    and we'll set an evidentiary hearing in this case, at

4    which point Mr. Leverett will be requested, and he -- I

5    don't believe you need to subpoena him, but it may be

6    necessary.  He may want to be subpoenaed for all we

7    know.

8             So, Ms. Marston, why don't you make contact

9    with him and advise counsel whether Mr. Leverett is

10   going to appear voluntarily or whether he needs to be

11   subpoenaed?  As I said, I think that he may want to be

12   subpoenaed just simply because he's in private practice

13   and I don't know.  If I were him --

14            MS. MARSTON:  I will find out.

15            THE COURT:  -- I would probably want to have

16   that.  So we will do that and then there will be a --

17   the defendants may serve a request for production of

18   documents, and the government will then respond to it

19   appropriately, and if there is an issue, then we'll try

20   to sort that out.

21            Now, in order for all of that to take place,

22   why don't we allow them 60 days to do that?  But let's

23   have -- 30 days from now, we'll have a telephone

24   conference with counsel to see where we are, to see

25   whether we got Mr. Leverett.

43

1          Number two, whether we got any issues with

2    the documents.  We can do that on the telephone

3    initially, okay?  And then the hearing is continued for

4    60 -- approximately 60 days from today.  Okay.

5    Anything else, Ms. Marston?

6          MS. MARSTON:  No, Your Honor.

7          THE COURT:  Ms. Cinquanto?

8          MS. MARSTON:  Thank you.

9          MS. CINQUANTO:  No, Your Honor.  Thank you,

10   very much.

11         THE COURT:  Okay.  Very well.  Thank you.

12   Hearing is adjourned.

13         MS. CINQUANTO:  Your Honor, is -- I'm so

14   sorry, sir.  Should Mr. Cobb remain locally during this

15   time period?

16         THE COURT:  Well, that's up to the marshals,

17   but it would probably be a good idea since he's going

18   to be needed here.  Where is he normally?

19         THE MARSHAL:  He's in Fort -- he's at Fort

20   Dix.

21         THE COURT:  Okay.  Well --

22         THE MARSHAL:  We have a writ out for him now,

23   but the writ will say that he is to go back after this

24   hearing.  So I can just do an order just to have him

25   remain here.

1        THE COURT:  Yes, why don't we keep him here

2   so he'll be available?  Okay.  So we will do an order

3   today.

4        MS. CINQUANTO:  All right, thank you, Your

5   Honor.

6        THE DEFENDANT:  Thank you.

7        THE MARSHAL:  All right.

8        (Proceedings adjourned, 9:59 a.m.)

9                       * * *

1
2
3
4
5
6                        <u>CERTIFICATION</u>
7
8        I, Donna Anders, do hereby certify that the
9   foregoing is a true and correct transcript from the
10  electronic sound recordings of the proceedings in the
11  above-captioned matter.
12
13
14  _____          _____
15  Date                       Donna Anders
16
17
18
19
20
21
22
23
24
25